**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**FILED**

MAY 2 0 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

PEDRO SOLIS SOSA,　　　　　§
TDCJ No. 000778,　　　　　　§
　　　　　　　　　　　　　　§
　　　　　Petitioner,　　　§
　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　§　　CIVIL NO. SA-00-CA-312-XR
　　　　　　　　　　　　　　§
DOUGLAS DRETKE, Director,　§
Texas Department of Criminal §
Justice, Correctional　　　§
Institutions Division,　　§
　　　　　　　　　　　　　　§
　　　　　Respondent.　　　§

**MEMORANDUM OPINION AND ORDER DENYING RELIEF**

Petitioner Pedro Solis Sosa filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 seeking review of his November, 1984 Atascosa County conviction for capital murder and his sentence of death. For the reasons set forth below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability.

**I. Synopsis**

As grounds for relief, petitioner argues in his federal habeas corpus amended petition that (1) his highly inculpatory written statement given to law enforcement officers within hours of petitioner's arrest was involuntary; (2) the prosecution violated its duty under the Supreme Court's holding in **Brady v. Maryland** by withholding evidence in the form of FBI investigative reports and information on other suspects, the absence of petitioner's fingerprints from the crime scenes, the results of petitioner's polygraph examination, and the fact that certain witnesses had been hypnotized during the criminal investigation; (3) the state trial

court erred in denying petitioner's trial counsel's requests for the written statements of three prosecution witnesses, the arrest records of all prosecution witnesses, information revealing the identity of the confidential informant who tipped off the police that petitioner and his 17-year-old nephew, Leroy Sosa, had committed the offense, and copies of all photo arrays shown by law enforcement agents during the investigation of the offense; (4) petitioner's prolonged stay on death row violates the Eighth Amendment and the International Convention on Civil and Political Rights; (5) the State of Texas retaliatory scheduling of petitioner's execution following petitioner's appeal from this Court's dismissal without prejudice of petitioner's prior federal habeas corpus petition violated the Eighth Amendment; (6) the state trial court erred in denying petitioner's repeated requests for appointment of a co-counsel to assist petitioner's trial counsel; (7) the prosecution violated its duty under **Brady** by failing to disclose impeachment evidence regarding prosecution witness Leroy Sosa; (8) petitioner's equal protection rights and right to indictment by a grand jury representing a fair-cross-section of Wilson County were violated by virtue of the under-representation of Hispanic females on the grand jury that indicted petitioner; (9) petitioner's equal protection rights and right to trial before a jury drawn from a fair-cross-section of Atascosa County were violated by virtue of the under-representation of Hispanic females on petitioner's jury venire; and (10) the cumulative impact of the

2

foregoing violations of petitioner's rights warrants federal habeas corpus relief.[1]

## II. **Statement of the Case**

A.   Background

1.   The Offense and its Aftermath

There is no doubt whatsoever as to the facts relevant to petitioner's offense of capital murder.   Both petitioner, a 31-year-old United States citizen, and his 17-year-old accomplice, Leroy Vargas Sosa, gave written confessions within hours of their respective arrests.   Both confessions corroborated the key elements of each other's versions of the fatal shooting of Wilson County Deputy Sheriff Ollie "Sammy" Childress on November 4, 1983.[2]

---

[1] See Petitioner's Amended Petition for Writ of Habeas Corpus, filed May 12, 2000, docket entry no. 9 (henceforth "Petitioner's Amended Petition").   Petitioner's operative pleading herein, i.e., his amended petition, is a 325-page document which incorporates by reference the seven volumes of exhibits which accompanied petitioner's Original Petition.

[2] Petitioner's confession, which was executed February 5, 1984 and admitted into evidence at petitioner's trial as State's Exhibit 52 ("S-X-52").   A copy of same is found in the volume of records from petitioner's trial marked "Trial Exhibits."   Another copy of petitioner's written statement or confession also appears behind tab number 29 in Volume Four of petitioner's Exhibits to his Original Habeas Corpus Petition, filed April 21, 2000, docket entry no. 8 (henceforth "Petitioner's Exhibits").   In pertinent part, petitioner's three-page written confession states that (1) on November 4, 1983, petitioner and Leroy Sosa drove from San Antonio to LaVernia in a yellow Thunderbird with a dark brown vinyl top and sunroof, where they encountered a Deputy Sheriff, (2) Leroy flashed their car's headlights to stop the Deputy's vehicle so they could ask directions, (3) petitioner became angry when the Deputy responded rudely, (4) petitioner pulled a gun and ordered the Deputy to move over and allow petitioner to drive the Deputy's vehicle, (5) petitioner told Leroy to follow and then drove the Deputy's vehicle a short distance, where petitioner disarmed the Deputy and forced the Deputy at gunpoint to relinquish control of

the Deputy's vehicle, give petitioner the Deputy's shirt, submit to being handcuffed, and climb into the trunk of the Deputy's vehicle, (6) petitioner and Leroy drove into LaVernia in the Deputy's vehicle and proceeded to rob the bank at gun point, (7) during the robbery, petitioner wore the deputy's shirt and a red ski mask while Leroy wore a Halloween mask, (8) inside the bank, Leroy handed a bank teller a bag and directed her to fill it with money while petitioner directed other persons into a room and began "playing hide-and-seek" with them, (9) after the robbery, they drove back to the location where they had left their Thunderbird and petitioner opened the trunk of the Deputy's vehicle, pointed the gun in the direction of the Deputy, and heard a loud noise, and (10) petitioner and Leroy drove back to San Antonio in the Thunderbird.

Leroy Vargas Sosa's written statement of confession was not admitted into evidence until the evidentiary hearing during petitioner's first state habeas corpus proceeding, where it was marked as "Defendant's Exhibit 31." In pertinent part, Leroy Sosa's written statement, executed December 19, 1983, states that (1) on the date of the robbery, petitioner was driving a yellow Thunderbird which belonged to Leroy's father, (2) petitioner drove them to LaVernia for the purpose of robbing a bank, (3) petitioner brought along two masks, two handguns, and two grocery bags to assist in that purpose, (4) at one point, as they drove toward LaVernia, Leroy waved at a pickup truck that was following them, (5) petitioner suggested that they use the deputy's vehicle to commit their robbery, (6) when Leroy drove their Thunderbird up next to the Deputy's vehicle, petitioner, who was wearing a ski mask, pulled a gun on the Deputy, and commandeered the Deputy's vehicle, (7) petitioner directed the Deputy to remove his shirt,, handcuffed the Deputy, and forced the Deputy into the trunk of the Deputy's vehicle, (8) after they stashed their Thunderbird, they drove to LaVernia in the Deputy's vehicle and entered the bank, (9) Leroy wore a green monster mask while petitioner wore the Deputy's shirt and hat and a red and blue ski mask, (10) Leroy went to a female Anglo teller and directed her to fill the two bags with money, (11) the teller filled only one of the bags and the other remained inside the bank after the robbery, (12) petitioner told everyone else to get down on the floor and disarmed a reserve deputy who entered the bank during the robbery, (13) petitioner threatened to shoot the Deputy unless they were given fifteen minutes to escape, (14) as they drove away from the bank, Leroy could hear the Deputy in the trunk pleading for his life, (15) when they arrived at the location where they had left their Thunderbird, petitioner opened the trunk of the Deputy's vehicle and shot the deputy once, (16) after driving only a short distance, they returned to the Deputy's vehicle to wipe off the trunk of that vehicle and petitioner shot the deputy a second time because the Deputy was still alive, and (17) they then drove back to San

Subsequently, Leroy Sosa testified at petitioner's capital murder trial in a manner wholly consistent with both his and petitioner's written confessions.[3]   Petitioner has never testified in any judicial proceeding or offered any other evidence to any court

---

Antonio in their Thunderbird.

[3]   Leroy Sosa testified at the guilt-innocence phase of petitioner's capital murder trial that (1) as they drove to LaVernia for the purpose of robbing the bank there, petitioner suggested that they commit the robbery in the Deputy's vehicle they passed on the road, (2) Leroy blinked the lights of their Thunderbird and the Deputy pulled over, (3) petitioner pointed his gun at the Deputy and told him they needed his car, (4) petitioner drove the Deputy's car to a dirt road, where he directed the Deputy to remove his shirt, (5) as petitioner was putting on the Deputy's shirt, petitioner's ski mask came up off his face, (6) Leroy and petitioner removed a tool box from the trunk of the Deputy's car and put the Deputy in the trunk, (7) after they stashed their Thunderbird, they drove to LaVernia, where they knocked on a policeman's door but no one answered, (8) they drove back to their Thunderbird to retrieve their two grocery bags, then returned to LaVernia and the bank, (9) Leroy wore a monster mask, flannel shirt, and jeans while petitioner wore the Deputy's shirt, slacks, and a ski mask, (10) Leroy gave a teller the two bags and told her to fill them with money, (11) petitioner guarded the bank's door and got the rest of the people inside the bank into a little room, (12) both Leroy and petitioner were armed during the robbery, (13) Leroy drove them away from the bank to the location where they had parked their Thunderbird, (14) petitioner said he was going to have to shoot the Deputy because he had seen petitioner's face, (15) Leroy tried to talk petitioner out of it but failed, (16) while Leroy wiped down the interior of the Deputy's vehicle and moved the money and their guns into the Thunderbird, Leroy heard the Deputy say something and then heard petitioner shoot the Deputy, (17) they drove a short distance before petitioner directed Leroy to return to the Deputy's vehicle so they could wipe off the trunk of that vehicle, (18) Leroy saw petitioner wipe off the trunk of the Deputy's vehicle and heard another shot, (19) petitioner explained that he shot the deputy a second time because he was still moving, and (20) they drove back to San Antonio, where petitioner gave Leroy two thousand dollars in cash and told Leroy not to say anything." See Statement of Facts from petitioner's trial (Henceforth "S.F. Trial"), Volume 9, testimony of Leroy Sosa, at pp. 3295-3351.

5

suggesting that anyone other than he was the person who fired the fatal shots into Deputy Childress.

To summarize the relevant facts, as set forth in the trial testimony of Leroy Sosa and other witnesses, sometime during the morning of November 3, 1983, petitioner and his nephew flashed the lights of their vehicle to flag down Deputy Childress' vehicle on a rural road in Wilson County, Texas.[4]   Petitioner pointed a handgun at Deputy Childress and directed him to move over to the passenger seat of his patrol vehicle.[5]  Petitioner got into Deputy Childress' vehicle and drove to a dirt road where, at gun point, petitioner directed Deputy Childress to exit his vehicle, remove his shirt, place himself in his own handcuffs, and climb into the trunk of his patrol car.[6]  Petitioner and Leroy Sosa then drove Deputy Childress' vehicle to the LaVernia State Bank where they robbed bank employees and customers at gun point, terrorized both bank employees and customers, repeatedly threatened to shoot the Deputy, and unsuccessfully attempted to take two women as additional hostages.[7]  After robbing the bank, petitioner and his

---

[4] See S.F. Trial, Volume 9, testimony of Leroy Sosa, at pp. 3302-04 and 3323-25.

[5] See S.F. Trial, Volume 9, testimony of Leroy Sosa, at pp. 3304-06.

[6] Id., at pp. 3306-08.

[7] Id., at pp. 3309-12, 3330-31, and 3333.  In addition to Leroy Sosa, a plethora of bank employees and customers testified at petitioner's trial in great detail regarding the events that transpired inside the State Bank in LaVernia during the robbery. For instance, the bank's executive vice-president, Steve Keeland, testified that (1) on the day in question, he saw two men pull on

masks as they entered the bank, (2) the men started waving guns and called Keeland over to the teller stations, (3) one robber, who was approximately 5'5" to 5'10" in height and 180 pounds, wore a Deputy's shirt and a ski mask while the other robber, who was larger, appearing to be approximately 5'10" in heights and 250 pounds, wore a Halloween mask, (4) the ski-masked robber directed Keeland to come to the front of the bank and hold up his hands, (5) the other robber walked to a teller window, handed teller Pat Wildenstein a brown sack, and directed her to put the money in the bag, (6) when she was slow, this robber, told her to hurry up, Keeland was two-to-three feet from the ski-marked robber, whose gun was cocked throughout the robbery and pointed at Keeland, (7) the ski-masked robber observed Glen McCoy talking on a telephone and told him to freeze, (8) while the heavier of the two robbers went down the teller windows collecting money, the ski-masked robber told Lucille Burns to hang up her phone, ordered Wanda Van Minden out of her office, and directed all of them to get down on the floor, (9) the ski-masked robber made several statements to the effect that he had the Sheriff in the trunk and would kill him if the police chased them, (10) LaVernia Mayor Charles Malloy entered the bank during the robbery and the ski-masked robber argued with him over a pistol and radio, (11) Keeland heard the door of the bank open and when he and others started to move around, the ski-marked robber returned to taunt them, saying "see I haven't gone. I was just testing you.  Y'all make sure you stay down twenty minutes.", and (12) the heavier of the two robbers appeared to be more nervous than the ski-masked robber, who did most of the talking and appeared to be in control. See S.F. Trial, Volume 8, testimony of Steve Keeland, at pp. 2858-95.

Charles Malloy testified that (1) as he entered the bank, an armed man wearing a Deputy's shirt over a flannel shirt and a ski-mask took Malloy's pistol and radio, (2) the robber in the ski mask directed Malloy to enter Wanda Von Minden's office and to lay down on the floor, (3) when Malloy attempted to argue with this robber, the ski-masked robber threatened Malloy, threatened the Deputy, and threatened to take additional hostages, (4) the robber wearing the ski mask repeatedly threatened to kill the Deputy, and (5) just before the two robbers left the bank, the ski-masked robber attempted to take two women hostages but one was weeping and the other refused to go. See S.F. Trial, Volume 8, testimony of Charles R. Malloy, at pp. 3016-28.

Bank teller Pat Wildenstein testified in pertinent part that (1) the robber who approached the teller windows was noticeably heavier than the other robber, (2) this robber handed her two bags and directed her to "Fill these up and hurry," (3) she took the top bag and the other fell to the floor, (4) the heavier robber kept insisting that she give him all the money and asked about the bank night deposit box and money order box, (5) after she gave the heavier robber the bag with the money, he directed her to sit on

accomplice drove back to the isolated location where they had parked their vehicle and petitioner fatally shot Deputy Childress twice.[8]

Because petitioner and his nephew wore masks throughout their bank robbery and left behind so few clues to their identities, law enforcement officials spent the following weeks meticulously running down one unproductive lead after another.[9]

_____

the floor, (6) the more slightly-built robber, who wore a ski mask, then directed her and others into the front office, and (7) when the ski-masked robber directed her to come with them, she verbally refused, went over a desk, and got on the floor. See S.F. Trial, Volume 8, testimony of Pat Wildenstein, at pp. 2952-74 & 2985-91.

[8] See S.F. Trial, Volume 9, testimony of Leroy Sosa, at pp. 3313-17 & 3347-48.
    Medical examiner Susannah Dana testified at the guilt-innocence phase of petitioner's trial that (1) Deputy Childress died as a result of two gunshot wounds to the neck and head, (2) one those wounds entered the right front side of the neck, exited the back of the head, and was consistent with close range firing by a revolver, (3) the bullet that took this path shattered two bones in the neck, severed a neck vein, and shattered the spinal cord, (4) the other gunshot wound, which did not evidence close-range firing, entered the right side of the neck and exited the left side of the head behind the eye, (5) this bullet course passed through the throat, entered the skull, caused trauma to the left side of the brain, and exited lateral to the eye, and (6) both gunshot wounds were capable of causing death. See S.F. Trial, Volume 9, testimony of Susannah Dana, at pp. 3182-3210.

[9] The oral depositions of various law enforcement officers involved in the investigation of the bank robbery and murder of Deputy Childress are included among the voluminous exhibits accompanying petitioner's pleadings herein. While this testimony has virtually no relevance to any of petitioner's claims herein, it does furnish insight into the difficulties law enforcement officers faced while investigating the bank robbery and murder. The reality is that, prior to receipt of a Crimestopper's tip, the FBI had no viable leads in the case. See Oral Deposition of Fritz Bohne, located at the first tab 22 in Volume Two of Petitioner's Exhibits to Petition for Writ of Habeas Corpus, filed April 21, 2000, docket entry no. 8 (henceforth "Petitioner's Exhibits"), at pp. 16-26, 31-37, 64-75, 82-118, 132-45, & 157-65; Oral Deposition of David A.

Following receipt of a Crime Stoppers' tip, law enforcement officials arrested Leroy Sosa on December 19, 1983.  That same date, Leroy gave a full, written, confession admitting that he and petitioner had robbed the bank in LaVernia and identifying petitioner as the person who twice shot Deputy Childress.

Petitioner managed to successfully avoid apprehension until late on the evening of February 3, 1984, when he and his wife Sylvia were taken into custody.[10]  Within hours of his arrest, petitioner also gave a written confession in which he admitted that he and Leroy Sosa robbed the bank in LaVernia and that he shot Deputy Childress.[11]

---

Harvilak, located behind tab number 24 contained in Volume Three of Petitioner's Exhibits, at pp. 12-14, 21-23, & 55-59; Telephone Deposition of Paul G. Hasselbach, located at tab 25 in Volume Three of Petitioner's Exhibits, at pp. 9-13 & 20-31; Oral Deposition of Moses P. Alaniz, located at tab 27 in Volume Four of Petitioner's Exhibits, at pp. 14-19, 29-36, 48-53, 78-96, & 128-31; Oral deposition of Karl McLeod, located at tab 31 in Volume Five of Petitioner's Exhibits, at pp. 17-27 & 33-52; Oral deposition of Claude Martin, located at tab 33 in Volume Five of Petitioner's Exhibits, at pp. 13-96; and Oral deposition of Michael E. Appleby, located at tab 34 in Volume Six of Petitioner's Exhibits, at pp. 10-15 & 27-61.  These depositions reveal no exculpatory or mitigating evidence with regard to the capital murder charge against petitioner.  On the contrary, they reveal only that law enforcement officers spent considerable time and resources running down unproductive leads and suspects until their investigation began to focus on petitioner and Leroy Sosa.

[10] See S.F. Trial, Volume 9, testimony of Ronald Clendening, at pp. 3234-42; testimony of Marvin (Pete) Baumann, at pp. 3351-57.

[11] Id., Volume 9, testimony of Ronald Clendening, at pp. 3243-51; testimony of Moses P. Alaniz, at pp. 3264-79 & 3284-91; testimony of Al Cuellar, at pp. 3366-74; and testimony of Kenneth L. Denn, at pp. 3382-84.

2.   Indictment

On January 19, 1984, a Wilson County grand jury indicted petitioner in cause no. 7729 on a charge of capital murder arising from the fatal shooting of Deputy Childress.[12]

3.   Pretrial Motions & Hearings

a.   Motion to Quash Indictment

On May 18, 1984, the state trial court heard evidence on and denied petitioner's motion to quash the indictment against him based on an alleged violation of petitioner's constitutional right to be indicted by a grand jury representing a fair cross-section of the community.[13]

b.   **Jackson v. Denno** Hearing

That same date, the state trial court heard evidence and granted in part and denied in part petitioner's motions to suppress his written confession, as well as several oral statements made by

_____

[12] See Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), at pp. 2-3.

The indictment charged petitioner with the capital murder of Deputy Childress under three separate factual and legal theories. More specifically, the first paragraph charged petitioner with having intentionally and knowingly caused the death of Deputy Childress by shooting him with a gun while Deputy Childress was acting in the lawful discharge of his official duties as a peace officer.   The second paragraph charged petitioner with having fatally shot Deputy Childress in the course of committing and attempting to commit the kidnaping of Deputy Childress.   The final paragraph charged petitioner with having fatally shot Deputy Childress while in the course of committing and attempting to commit the robbery of Patricia Wildenstein.

[13] See S.F. Trial, Volume 1, at pp. 104-249.

petitioner shortly after his arrest.[14] More specifically, the state trial court ruled petitioner's written confession and a comment made by petitioner at the time of his arrest to be admissible. However, the state trial court excluded a highly inculpatory remark made by petitioner during his initial appearance in federal court on a bank robbery charge.[15]

---

[14] See S.F. Trial, Volumes 1-2, at pp. 253-510. Petitioner did not testify at his **Jackson v. Denno** hearing or offer any other evidence directly establishing that his confession was involuntary. Petitioner's trial counsel called and cross-examined several law enforcement officers who had been present at petitioner's arrest and subsequent interrogation. **Id.,** Volume 1, testimony of Ronald Clendening, at pp. 257-315; testimony of Moses P. Alaniz, at pp. 315-89; and testimony of Kenneth L. Denn, at pp. 389-400; and **Id.,** Volume 2, testimony of Kenneth L. Denn, at pp. 403-44; testimony of Adolpho Cuellar, at pp. 445-75; and testimony of Marvin (Pete) Baumann, at pp. 476-88.

All of the witnesses who testified at petitioner's **Jackson v. Denno** hearing emphasized that (1) no threats or promises were made to induce petitioner's confession, (2) petitioner was repeatedly given **Miranda** warnings prior to his interrogation and execution of his written statement, (3) petitioner indicated that he understood his rights, (4) petitioner did not indicate that he had any difficulty communicating orally in English, and (5) petitioner's confession was voluntary and not the product of any duress or coercion. **Id.,** Volume 1, testimony of Ronald Clendening, at pp. 265-66, 268, 288-90, 292, 297-300, 302-03, 310, & 313-14; testimony of Moses P. Alaniz, at pp. 318-19, 321-27, 329-33, 343, 345, 364-65, 369, 371-74, 377, 379, & 387; testimony of Kenneth L. Denn, at pp. 391-93, 395, 397-400; and **Id.,** Volume 2, testimony of Kenneth L. Denn, at pp. 404-05, 409, 410, 412-15, 433, 436-37, & 442-44; testimony of Adolpho Cuellar, at pp. 453 & 473; and testimony of Marvin (Pete) Baumann, at p. 478.

[15] FBI Special Agent Moses P. Alaniz testified at petitioner's **Jackson v. Denno** hearing that, at petitioner's initial appearance before a federal Magistrate on February 6, 1984, following a reading of petitioner's rights, when the Magistrate asked him whether he needed an attorney, petitioner replied "I don't need an attorney, I am guilty." See S.F. Trial, Volume 1, testimony of Moses P. Alaniz, at pp. 335-36 and 379-80. The state trial court ruled this statement inadmissible against petitioner. See S.F. Trial, Volume 2, at pp. 505-10.

c.   More Motions to Suppress

On May 23, 1984, the state trial court heard evidence on and denied petitioner's motions to reduce bond, quash the indictment, suppress evidence discovered in a post-arrest search of a residence once used by petitioner, and a motion to suppress the confession of Leroy Sosa.[16]

d.   More Motions to Quash

On June 28, 1984, the state trial court heard testimony from almost all the members of the Wilson County grand jury that indicted petitioner and denied two more motions to quash the indictment against petitioner.[17]

e.   Change of Venue

Also on June 28, 1984, the prosecution announced in open court that it would not contest petitioner's motion for change of venue.[18]

f.   Competency Proceedings

On June 4, 1984, petitioner's trial counsel filed a motion requesting that the state trial court appoint an independent mental health expert to evaluate petitioner's competence to stand trial, as well as to determine whether petitioner were mentally retarded or insane.[19]   On June 28, 1984, the state trial court granted

---

[16] See S.F. Trial, Volume 2, at pp. 514-76.

[17] See S.F. Trial, Volume 2, at pp. 593-660.

[18] See S.F. Trial, Volume 2, at p. 674.

[19] See Trial Transcript, at pp. 100-02.  Significantly for purposes of this federal habeas corpus proceeding, petitioner's motion (1) did not identify any particular mental health expert by name (the place for a suggested name in the motion was left blank),

12

petitioner's motion for appointment of a mental health expert to examine petitioner.[20]   At a hearing held September 5, 1984, the state trial court requested petitioner's trial counsel to suggest names of mental health experts who could evaluate petitioner.[21]   Thereafter, two mental health experts evaluated petitioner.  At a hearing held October 10, 1984, the state trial court set an October 29, 1984 date for the pretrial hearing on petitioner's competence to stand trial.[22]

In accordance with Texas law, on October 29, 1984, a trial was held at the conclusion of which the jury determined that petitioner was competent to stand trial on the charge of capital murder.[23]

  4.   Petitioner's Trial

    a.   Jury Selection

Jury selection in petitioner's capital murder case began on November 5, 1984.  Petitioner's trial began November 19, 1984.

    b.   Guilt-Innocence Phase

Petitioner's jury heard testimony at the guilt-innocence phase of trial from (1) Wilson County Sheriff Marvin "Pete" Baumann and

---

(2) requested that the mental health expert appointed by the court make a written report of his or her findings to the state trial court, and (3) did not include a specific request for appointment of a mental health expert to assist petitioner's trial counsel with preparation for trial or for a competency hearing.

  [20] See S.F. Trial, Volume 2, at pp. 660-72.

  [21] See S.F. Trial, Volume 2, at pp. 693-95.

  [22] See S.F. Trial, Volume 2, at pp. 716-20.

  [23] See S.F. Trial, Volume 3, at pp. 740-1162.

a Wilson County Sheriff's Department dispatcher establishing that
Deputy Childress was on active duty as a law enforcement officer at
the time of his murder[24]; (2) several lay witnesses who observed
Deputy Childress' vehicle or  the vehicle used by petitioner and
his accomplice around the time of Deputy Childress' kidnaping and
murder[25]; (3) several bank employees and customers testified

---

[24] See S.F. Trial, Volume 8, testimony of Marvin "Pete"
Baumann, at pp. 2795-96; testimony of Jo Ann Jansky Ebrom, at pp.
2811, 2813, & 2816-17.

[25] A local farmer, testified that (1) on the morning of
November 4, 1983, he observed a yellow vehicle with a black top and
a sun roof that he thought was a Cougar while driving on FM 539,
(2) after he followed the vehicle for about a mile and a half, the
passenger in that vehicle stuck his hand out of the sun roof and
gestured for him to pass them, (3) a short time later, as he
returned to his home along the same route he had previously
traveled, he again observed the yellow and black vehicle, and (4)
this time, the vehicle in question was following closely behind a
gray car at a slow rate of speed and there was one person in each
vehicle. See S.F. Trial, Volume 8, testimony of Charles Esparza, at
pp. 2822-28.
    A mechanic in Sutherland Springs, a town near LaVernia,
testified that (1) at approximately 11 a.m. on November 4, 1983, he
observed a Wilson County Sheriff's vehicle drive through Sutherland
Springs going north toward LaVernia, (2) he also observed a yellow
car with a light brown vinyl top, possibly a Ford Mustang,
following right behind the Sheriff's vehicle, and (3) the driver of
the patrol car had a big beard and Cavazos knew immediately the
vehicle, which Cavazos recognized as the vehicle usually driven by
Deputy Sammy Childress. See S.F. Trial, Volume 8, testimony of
Porfirio Cavazos, at pp. 2835-37.
    A local resident testified that (1) on the morning of November
4, 1983, he observed a Sheriff's Deputy car driving between
Floresville and Stockdale, (2) the Deputy's vehicle turned around
in front of his grandmother's house, (3) he saw and recognized
Deputy Childress as the driver of the Deputy's vehicle, (4) he
observed another person, wearing a ski mask, also seated in the
Deputy's vehicle, (5) he also saw another vehicle following closely
behind the Deputy's vehicle, and (6) this second vehicle looked
like a late-seventies model Cougar and appeared to be pale yellow
in color with a black top. See S.F. Trial, Volume 8, testimony of
Larry Cox, at pp. 2839-44.
    Another local resident who was traveling the highway that

14

regarding the conduct of petitioner and his accomplice during the

armed    robbery    of    the    bank    in    LaVernia[26];    (4)

morning, testified that (1) as he drove east toward Stockdale from
Floresville, he observed a vehicle that he recognized as Deputy
Childress' vehicle, being driven by Deputy Childress, (2) another
vehicle was close behind Deputy Childress' vehicle and both of
those vehicles were slowly coming to a stop, (3) the second vehicle
was a two-tone hard top with a dark top and a light bottom,
possibly a Dodge Charger, (4) Deputy Childress was inside his
vehicle and two men were in the other vehicle, and (5) Deputy
Childress' vehicle did not have any emergency lights or sirens
going. See S.F. Trial, Volume 8, testimony of Reagan L. Mills, at
pp. 2853-57.
      An employee at a gas station in LaVernia testified that (1) on
November 4, 1983, he observed two people he did not recognize
driving in Deputy Childress' vehicle from LaVernia toward Lone Oak
and San Antonio, (2) when he first saw it, the Deputy's car was
headed east toward the city hall and bank, (3) when he next saw the
same vehicle, it was headed west, and (4) he did not recall seeing
any masks on either the driver or passenger. See S.F. Trial, Volume
9, testimony of Robert Hines, at pp. 3078-84.

      [26] In addition to the testimony of Steve Keeland, Charles
Malloy, and Pat Wildenstein summarized in note 7, **supra**, several
other bank employees also gave their accounts of the bank robbery
on November 4, 1983.
      More specifically, bank vice president Lucille Burns testified
that (1) she was talking on the telephone with her niece when she
saw the two robbers enter the bank, (2) one robber pulled on a ski
mask while the other put on a Halloween mask, (3) the ski-masked
robber was of average build, and wore a Deputy's shirt, (4) the
ski-masked robber waved his gun and went immediately to Steve
Keeland's desk, (5) the Halloween-masked robber, who was also
armed, was very obese, (6) both robbers waved their guns toward
her, (7) the obese robber went to the location in the bank where
deposits are filled out, produced a brown paper bag, and repeatedly
directed Pat Wildenstein to fill up the bags and to hurry up, (8)
the ski-masked robber directed her to stand behind the obese
robber, (9) the obese robber did not directly address her but did
wave his gun toward her, (10) when a customer drove up to the
bank's drive-through window, the ski-masked robber directed her to
move so that she could not be seen from that window, (11) the obese
man wore a flannel shirt and appeared to her to be nervous because
his gun and pants were shaking, (12) the ski-masked robber appeared
more self-assured and repeatedly made threats to shoot the Sheriff,
who he stated was in the trunk of the car, (13) the ski-masked
robber then directed her and several others to enter Wanda Von
Minden's office, where he told them to lay face down on the floor,

15

(14) when Pat Wildenstein was being herded into the same office, along with others, the ski-masked robber said "you're going with us," (15) when Pat Wildenstein said "no," the ski-masked robber replied "one of you is going with us," (16) at that point, Charles Mallow began arguing with the ski-masked robber about an emergency beeper taken from Malloy, (17) after that, there was no more discussion regarding the taking of additional hostages, (18) she heard the bank's doors shut as the heavy-set robber left, (19) the ski-masked robber told them he was going to stay and watch them, (20) a few second later, someone moved and the ski-masked robber announced "see, I am still here watching you," and (21) the ski-masked robber repeatedly threatened to shoot the Sheriff in the trunk of the car unless they were given twenty minutes to escape. See S.F. Trial, Volume 8, testimony of Lucille Burns, at pp. 2896-2921.

Bank vice president Wanda Von Minden testified that (1) she first observed a heavy-set man about 5'9" to 6' in height, wearing a Halloween mask with a wig attached, (2) a second gunman held a gun to the back of Steve Keeland, (3) during the first five minutes of the robbery, apparently neither robber observed her or the customer who was with her in her office facing the bank lobby, (4) at some point, the ski-masked robber, who held a cocked gun to Steve Keeland's back and wore a white Deputy's shirt over a red flannel shirt, directed her and her customer to come out of her office, (5) she and her customer, Clement Zigmund, exited her office, (6) the ski-masked robber pointed his gun at her and threatened to "blow your brains out," (7) she and Mr. Zigmund remained standing behind Steve Keeland for several minutes, (8) the ski-masked robber in the Deputy's shirt repeatedly threatened to kill the sheriff, (9) she heard nothing said by the other robber except for his direction to Pat Wildenstein to "hurry up," (10) she and others were then directed back into her office and told by the ski-masked robber to lay down on the floor and give the robbers at least twenty minutes or he would shoot the sheriff, (11) at one point, the ski-masked robber came back to her office, laughed, and said "see, I am still here, I fooled you," (12) the ski-masked robber did not appear to be nervous but was very talkative, bragging that he had the sheriff's shirt and gun and repeatedly tapped the badge on his shirt, and (13) the ski-masked robber repeatedly threatened to kill the sheriff if anyone called the police. See S.F. Trial, Volume 8, testimony of Wanda Von Minden, at pp. 2922-51.

Bank vice president Glen McCoy testified that (1) he was in the bank's loan department on November 4, 1983 when he heard someone yell "freeze," (2) he observed a ski-masked robber wearing a Deputy's shirt and another robber wearing a Halloween mask, (3) the ski-masked robber was approximately 5'10" in height and weighed approximately 175-180 pounds, wore a Deputy's shirt, and directed him to lay on Wanda Von Minden's office floor, (4) the other robber

16

a fingerprint expert establishing that a brown paper grocery bag

left at the bank by the robbers bore the right palm print of

petitioner and the right thumb print of Leroy Sosa[27]; (5) law

weighed approximately 230-240 pounds and was telling Pat
Wildenstein "hurry up" and "get all of the money," (5) when Pat
Wildenstein entered the office with the others, the thinner of the
two robbers, who wore a ski-mask, told her "you're going with us,
lady," but Pat said either "no, I don't want to go" or "no, I'm not
going," and "bailed across there" to avoid being taken, (6) the
ski-masked robber told them to give the robbers twenty minutes,
said they had the sheriff in the car, and threatened to shoot
through the back seat and kill the Deputy, (7) he heard the door
pop open but, then, moments later, heard the ski-masked robber say
"see, I haven't left yet," (8) after the robbery, teller Julie
Pollock pointed out a bag that had not been in the bank before the
robbery which he later turned over to the FBI, and (9) slightly
more than fifty one thousand dollars was taken in the robbery. See
S.F. trial, Volume 8, testimony of Glen McCoy, at pp. 2994-3007.
   Bank president Dan Bosanko testified that (1) he was
discussing a loan with a customer when he noticed a heavy-set
robber at the counter waving a gun at the teller, (2) this robber
told the teller to hurry up, looked around and saw him and his
customer, and motioned for them to get up and hold up their hands,
(3) when he exited his office, he saw the other robber for the
first time, (4) the other robber, who wore a ski mask and a
Deputy's shirt, seemed to take charge, directing everyone to lie
down in Wanda Von Minden's office, (5) the ski-masked robber
threatened to kill the Deputy unless they gave the robbers twenty
minutes and said he would check to make sure they did not get up,
(6) a minute later, this robber came back, and (7) he never gave
his consent for the taking of the fifty one thousand dollars that
day. See S.F. Trial, Volume 8, testimony of Dan Bosanko, at pp.
3007-15.

[27] Bank teller Julie Pollock testified that (1) she fell to the
floor as soon as the robbery began and stayed on the floor
throughout the robbery, (2) immediately after the robbery, she
found a brown paper grocery bag on the floor near window number
three, (3) the bag was neatly folded and had not been there before
the robbery, and (4) she pointed the bag out to Glen McCoy, who
took custody of same. See S.F. Trial, Volume 8, testimony of Julie
Pollock, at pp. 2974-85.
   An FBI Special Agent testified that he took custody of the
brown paper grocery bag found on the floor of the bank after the
robbery. See S.F. Trial, Volume 8, testimony of Paul G. Hasselbach,
at pp. 3036-37.
   A San Antonio Police fingerprint examiner testified that he

enforcement and lay witnesses regarding the discovery of the body of Deputy Childress[28]; (6) a firearms and tool mark examiner establishing that both of the spent bullets recovered from the trunk of Deputy Childress vehicle and Deputy Childress' body at autopsy were fired from the same type of weapon as Deputy Childress' handgun, i.e., a .44 Special Charter Arms Bulldog, and a plaster cast of a tire track print found adjacent to the location where Deputy Childress' vehicle was discovered had characteristics similar to the right rear tire on a recently painted 1977 Thunderbird bearing license plate number PZA 564[29]; (7) a medical examiner establishing that Deputy Childress died as a result of two gunshot wounds to the neck, one of which was a close-range shot that shattered two cervical vertebrae and Deputy Childress' spinal cord[30]; (8) a tool salesman who testified that petitioner used a one hundred dollar bill to pay off a months-old debt on the afternoon

---

processed the brown paper bag found at the robbery scene and identified petitioner's right palm print as well as Leroy Sosa's right thumb print on the bag. See S.F. Trial, Volume 8, testimony of Henry Cruz, at pp. 3058-65.

[28] See S.F. Trial, Volume 9, testimony of Carlos Mendez, at pp. 3101-07; and testimony of Arthur Garcia, at pp. 3110-23.

[29] See S.F. Trial, Volume 9, testimony of David Mills, at pp. 3160-65 & 3170-72.  Officer Mills also testified that the Ford Thunderbird automobile, license number PZA 564, had once been pale yellow with a dark brown, Landau-vinyl roof but, when discovered by law enforcement officers, had been painted over. **Id.**, at pp. 6167-68.

[30] Medical examiner Susannah Dana's testimony at petitioner's trial regarding the results of her autopsy of Deputy Childress' body is summarized in note 8, **supra**.

of November 4, 1983[31]; (9) a lifelong friend of petitioner whom petitioner paid cash to paint petitioner's Ford Thunderbird, the same vehicle identified by the tire track mold from the crime scene, just days after the robbery of the bank in LaVernia[32]; (10) law enforcement agents establishing that petitioner voluntarily gave a highly inculpatory, written statement within hours of his arrest on February 3, 1984[33]; and (11) Leroy Sosa establishing that (a) he and petitioner kidnaped Deputy Childress, (b) he and petitioner robbed the bank in LaVernia, and (c) petitioner fired the two shots that killed Deputy Childress.[34]  Petitioner's trial counsel presented no witnesses or other evidence at the guilt-innocence phase of petitioner's trial.

After deliberating less than two hours on November 27, 1984, the jury returned its verdict of guilty.[35]

---

[31] James Thomas Cathcart testified that (1) he sold tools to petitioner on February 18, 1983 and petitioner made a partial payment on April 8, 1983, (2) petitioner paid the remaining $93.69 to Cathcart on November 4, 1983 with a one hundred dollar bill and told Cathcart to "keep the change," and (3) petitioner did not appear to be intoxicated on that date. See S.F. Trial, Volume 9, testimony of James Thomas Cathcart, at pp. 3222-26.

[32] See S.F. Trial, Volume 9, testimony of Rogelio Guerrero, at pp. 3228-32.  Guerrero testified that petitioner paid two hundred dollars in cash for materials when he dropped off the vehicle in question and eight hundred dollars in cash for the labor when he picked up the vehicle from Guerrero a few days later. **Id.**

[33] See S.F. Trial, Volume 9, testimony of Ronald Clendening, at [pp. 3234-51 & 3255; testimony of Moses P. Alaniz, at pp. 3262-79, 3285, & 3288-89; and testimony of Al Cuellar, at pp. 3366-72.

[34] The testimony of Leroy Sosa at petitioner's capital murder trial is summarized in note 3, **supra**.

[35] See S.F. Trial, Volume 10, at pp. 3483-95.

c.   Punishment Phase

The prosecution offered no new evidence at the punishment phase of petitioner's trial.  Petitioner's trial counsel presented the testimony of petitioner's father, mother-in-law, sister-in-law, and wife, as well as a family friend, all of whom asserted they had never seen petitioner engage in any violent behavior.[36]

After deliberating approximately three hours on November 28, 1984, petitioner's jury returned its verdict at the punishment phase of trial, finding that petitioner (1) caused the death of Deputy Childress deliberately and (2) there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society.[37]

Based on the jury's answers to the Texas capital sentencing special issues, the state trial judge sentenced petitioner to death by lethal injection.[38]

---

[36] See S.F. Trial, Volume 10, testimony of Florencio Sosa (petitioner's father), at pp. 3506-13; testimony of Julia De Leon (petitioner's mother-in-law), at pp. 3513-15; testimony of Robert C. Serna (petitioner's long-time friend), at pp. 3516-17; testimony of Oralia Muscoro (petitioner's sister-in-law), at pp. 3519-23; and testimony of Sylvia Sosa, at pp. 3523-35.

[37] See Transcript, at pp. 287-88; and S.F. Trial, Volume 10, at pp. 3572-76.

[38] See S.F. Trial, Volume 10, at p. 3583.

5.   <u>Direct Appeal</u>

Petitioner appealed his conviction and sentence.[39]   In an opinion issued February 15, 1989, the Texas Court of Criminal Appeals affirmed both petitioner's conviction and sentence.[40]   That same court denied petitioner's motion for rehearing on March 15, 1989.   Petitioner did not file a petition for writ of certiorari with the United States Supreme Court or otherwise seek further review of his conviction on direct appeal

6.   <u>First State Habeas Corpus Proceeding</u>

On May 17, 1993, petitioner filed his original application for state habeas corpus relief, asserting seventeen grounds for relief.[41]   On October 29, 1993, petitioner filed a supplemental

---

[39] In his original and supplemental briefs on direct appeal, petitioner argued that (1) there was insufficient evidence establishing there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society, (2) the trial court erred in excusing two members of the jury venire over defendant's objection, (3) the trial court erred in denying defendant's motion to suppress defendant's written and oral statements, (4) the Texas capital sentencing special issues are unconstitutional because they impermissibly reduce the prosecution's burden of proof with regard to the future dangerousness special issue, and (5) the trial court committed fundamental error when it failed to *sua sponte* instruct the jury that it could consider mitigating evidence at the punishment phase of petitioner's capital murder trial.

[40] <u>See</u> **Sosa v. State**, 769 S.W.2d 909 (Tex. Crim. App. 1989).

[41] More specifically, petitioner argued that (1) the state trial court erroneously denied his requests for appointment of co-counsel and a mental health expert, (2) he was denied a grand jury drawn from a fair cross-section of Wilson County, (3) he was denied a petit jury drawn from a fair cross-section of Atascosa County, (4) his jury was unable to give mitigating effect to evidence of his background and character, (5) his confession was involuntary, (6) the state trial court erroneously admitted hypnotically enhanced testimony, (7) the prosecution failed to disclose

21

state habeas corpus application asserting four additional claims

for relief.[42]   On November 8, 1993, petitioner filed a second

supplemental state habeas application.[43]

Petitioner's motion to recuse the state trial judge who had

presided over petitioner's capital murder trial from presiding over

petitioner's state habeas corpus proceeding was denied following an

---

exculpatory evidence in the form of (a) FBI reports containing
descriptions of the two bank robbers, (b) the results of
petitioner's polygraph examination on February 21, 1984, (c)
evidence showing that many fingerprints obtained from the bank did
not match those of petitioner, (d) information relating to other
suspects in the bank robbery, (e) information showing that hypnosis
had been used as an investigatory tool, (f) the witness statements
of Larry Cox and Wanda Von Minden, (8) venire member and juror
Rosalio Orta misrepresented that he had no prior jury experience,
(9) the trial court erred in refusing to order the disclosure of
the identity of the confidential informant, (10) the jury charge at
the punishment phase of trial misled the jury regarding the impact
of a single "no" vote on either of the special sentencing issues,
(11) the second sentencing special issue regarding future
dangerousness was unconstitutionally vague, (12) the jury's
consideration of prior, unadjudicated, allegedly criminal, acts
violated petitioner's equal protection rights, (13) the trial court
failed to instruct the jury how to consider prior, unadjudicated,
acts, and (14) the trial court failed to instruct the jury
regarding the impact of parole on a life sentence. See Transcript
from petitioner's first state habeas corpus proceeding (henceforth
"State Habeas Transcript"), Volume I, at pp. 2-152.

[42] In his supplemental application, petitioner argued that (1)
the prosecution withheld from the defense evidence regarding Leroy
Sosa's history of drug use, (2) the prosecution knowingly used
perjured testimony by Leroy Sosa to secure petitioner's conviction,
(3) the state trial judge engaged in an improper *ex parte*
communication with juror Rosalio Orta, and (4) the cumulative
impact of petitioner's alleged violations of his constitutional
rights independently warranted state habeas relief. See State
Habeas Transcript, Volume I, at pp. 306-23.

[43] In his second supplemental state habeas application,
petitioner complained that prosecutors had threatened petitioner's
state habeas counsel and witnesses with prosecution for perjury. Se
State Habeas Transcript, Volume II, at pp. 439-45.

evidentiary hearing on November 8, 1993 presided over by a different judge.[44]

The state trial court held an evidentiary hearing November 8-12, 1993 and heard testimony, in pertinent part, from (1) a San Antonio Police fingerprint examiner establishing that many latent fingerprints were lifted from the bank in LaVernia the day of the robbery, most of which were not sufficiently legible to allow identification or comparison and none of which were ever linked to petitioner or his accomplice[45]; (2) two persons who were hypnotized by the FBI during the investigation of petitioner's offense but who did not testify at petitioner's trial[46]; (4) one witness from

---

[44] More specifically, state district judge Peter Michael Curry of San Antonio heard testimony from (1) Rosalio Orta, who gave his age at various times as either 72 or 73 and had served as a juror a petitioner's capital murder trial, (2) Robert Eric Reed, an attorney and former St. Mary's University law student who previously interviewed Mr. Orta as part of a legal aid clinic project, (3) Texas Ranger Adolpho Cuellar, and (4) J. Taylor Brite, who served as the presiding judge at both petitioner's trial and state habeas corpus proceeding. See Statement of facts from petitioner's first state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing"), Volume III of 8, at pp. 53-311. At the conclusion of that hearing, Judge Curry denied petitioner's motion to recuse Judge Brite from presiding over petitioner's state habeas corpus proceeding.

[45] See S.F. State Habeas Hearing, Volume V of 8, testimony of Vernon Ginn, at pp. 64-82.

[46] More specifically, Homer Burkett testified that (1) he saw a county sheriff's car being driven by someone wearing a ski mask on November 4, 1983 while he was driving back from Stockdale on Highway 97, (2) the sheriff's car was being followed by another, light yellow, vehicle, (3) he was asked by the FBI to submit to hypnosis for the purpose of ascertaining if he could recall any additional details about the yellow vehicle, (4) he and his wife went into the hypnosis session, (5) he was conscious throughout the procedure, and (6) while under hypnosis, he was unable to furnish any additional details except for recalling a black mark on the

petitioner's trial who also had been hypnotized[47]; (5) petitioner's

---

bottom of the ski mask worn by the driver of the sheriff's vehicle.
See S.F. State Habeas Hearing, Volume V of 8, testimony of Homer
Burkett, at pp. 141-68.

A rural mail carrier testified that (1) she was asked by
Department of Public Safety personnel whether she saw any
suspicious vehicles while making deliveries on November 4, 1983,
(2) she reported that she had seen a car parked in an unusual
location near a little bridge along Stanteen Road, (3) when she led
the FBI back to that location, the car was no longer there, (4) the
car in question appeared to her to be a light yellow, 1975
Oldsmobile, (5) five or six minutes after she saw the car parked
along Stanteen Road, she saw a deputy sheriff's vehicle containing
two people, (6) another five or six minutes later, she again saw
the deputy's car and this time, it was being driven by a bearded
man whom she could not identify, (7) she and her daughter went into
the hypnosis session, (8) during her hypnosis session, she was
asked repeatedly whether she had seen the license plate of the
vehicle, but (9) she was unable to furnish any additional details
or a license plate number. See **Id.**, Volume V of 8, testimony of
Bernice Howes, at pp. 168-97.

[47] More specifically, Charles Esparza testified during
petitioner's state habeas corpus hearing, consistent with his
testimony at petitioner's trial, that (1) on the morning of
November 4, 1983, he followed a slow-moving, yellow car for about
a mile and a half, (2) the yellow car appeared to be either a
Cougar or a Thunderbird and contained two occupants, (3) he
followed the yellow car around two curves, after which the
passenger in the car, who had medium length, curly hair and a full
beard, stood and waved at him through a sun roof to go on by, (4)
he did so but did not see the faces of either occupant of that
vehicle, (5) later that same morning, he saw the same yellow car
traveling with a gray vehicle, and (6) because of the distance from
his own vehicle, he was unable to determine who was inside those
two vehicles. See S.F. State Habeas Hearing, Volume V of 8,
testimony of Charles Esparza, at pp. 200-03.

Mr. Esparza testified further that (7) the FBI called him in
for a hypnosis session, (8) during his session, he was asked
repeatedly about the back end of the yellow vehicle, especially its
occupants, tail light configuration, decals, and license plate, (9)
while under hypnosis, he was able to remember a license plate
number and the fact that the yellow car's tail light configuration
appeared to be that of a Thunderbird, (10) he was also able to
recall that the rear license plate on the yellow car was tied on by
a string or twine, (11) he was never shown a photo lineup but did
see a composite drawing of the two bank robbery suspects, and (12)
on the day he testified at petitioner's trial, he recognized
petitioner as the passenger in the yellow car who had waved at him.

lead trial counsel, who testified that (a) had he known the FBI had investigated other suspects, he would have attempted to introduce evidence of that fact at petitioner's trial, (b) had he been aware of alleged discrepancies in the descriptions of the bank robbers given to the FBI by bank employees and customers the day of the robbery, he would have attempted to use that information to impeach those same persons when they testified at petitioner's trial, and (c) had he been aware of Leroy Sosa's history of heavy drug and alcohol abuse, he would have used that information to impeach Leroy Sosa's trial testimony[48]; (6) a psychologist who, after reviewing Leroy Sosa's federal prison medical records (but never interviewing Leroy and never reviewing Leroy's written statement or Leroy's trial testimony), opined that Leroy Sosa may have been suffering from the effects of drug and alcohol withdrawal at the time of Leroy's arrest and confession and that, as such, Leroy's written confession was suspect[49]; (7) Leroy Sosa's former counsel, who testified regarding the negotiations that resulted in Leroy's plea

---

**Id.**, at pp. 213-41.

[48] See S.F. State Habeas Hearing, Volume VI of 8, testimony of Manuel Montez, at pp. 282-389; and Volume VII of 8, testimony of Manuel Montez, at pp. 514-605. Significantly, petitioner's former trial counsel admitted that both petitioner's confession and the testimony of Leroy Sosa would have been admitted at petitioner's capital murder trial regardless of whether he had been aware of Leroy's alleged history of drug abuse, the alleged discrepancies in descriptions of the bank robbers given to the FBI by eyewitnesses to the robbery, and information about other potential suspects. **Id.**, at p. 559.

[49] See S.F. State Habeas Hearing, Volume VI of 8, testimony of Paula Kathleen Lundberg-Love, at pp. 405-502.

bargain and agreement to testify against petitioner, as well as his
own lack of personal knowledge of any evidence showing that any
persons other than Leroy Sosa and petitioner were involved in the
bank robbery or murder of Deputy Childress[50]; (8) the former
prosecuting attorney at petitioner's capital murder trial, who
testified regarding his plea negotiations with Leroy Sosa, as well
as his own lack of knowledge of any evidence showing that any
persons other than petitioner and Leroy Sosa were involved in the
bank robbery or murder of Deputy Childress[51]; and (9) a Texas

---

[50] See S.F. State Habeas Hearing, Volume VII of 8, testimony
of Allan Manka, at pp. 619-33 & 636-76.  Significantly, attorney
Manka testified that (1) he was unaware of any request or demand by
prosecutors that Leroy Sosa testify falsely in order to receive a
reduced sentence, (2) he was unaware of any information suggesting
that anyone other than Leroy Sosa and petitioner were involved in
the bank robbery or murder of Deputy Childress, (3) while he was
aware that Leroy was intoxicated at the time of the offense, he was
unaware of any evidence showing that Leroy was also high on drugs
at that time, (4) Leroy Sosa never told him that he (Leroy) was the
leader of the bank robbery, fired the fatal shots into Deputy
Childress, or was suffering from alcohol withdrawal at the time he
gave his written confession, (5) on the contrary, he used the fact
that Leroy was a minor at the time of the murder and was not the
triggerman during his plea negotiations with the prosecutor, (6) he
was unaware of any request by the prosecution that Leroy testify in
any manner at petitioner's trial, other than in a manner consistent
with Leroy's written statement to law enforcement agents, (7) Leroy
manipulable, not strong-willed, and afraid of petitioner, whom
Leroy had looked up to as a role model prior to the crime, and (8)
he was unaware of any contact between the prosecution or any law
enforcement agent and Leroy except for those occasions when he was
present with Leroy. **Id.**

[51] See S.F. State Habeas Hearing, Volume VI of 8, testimony of
Alger H. Kendall, Jr., at pp. 677-742.  More specifically, Mr.
Kendall testified that (1) he and attorney Manka reached a plea
bargain agreement with regard to Leroy Sosa during the voir dire
portion of petitioner's trial, (2) he never told Leroy Sosa to
identify petitioner as the person who planned the bank robbery and
fired the fatal shots into Deputy Childress, (3) he never asked or
told Leroy Sosa to lie, (4) he never coached Leroy Sosa to testify

Ranger, who testified regarding Leroy Sosa's physical appearance and demeanor at the time of Leroy's arrest, interrogation, and confession, as well as his lack of knowledge of any evidence showing that any persons other than petitioner and Leroy Sosa were involved in the bank robbery or murder of Deputy Childress.[52]

On November 7, 1994, the state trial court issued an Order containing its findings of fact, conclusions of law, and its recommendation that petitioner's request for state habeas corpus relief be denied.[53]

---

in any particular manner, (5) the only thing that Leroy's trial testimony added that was not already before the jury through petitioner's confession were the circumstances surrounding the petitioner's firing of a second shot into Deputy Childress, and (6) the only agreement he ever had with Leroy Sosa was contained in Leroy's written plea agreement. **Id.**

[52] See S.F. State Habeas Hearing, Volume VII of 8, testimony of Adolfo Cuellar, at pp. 757-819.  Ranger Cuellar testified, in pertinent part, that (1) he observed nothing in Leroy Sosa's appearance or demeanor at the time of Leroy's arrest on December 19, 1983 or during Leroy's post-arrest interview that led him to believe Leroy was either intoxicated, high on drugs, or withdrawing from alcohol or drugs at that time, (2) no drugs were found at Leroy's grandmother's home at the time of Leroy's arrest, (3) he observed no needle marks on Leroy at or after the time of Leroy's arrest, (4) Leroy did not appear to be under the influence of either alcohol or drugs at the time of his arrest, (5) Leroy said nothing during his arrest or afterwards that suggested to Cuellar that Leroy was on drugs at the time of his arrest, (6) he was unaware of any information suggesting that Leroy was under the influence of drugs at the time of his arrest or the time of the offense, (7) while law enforcement officers received many tips following the bank robbery and murder of deputy Childress, they were quickly able to eliminate many potential suspects because the eyewitnesses at the bank had described a pair of Mexican American males who both spoke with heavy Mexican accents, and (8) he had never seen a fat heroin addict. **Id.**, at pp. 760-62, 765-76, 782-83, 786, 790, 792, 798, & 809.

[53] See Petitioner's First State Habeas Transcript, Volume II, at pp. 615-57.  An additional copy of the state trial court's

In an unpublished per curiam Order issued May 30, 1995, the Texas Court of Criminal Appeals denied petitioner's state habeas corpus application.[54]

### 7. First Federal Habeas Corpus Proceeding

On July 3, 1995, petitioner filed a series of motions in cause no. SA-95-CA-586-OG, requesting appointment of counsel to represent him in a federal habeas corpus proceeding challenging his conviction and death sentence. In an Order issued July 6, 1995, this Court, per Judge Orlando L. Garcia, granted petitioner's motion for appointment of counsel. On November 17, 1995, petitioner filed his original petition for federal habeas corpus

findings of fact and conclusions of law in petitioner's first state habeas corpus proceeding appears at tab 17 located in Volume One of Petitioner's Exhibits.

In pertinent part, Judge Brite (1) found that petitioner's trial counsel was assisted at trial by a co-counsel and a court-appointed investigator, (2) found that petitioner had presented no evidence showing that his trial counsel's performance was deficient or that petitioner was prejudiced thereby, (3) found petitioner failed to present any evidence supporting his allegation of the systematic exclusion of female Hispanics from Wilson County grand juries, (4) found petitioner failed to present any evidence supporting his argument that Hispanic females were under-represented on Atascosa County petit juries, (5) concluded the Texas Court of Criminal Appeals' ruling in the course of petitioner's direct appeal that petitioner's confession was voluntary foreclosed state habeas review of that same claim, (6) concluded that none of the evidence allegedly withheld from petitioner's trial counsel by the prosecution was material to the outcome of either portion of petitioner's capital murder trial, and (7) found that neither Charles Esparza nor Wanda Von Minden ever furnished written statements to a law enforcement officer and the prosecution did furnish petitioner's trial counsel with a copy of a statement made by Larry Wilcox [sic]. **Id.**

[54] See **Ex parte Pedro Solis Sosa**, Writ No. 24,852-01 (Tex. Crim. App. May 30, 1995). A copy of this one-page Order appears as Exhibit 18 in Volume One of Petitioner's Exhibits to Petition for Writ of Habeas Corpus, filed April 21, 2000, in this Court.

relief.  On December 20, 1995, petitioner filed his first amended federal habeas corpus petition.

This Court subsequently granted petitioner's requests to engage in lengthy and extensive discovery and held the case in abeyance while petitioner pursued requests for information pursuant to the Freedom of Information Act.  On November 30, 1998, petitioner filed his second amended federal habeas corpus petition and accompanied same with several thousand pages of deposition transcripts and other documents theretofore never presented to any state court.

In a Memorandum Opinion and Order issued March 11, 1999, this Court dismissed petitioner's second amended petition without prejudice for failure to exhaust available state remedies with regard to his newly discovered evidence, citing the principles of federalism and comity that underlie the exhaustion doctrine. Petitioner appealed from that dismissal.  In an unpublished opinion issued September 27, 1999, the Fifth Circuit affirmed this Court's dismissal of cause no. SA-95-CA-586, citing the many new documents petitioner presented to this Court in support of his claims therein which had never been reviewed by any state court.

    8.    Second State Habeas Corpus Proceeding

On or about October 14, 1999, petitioner filed a second application for state habeas corpus relief, asserting six claims for relief.[55]  On November 10, 1999, the Texas Court of Criminal

---

[55] Petitioner argued in his second state habeas corpus application that (1) his confession was involuntary, (2) the

29

Appeals dismissed petitioner's second state habeas corpus
application pursuant to the Texas writ-abuse statute.[56]

B.   Procedural History

On March 8, 2000, petitioner filed a motion for appointment of
counsel.[57]   In an Order issued March 9, 2000, this Court granted,
in part, petitioner's motion for appointment of counsel.[58]   On April
21, 2000, petitioner filed his original federal habeas corpus
petition in this cause.[59]   On May 12, 2000, petitioner filed his
amended petition for federal habeas corpus relief, setting forth as
grounds for relief the claims outlined in Section I above.[60]

---

prosecution failed to disclose to petitioner's trial counsel
certain exculpatory evidence, (3) petitioner's right to confront
witnesses was denied by virtue of the trial court's refusal to
order the production of witness statements, (4) petitioner's
lengthy post-conviction, pre-execution, incarceration violates the
Eighth Amendment and an international treaty, (5) the setting of
petitioner's numerous execution dates violates the Eighth Amendment
and an international treaty, and (6) the cumulative effect of the
foregoing alleged violations of petitioner's federal constitutional
rights independently warrants federal habeas relief.

[56] See **Ex parte Pedro Solis Sosa**, App. No. 24,852-02 (Tex.
Crim. App. November 10, 1999).

[57] See docket entry no. 2.

[58] See docket entry no. 4.

[59] See docket entry no. 8.  Accompanying petitioner's original
petition were seven volumes of exhibits, including an extensive
collection of deposition transcripts and other documents obtained
by petitioner during the course of discovery in petitioner's first
federal habeas corpus proceeding.

[60] See Petitioner's Amended Petition for Writ of Habeas Corpus,
filed May 12, 2000, docket entry no. 9 (henceforth "Petitioner's
Amended Petition").

On November 14, 2000, respondent filed an answer and motion for summary judgment, arguing, in pertinent part, that (1) several of petitioner's claims for relief herein are barred by the doctrines of procedural default, the non-retroactivity principle announced in **Teague v. Lane**, or the harmless error rule; (2) petitioner's confession was voluntary and properly admitted; (3) petitioner's **Brady** claims all fail to satisfy the materiality standard; (4) there was no systemic or intentional exclusion of female Hispanics from either the Wilson County grand jury that indicted petitioner or from the Atascosa County jury venire from which petitioner's jury was selected; and (5) even under the most liberal construction of the cumulative error principle, petitioner is not entitled to federal habeas corpus relief in this cause.[61]

---

[61] See Respondent's Answer, Motion for Summary Judgment, and Supporting Brief, filed November 14, 2000, docket entry no. 14 (henceforth "Respondent's Motion for Summary Judgment"). Respondent's broad assertion of the defense of procedural default is utterly without merit. The Fifth Circuit has repeatedly emphasized that Texas appellate courts did not begin to strictly and regularly applying the Texas abuse-of-the-writ doctrine until February 23, 1994 when the Texas Court of Criminal Appeals announced its decision in **Ex parte Barber**, 879 S.W.2d 889, 892 n.1 (Tex. Crim. App. 1994), **cert. denied**, 513 U.S. 1084 (1995). See **Kunkle v. Dretke**, 352 F.3d 980, 989 (5th Cir. 2003); **Henderson v. Johnson**, 333 F.3d 592, 605 (5th Cir. 2003), **cert. denied**, ___ U.S. ___, 124 S.Ct. 1170, ___ L.Ed.2d ___ (2004); **Fuller v. Johnson**, 158 F.3d 903, 906 (5th Cir. 1998), **cert. denied**, 526 U.S. 1133 (1999); **Emery v. Johnson**, 139 F.3d 191, 195-96 (5th Cir. 1997), **cert. denied**, 525 U.S. 969 (1998); **Fearance v. Scott**, 56 F.3d 633, 642 (5th Cir. 1995), **cert. denied**, 515 U.S. 1153 (1995); **Lowe v. Scott**, 48 F.3d 873, 876 (5th Cir. 1995). Prior to **Ex parte Barber**, Texas courts had not consistently applied state writ-abuse principles. See **Emery v. Johnson**, 139 F.3d at 195; **Fearance v. Scott**, 56 F.3d at 642; **Lowe v. Scott**, 48 F.3d at 876. Because all of petitioner's pleadings in his first state habeas corpus proceeding were filed in calendar year 1993, application of the Texas writ-abuse statute to foreclose state judicial review of petitioner's second state habeas

On April 6, 2001, petitioner filed his reply to respondent's motion for summary judgment and argued therein, in pertinent part, that (1) petitioner's amended federal habeas corpus petition herein was neither a "successive" nor a "second" petition and (2) law enforcement officers had been negligent during their investigation of other suspects.[62]

### III. **Analysis and Authorities**

A.   The Applicable Standard of Review

    1.   The Arguments

Petitioner contends that because he presented the same claims in his first federal habeas proceeding (i.e., SA-95-CA-586-OG) that he presents in this cause and this Court dismissed his first federal habeas corpus proceeding without prejudice for the express purpose of permitting petitioner to return to state court to exhaust state remedies on the same claims and evidence petitioner now presents in this federal habeas corpus proceeding, therefore, his current federal habeas corpus action is a mere "continuation" of his prior federal habeas corpus proceeding.[63] For these reasons,

---

corpus application does not preclude federal habeas review of the merits of the federal constitutional claims petitioner presented for the first time in his second state habeas corpus application.

   [62] See Petitioner's Reply to Respondent's Answer, filed April 6, 2001, docket entry no. 22 (Henceforth "Petitioner's Reply").

   [63] See Petitioner's Amended Petition, at pp. 32-44 and 216-35. Petitioner spends considerable effort arguing that his present federal habeas corpus petition is not a "second" or "successive" petition within the meaning of Title 28 U.S.C. §2244(b). See Petitioner's Amended Petition, at pp. 23-32. However, this Court does not construe respondent's motion for summary judgment as arguing that petitioner's federal habeas corpus petition in this

petitioner argues, he is entitled to de novo review from this Court of his claims herein.

Respondent points out that the Fifth Circuit has expressly rejected this same argument, holding that the more restrictive standard of federal habeas review enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to a federal habeas corpus petition such as petitioner's herein, filed after the effective date of the AEDPA and following the dismissal of a previous federal habeas petition (filed prior to the effective date of the AEDPA) for failure to exhaust available state remedies.[64]

---

cause should be dismissed pursuant to Section 2244(b). Moreover, it is clear in this Circuit that a subsequent federal habeas corpus petition filed after a previous petition has been dismissed without prejudice for want of exhaustion is not a "second" or "successive" petition within the meaning of Section 2244(b). See **Graham v. Johnson**, 168 F.3d 762, 775 (5th Cir. 1999), **cert. denied**, 529 U.S. 1097 (2000); and **In re Gasery**, 116 F.3d 1051, 1052 (5th Cir. 1997). Thus, this portion of petitioner's argument is unnecessary.

[64] See **Graham v. Johnson**, 168 F.3d at 775-81 (rejecting the same arguments made by petitioner herein regarding the appropriate standard of review to be applied to a subsequent federal habeas corpus petition filed after the effective date of the AEDPA following a previous dismissal without prejudice for lack of exhaustion of a federal habeas corpus petition that had been filed prior to the effective date of the AEDPA).
Petitioner also argues that application of the AEDPA's more narrow standard of federal habeas review to his claims herein applies the AEDPA in an impermissibly retroactive manner, thus violating the principle announced in **Landgraf v. USI Film Products**, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). See Petitioner's Amended Petition at pp. 216-35 and Petitioner's Reply at pp. 11-17. However, the Fifth Circuit has expressly rejected this same argument. See **Graham v. Johnson**, 168 F.3d at 781-87 (rejecting as unreasonable a petitioner's professed detrimental reliance on pre-AEDPA case law where the petitioner filed an unexhausted, pre-AEDPA, federal habeas corpus petition that was dismissed without prejudice and who later sought to avoid the application of the AEDPA when he re-filed his federal habeas corpus petition after the effective date of the AEDPA). Moreover,

2.   The AEDPA Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA.[65]

Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[66]

---

petitioner does not identify any changes in substantive federal constitutional law between the date he filed his first federal habeas corpus petition and the date he initiated this proceeding on which he claims to have relied to his detriment. As explained hereinafter, petitioner is entitled to no relief from this Court, regardless of whether his claims herein are reviewed under the AEDPA's highly deferential standard or a de novo standard of review. Thus, even if petitioner's construction of the Supreme Court's holding in **Landgraf** is correct and the Fifth Circuit's holding in **Graham v. Johnson** erroneous, petitioner is still entitled to no relief from this Court.

[65] See **Penry v. Johnson**, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001).

[66] See **Wiggins v. Smith**, 539 U.S. 510, ___, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003); **Price v. Vincent**, 538 U.S. 634, ___, 123 S.Ct. 1848, 1852-53, 155 L.Ed.2d 877 (2003); **Williams v. Taylor**, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); and 28 U.S.C. §2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings.[67]  Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.[68]  Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.[69]  A federal court

---

[67] See **Bell v. Cone**, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002); **Penry v. Johnson**, 532 U.S. at 792, 121 S.Ct. at 1918; and **Williams v. Taylor**, 529 U.S. at 404-05, 120 S.Ct. at 1519.

[68] See **Mitchell v. Esparza**, ___ U.S. ___, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003): "A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"; **Price v. Vincent**, 538 U.S. at ___, 123 S.Ct. at 1853; **Bell v. Cone**, 535 U.S. at 694, 122 S.Ct. at 1850; **Penry v. Johnson**, 532 U.S. at 1918; and **Williams v. Taylor**, 529 U.S. at 404-06, 120 S.Ct. at 1518-19.
    The Supreme Court has held that a state court's failure to cite governing Supreme Court authority does <u>not</u>, *per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" **Mitchell v. Esparza**, ___ U.S. at ___, 124 S.Ct. at 10; **Early v. Packer**, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002).

[69] See **Wiggins v. Smith**, 539 U.S. at ___, 123 S.Ct. at 2534-35; **Woodford v. Visciotti**, 537 U.S. 19, 24-25, 123 S.Ct. 357, 360, 154

making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."[70]  The focus of this inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable and an "unreasonable" application is different from a merely incorrect one.[71]

The AEDPA significantly restricts the scope of federal habeas review of state court fact findings, requiring that a petitioner challenging state court factual findings establish by clear and convincing evidence that the state court's findings were erroneous.[72]

---

L.Ed.2d 279 (2002); **Bell v. Cone**, 535 U.S. at 694, 122 S.Ct. at 1850; **Penry v. Johnson**, 532 U.S. at 792, 121 S.Ct. at 1918; and **Williams v. Taylor**, 529 U.S. at 407-08, 120 S.Ct. at 1520-21.
  In **Williams**, the Supreme Court expressly reserved for another day the issue of how federal habeas courts should determine whether a state court erroneously extended a legal principle into a new realm or erroneously refused to extend an existing legal principle into a new area. See **Williams v. Taylor**, 529 U.S. at 408-09, 120 S.Ct. at 1521.

[70] See **Wiggins v. Smith**, 539 U.S. at ___, 123 S.Ct. at 2535; **Woodford v. Visciotti**, 537 U.S. at 25, 123 S.Ct. at 360; **Penry v. Johnson**, 532 U.S. at 793, 121 S.Ct. at 1918; **Williams v. Taylor**, 529 U.S. at 409-11, 120 S.Ct. at 1520-22.

[71] See **Wiggins v. Smith**, 539 U.S. at ___, 123 S.Ct. at 2535; **Price v. Vincent**, 538 U.S. at ___, 123 S.Ct. at 1853, ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner."); **Woodford v. Visciotti**, 537 U.S. at 25, 123 S.Ct. at 360; **Bell v. Cone**, 535 U.S. at 694, 122 S.Ct. at 1850; **Penry v. Johnson**, 532 U.S. at 793, 121 S.Ct. at 1918; and **Williams v. Taylor**, 529 U.S. at 410-11, 120 S.Ct. at 1522.

[72] See **Foster v. Johnson**, 293 F.3d 766, 776 (5th Cir. 2002), **cert. denied**, 537 U.S. 1054 (2002); **Rudd v. Johnson**, 256 F.3d 317, 319 (5th Cir. 2001), **cert. denied**, 534 U.S. 1001 (2001): "The presumption is particularly strong when the state habeas court and

3.   **De Novo** Review

Out of an abundance of caution, however, and for the purpose

of avoiding having to grant a Certificate of Appealability on the

issue of which standard of review should apply to petitioner's

claims herein, this Court will evaluate all of petitioner's claims

herein under both the AEDPA standard of review as well as a de novo

standard of review.[73]

---

the trial court are one and the same."; **Dowthitt v. Johnson**, 230 F.3d 733, 741 (5th Cir. 2000), **cert. denied**, 532 U.S. 915 (2001); **Miller v. Johnson**, 200 F.3d 274, 281 (5th Cir. 2000), **cert. denied**, 531 U.S. 849 (2000), (holding state court fact findings are presumed correct and the petitioner has the burden of rebutting the presumption by clear and convincing evidence); **Hicks v. Johnson**, 186 F.3d 634, 637 (5th Cir. 1999), **cert. denied**, 528 U.S. 1132 (2000), (holding the AEDPA requires federal habeas courts to accept as correct state court factual determinations unless the petitioner rebuts same by clear and convincing evidence); **Morris v. Cain**, 186 F.3d 581, 583 (5th Cir. 1999); **Davis v. Johnson**, 158 F.3d 806, 812 (5th Cir. 1998), **cert. denied**, 526 U.S. 1074 (1999); **Jackson v. Johnson**, 150 F.3d 520, 524 (5th Cir. 1998), **cert. denied**, 526 U.S. 1041 (1999); **Williams v. Cain**, 125 F.3d 269, 277 (5th Cir. 1997), **cert. denied**, 525 U.S. 859 (1998), (recognizing that under the AEDPA, state court factual findings "shall be presumed correct unless rebutted by 'clear and convincing evidence'"); **Hernandez v. Johnson**, 108 F.3d 554, 558 & n.4 (5th Cir. 1997), **cert. denied**, 522 U.S. 984 (1997), (holding that under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts "where it belongs" and recognizing that the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court"); and 28 U.S.C. § 2254(e)(1).

[73]   As explained at length hereinafter, petitioner's claims herein are utterly without even arguable merit that petitioner is entitled to federal habeas corpus relief under either the AEDPA's standard of review of a true de novo standard of review.

B.   Involuntary Confession Claim

   1.   The Claim

   Petitioner argues that the admission of his written confession was improper because his confession was involuntary.   More specifically, he argues that (1) his wife's arrest was pre-textual, intended to coerce petitioner into confessing his guilt, (2) federal law enforcement agents failed to take petitioner before a federal magistrate immediately after his arrest, (3) petitioner's interrogators "fed" petitioner information obtained from Leroy Sosa, (4) petitioner was incapable of reading his written confession, and (5) petitioner was mentally impaired during his interrogation.[74]

   2.   The Clearly Established Constitutional Standard

   In **Colorado v. Connelly**,[75] the United States Supreme Court rejected many of the arguments underlying petitioner's first claim for relief herein, i.e., that the voluntariness of a defendant's confession somehow turns on the subjective state of mind and mental condition of the defendant.[76]   Instead, the Supreme Court held

_____

   [74] See Petitioner's Amended Petition, at pp. 44-68.
   Respondent argues petitioner's involuntary confession claim, as augmented by the additional evidence now before this Court, is procedurally barred. See Respondent's Motion for Summary Judgment, at p. 13.   For the reasons discussed forth in note 61, **supra**, respondent's assertions of procedural default are legally frivolous.

   [75] 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

   [76] See **Colorado v. Connelly**, 479 U.S. at 164-67, 107 S.Ct. at 520-22, repeatedly emphasizing that coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the

unequivocally that a conclusion that a confession was involuntary must be premised on a finding that law enforcement officials employed or directed coercive actions toward the defendant and that said coercive conduct was "causally related to the confession."[77]

3.   AEDPA Review

a.   The State Court Decisions

At the **Jackson v. Denno**[78] hearing held May 18, 1984, petitioner neither testified that his confession was involuntary nor offered the state trial court any other evidence suggesting that any promises or threats, express or implied, had ever been made which actually induced petitioner's confession.  On the contrary, the only witnesses to testify during that hearing were law enforcement officers who repeatedly emphasized that (1) petitioner was orally given his **Miranda** warnings both immediately after petitioner's arrest and again immediately prior to the start of petitioner's custodial interrogation, (2) petitioner indicated he understood his rights and wished to answer questions concerning the bank robbery and murder of Deputy Childress, (3) no promises or threats were ever made to induce petitioner's confession, and (4) petitioner read over his written confession, had it read to him, and made and

---

Fourteenth Amendment).

[77] See **Colorado v. Connelly**, 479 U.S. at 164-71, 107 S.Ct. at 520-24.

[78] 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

initialed changes thereto, before petitioner signed same.[79]   In

---

[79] FBI Special Agent Ronald Clendening testified at the pretrial hearing on petitioner's motion to suppress his confession that (1) he orally read petitioner his **Miranda** warnings at the scene of petitioner's arrest, (2) petitioner said he had no questions regarding the rights Clendening read to him, (3) en route to the FBI's office in down town San Antonio the night of the petitioner's arrest, petitioner was asked if he was involved in the bank robbery in LaVernia on November 4, 1983 and petitioner indicated he was, (4) when they arrived at the FBI office shortly thereafter, another agent again read petitioner a set of warnings, which petitioner acknowledged by signing same, (5) petitioner indicated that he understood the rights that were read to him at the FBI office, (6) thereafter, petitioner gave a statement that was reduced to writing and which petitioner signed, and (7) no promises or threats were made to induce petitioner's confession. See S.F. Trial, Volume 1, testimony of Ronald Clendening, at pp. 260-61, 263, 265-71, 287-90, 296-302, 310, and 313-14.

FBI Special Agent Moses Alaniz testified at the same hearing that (1) he witnessed agent Clendening orally advice petitioner of his rights at the time and place of petitioner's arrest, (2) he read petitioner a document styled "Advice to Rights" and petitioner acknowledged same by signing that document, all within five minutes after petitioner arrived at FBI office on the night of petitioner's arrest, (3) petitioner indicated that he wished to make a statement, (4) no threats or promises were made to induce petitioner's statement, (5) he interviewed petitioner concerning the bank robbery and murder for approximately one and a half hours, (6) once a stenographer arrived, he dictated a statement to the stenographer that was consistent with what petitioner had told him during the interview, (7) he read the written statement to petitioner, who also read the document and made several changes thereto and initialed same, (8) petitioner then signed the written statement, (9) he and agent Clendening interviewed petitioner in English, during which they allowed petitioner to speak in a narrative and interrupted when they knew petitioner was fabricating or when petitioner said something that was inconsistent with the statement Leroy Sosa had previously given, (10) while petitioner indicated that he had some difficulty reading and writing English, petitioner did not indicate that he had any difficulty reading his own written statement, and (11) he read petitioner's entire written statement back to petitioner before petitioner signed same. See **Id.**, Volume 1, testimony of Moses Alaniz, at pp. 317-19, 321-26, 330-33, 343, 345, 348-53, 360, 364-65, 369, 371, 373-74, and 387.

A District Attorney's investigator testified that (1) he observed petitioner being read his **Miranda** rights at the scene of petitioner's arrest, (2) he witnessed another FBI agent read petitioner his rights at the FBI office shortly thereafter, (3) petitioner said that he understood his rights, (3) he witnessed

addition, the top of the first page of petitioner's three-page, written statement which petitioner executed contains a written recitation of petitioner's constitutional rights.[80]

While there was testimony from a law enforcement officer at the **Jackson v. Denno** hearing that petitioner's wife Sylvia was crying hysterically during petitioner's arrest,[81] there was no testimony or other evidence introduced during that hearing

---

petitioner sign the rights information form, (4) petitioner then began talking with agent Alaniz, (5) after a stenographer recorded petitioner's written statement, the statement was read back to petitioner, who made a couple corrections, initialed same, and then signed the last page of the statement, (6) no threats or promises were made to induce petitioner's confession, (7) petitioner indicated several times that he understood his written statement, and (8) he had no trouble communicating orally in English with petitioner, either on the night of petitioner's arrest or on subsequent dates when he encountered petitioner. See **Id.**, Volumes 1-2, testimony of Kenneth L. Denn, at pp. 391-93, 395, 397-400, 403-05, 409-10, 412-16, 433, 436-37, 442-43, and 446.

A Texas Ranger testified that he witnessed petitioner give, review, make changes to, and eventually sign a written statement in the hours immediately following petitioner's arrest. See **Id.**, Volume 2, testimony of Adolpho Cuellar, at pp. 453, 464, and 473.

[80] See Petitioner's Confession, admitted into evidence at trial as State's Exhibit 52 (previously admitted at petitioner's **Jackson v. Denno** hearing as State's Exhibit 5), included in the volume from petitioner's state court trial marked "Trial Exhibits" at p. 1.

[81] See **Id.**, Volume 2, testimony of Kenneth L. Denn, at p 403:
Q:   And did he, do you recall hearing any statements subsequent to him having given his Miranda Warning?
A:   He said something, I don't remember the exact words, but it was something like, "I am Pete", "I am Pete, and I understand", and at that time I walked around and his wife was toward the front, on the same side of the car, and she was crying and almost in hysterics, and I went up and asked her not to cry, I told her nobody was going to get hurt, and I walked back to where Pedro was.

establishing that Sylvia was either threatened or menaced by anyone with a weapon during or after petitioner's arrest.[82]   Likewise, petitioner completely failed to present any evidence to the state trial court prior to the admission of petitioner's confession suggesting that the petitioner was either (1) unable to read or understand his written statement, (2) mentally impaired at the time he gave his confession, (3) under the impression that his wife had been charged or would be charged with any crime relating to the bank robbery or murder of Deputy Childress, or (4) "fed" any information during petitioner's post-arrest interview relating to either the robbery or murder of which petitioner lacked pre-existing personal knowledge.

On direct appeal from his conviction and sentence, petitioner argued the state trial court had erroneously concluded his

---

[82] There was testimony by FBI Special Agent Moses Alaniz during petitioner's trial that (1) when he arrived at the scene of petitioner's arrest, there were several law enforcement officers already present and the situation was under control, (2) the only weapon drawn was a shotgun held by agent Joe Ford, who was located near Sylvia Sosa, (3) Sylvia Sosa was on the ground and agent Ford's shotgun was pointed at her, and (4) petitioner was informed during his post-arrest interview that his wife had been arrested. See S.F. Trial, Volume 9, testimony of Moses P. Alaniz, at pp. 3283-84 and 3289.   Significantly, the foregoing testimony was elicited at petitioner's trial after the admission of petitioner's written confession. See **Id.**, at pp. 3277-78.   Even at trial, petitioner offered no testimony from either himself or any other witnesses, including his wife, establishing that petitioner actually observed the allegedly threatening behavior by agent Ford toward Sylvia Sosa. Nor did petitioner offer the state trial court any evidence showing that his decision to give his confession was related in any way to his wife's arrest. Curiously, petitioner has not argued that his trial counsel rendered ineffective assistance by failing to introduce such evidence during petitioner's **Jackson v. Denno** hearing.

confession was voluntary.  The Texas Court of Criminal Appeals rejected those arguments, finding the petitioner had been warned of his rights on three occasions during the course of the evening in question and, on each occasion, petitioner acknowledged that he understood his rights, wished to waive them, and wished to talk with the FBI agents.[83]

      b.   <u>AEDPA Analysis</u>

Having independently reviewed the record from petitioner's **Jackson v. Denno** hearing held May 18, 1984 and from the petitioner's trial, this Court can find not even a scintilla of evidence in the record indicating that law enforcement officials ever engaged in any coercive actions toward petitioner that elicited petitioner's written confession.  Not surprisingly, petitioner does not identify any evidence in the record supporting a conclusion that there was any coercion directed toward him which actually led to his confession.  Instead, he argues that implicit threats made against his wife, arising from his knowledge of her arrest, combined with his own limited command of the English language and his "submissive personality," rendered his otherwise logical, coherent, confession involuntary.  However, the Supreme Court rejected such an approach to voluntariness issues when it held in **Colorado v. Connelly** that coercion was the *sine qua non* of

---

[83] <u>See</u> **Sosa v. State**, 769 S.W.2d at 915 (emphasizing that petitioner did not testify at the hearing on his motion to suppress and that every law enforcement officer present testified that no promises, coercion, or any type of force or threats were used to induce petitioner's confession).

any finding of involuntariness.[84]  Likewise, the Supreme court's

opinion in **Colorado v. Connelly** also emphasized that allegedly

coercive police conduct must be causally related to the confession

before a constitutional violation occurs.[85]

Petitioner offered the state courts absolutely no testimony or

other evidence showing that his wife's arrest had any impact

whatsoever upon his decision to give his post-arrest confession.

In fact, while there was testimony at petitioner's trial suggesting

that petitioner was informed sometime during his interview of the

fact of his wife's arrest, petitioner made no effort (either at

trial or during his **Jackson v. Denno** hearing) to establish at

---

[84] See **Colorado v. Connelly**, 479 U.S. at 166-67, 107 S.Ct. at 521-22.
The cases cited by petitioner in support of his contention that the arrest of Sylvia Sosa was itself inherently coercive vis-a-vis petitioner's written statement are unpersuasive because those opinions either (1) involve factual situations in which there was an express threat to arrest, question, or bring charges against a defendant's relative in the absence of probable cause therefor, (2) pre-date the Supreme Court's landmark opinion in **Colorado v. Connelly**, or (3) the defendant had some reason to believe that his confession would lead to the release of his relative from custody.
Petitioner has never alleged that any law enforcement officer or agent ever promised or represented to petitioner that his wife would be released from custody if petitioner gave a confession. Thus, petitioner has failed to allege any facts from which a finding could be made that Sylvia's arrest actually induced petitioner's confession. Petitioner offered no testimony at his **Jackson v. Denno** hearing establishing that his wife's arrest had any impact on his decision to consent to his post-arrest interview or to give his written statement to FBI agent Alaniz. As such, it is unnecessary for this Court to determine whether Sylvia Sosa's arrest was pre-textual.

[85] See **Colorado v. Connelly**, 479 U.S. at 164, 107 S.Ct. at 520: "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."

precisely what point during his interview petitioner became aware of the fact his wife had been arrested.

Under such circumstances, neither the state trial court's finding of voluntariness at the conclusion of the **Jackson v. Denno** hearing nor the Texas Court of Criminal Appeals' finding of voluntariness on direct appeal were unreasonable determinations of the facts in light of the evidence then-before those state courts. Petitioner simply failed to present the state courts with any evidence prior to the admission of his written statement at trial showing that he was coerced into giving that statement. Thus, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's involuntary confession claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented to that court.

4.  De Novo Review

Petitioner utterly failed to present the state courts and this Court with any specific factual allegations, much less any evidence, showing that he was ever advised during his interrogation immediately after his arrest that his wife would be freed or that potential charges against her would be dropped if he confessed. Nor does petitioner allege that any law enforcement officer or agent threatened to prosecute Sylvia Sosa for any criminal offense unless petitioner confessed to the murder of Deputy Childress. Thus, petitioner has failed to allege any specific facts, much less

furnish any evidence, showing that law enforcement officers made any threats or otherwise engaged in any coercive conduct which actually induced petitioner's waiver of his constitutional rights or otherwise rendered petitioner's confession involuntary.[86]

Petitioner alleges no specific facts showing that he was given any information during his post-arrest interview about the murder of Deputy Childress of which petitioner was unaware prior to his arrest. Likewise, petitioner offered neither the state courts nor this Court any evidence establishing that petitioner (contrary to his numerous statements to the contrary made to law enforcement officers during his interview), did <u>not</u> understand either his constitutional rights or the contents of his written confession. Thus, petitioner offered neither the state courts nor this Court any specific factual allegations, much less any evidence, showing that his waiver of his constitutional right to remain silent and his ensuing confession were anything other than voluntary.[87]

---

[86] <u>See</u> **Colorado v. Connelly**, 479 U.S. at 170-71, 107 S.Ct. at 523-24 (holding that coercive governmental conduct is the key to a finding of involuntariness and that, absent a showing that physical or psychological pressure was used to elicit a defendant's statement, the Fifth Amendment is not violated); **Hopkins v. Cockrell**, 325 F.3d 579, 584 (5th Cir. 2003), **cert. denied**, ___ U.S. ___, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003): "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant."; and **Muniz v. Johnson**, 132 F.3d 214, 219 (5th Cir. 1998), **cert. denied**, 523 U.S. 1113 (1998): "The defendant, therefore, must show that but for police coercion he would not have given the confession."

[87] In **Colorado v. Connelly**, the Supreme Court reiterated that the State carries its burden of showing that a defendant's waiver of his **Miranda** rights was voluntary simply by establishing that

Both the Supreme Court and Fifth Circuit have expressly held that while mental condition may be a significant factor in the voluntariness calculation, the defendant's mental condition, by itself, is not dispositive of the issue of voluntariness.[88] Petitioner's unsubstantiated contention that he heard voices during his post-arrest interrogation (a contention petitioner utterly failed to support with any evidence during his **Jackson v. Denno** hearing) likewise does not support a finding of involuntariness.[89]

In sum, because petitioner failed to testify at his **Jackson v. Denno** hearing or to offer the state trial court any evidence

_____

fact by a preponderance of the evidence. See **Colorado v. Connelly**, 479 U.S. at 168, 107 S.Ct. at 522.

Petitioner's lengthy arguments suggesting that law enforcement officers subjectively knew or should have known that they lacked probable cause to arrest Sylvia Sosa are irrelevant to the issue of whether petitioner's waiver of his own constitutional rights and ensuing confession were voluntary. See **Moran v. Burbine**, 475 U.S. 412, 423, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1985): "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights."

[88] See **Colorado v. Connelly**, 479 U.S. at 165, 107 S.Ct. at 520-21: "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."; and **Carter v. Johnson**, 131 F.3d 452, 462-63 (5th Cir. 1997), **cert. denied**, 523 U.S. 1099 (1998) (holding that a defendant's failure to establish both official coercion and a causal link between the coercive conduct and the confession negates a finding of involuntariness).

[89] See **Colorado v. Connelly**, 479 U.S. at 170-71, 107 S.Ct. at 523-24: "Respondent's perception of coercion flowing from the 'voice of God,' however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak."; and **Carter v. Johnson**, 131 F.3d at 462 n.16 (holding that allegations regarding the defendant's state of mind at the time of the confession are unavailing absent state coercion).

showing that his decision to confess was based in any manner on his becoming aware of wife's arrest, petitioner's challenge to the voluntariness of his confession on that basis does not satisfy the standard set forth in **Colorado v. Connelly**. Likewise, petitioner utterly failed to present any specific factual allegations, much less any evidence, to this Court showing that his confession actually resulted from his lack of fluency in English, mental problems, or allegedly submissive personality. Petitioner also failed to identify for this Court any information law enforcement officers allegedly "fed" him during his post-arrest interview.

Finally, it appears undisputed that petitioner was orally given his **Miranda** warnings at least twice prior to his post-arrest interview and Special Agent Alaniz read petitioner the warnings on the top of the first page of petitioner's written statement before petitioner executed same. Petitioner has not alleged any specific facts, much less presented this Court with any evidence, showing that he failed to comprehend any of those warnings. Under such circumstances, petitioner's challenge to the admission of his written statement as involuntary is without any arguable merit, even when reviewed de novo.[90]

---

[90] See **Muniz v. Johnson**, 132 F.3d at 220 (holding in a pre-AEDPA case that a petitioner's complaint that his confession was involuntary lacked merit where the evidence supported the state court's finding that the petitioner received and understood his **Miranda** warnings before he gave his confession). It should be noted that petitioner executed his written confession approximately four hours after his arrest and that the delays in transcribing same appear to have resulted from the fact that petitioner was apprehended late on a Saturday night and Texas Ranger Cuellar needed to travel from the FBI office in downtown San Antonio to his

C.   **Brady** Claims

   1.   The Claims

   In his second, third, and seventh claims for relief, petitioner argues that the prosecution withheld "voluminous *Brady* material that was crucial to the defense's case." More specifically, petitioner identifies the following allegedly exculpatory material: (1) FBI reports summarizing descriptions of the bank robbers given by eyewitness shortly after the robbery; (2) information on other suspects, i.e., Oscar Barrientos, Evodio Arriaga, Earl Hunter, Gilbert and Severo Garza, Gilbert Jaramillo, and Manuel Villanueva; (3) over sixty fingerprints lifted from the bank, none of which matched either petitioner or Leroy Sosa; (4) the results of the polygraph examinations of petitioner, Bruno Juarez Escamilla, and Irene Lugo Villarreal; (5) the results of the hypnosis sessions of Charles Esparza, Homer Burkett, and Bernice Howes; (6) the statements of trial witnesses Charles Esparza, Larry Cox, and Wanda Von Minden; and (7) information regarding Leroy Sosa's history of drug and alcohol abuse.[91]

   2.   The Clearly Established Constitutional Standard

   Few constitutional principles are more firmly established by Supreme Court precedent than the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt

_____

office to obtain the proper state form for petitioner's confession.

   [91] See Petitioner's Amended Petition, at pp. 69-169 and 271-80.

49

or to punishment, irrespective of the good faith or bad faith of the prosecution.'"[92] The Supreme Court has also held that the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced more than forty years ago in **Brady v. Maryland**, applies even when there has been no request by the accused.[93] The duty also applies to impeachment evidence.[94] Moreover, the rule encompasses evidence known only to police investigators and not to the prosecutor.[95]

Under clearly established Supreme Court precedent, there are three elements to a **Brady** claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the

---

[92] **Banks v. Dretke**, ___ U.S. ___, ___, 124 S.Ct. 1256, 1272, ___ L.Ed.2d ___ (2004) (*quoting* **Brady v. Maryland**, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963)); **Strickler v. Greene**, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (*quoting* **Brady**); **Kyles v. Whitley**, 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (*quoting* **Brady**).

[93] See **Strickler v. Greene**, 527 U.S. at 280, 119 S.Ct. at 1948; **Kyles v. Whitley**, 514 U.S. at 433, 115 S.Ct. at 1565; **United States v. Agurs**, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

[94] See **Banks v. Dretke**, ___ U.S. at ___, 124 S.Ct. 1272; **Strickler v. Greene**, 527 U.S. at 280, 119 S.Ct. at 1948; **Kyles v. Whitley**, 514 U.S. at 433-34, 115 S.Ct. at 1565-66; **United States v. Bagley**, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

[95] **Strickler v. Greene**, 527 U.S. at 280-81, 119 S.Ct. at 1948; **Kyles v. Whitley**, 514 U.S. at 437-38, 115 S.Ct. at 1567-68. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." **Strickler v. Greene**, 527 U.S. at 281, 119 S.Ct. at 1948, *quoting* **Kyles v. Whitley**, 514 U.S. at 437, 115 S.Ct. at 1567.

State, either willfully or inadvertently; and (3) the evidence must
be "material," i.e., prejudice must have ensued from its non-
disclosure.[96]  Evidence is "material" under **Brady** where there exists
a "reasonable probability" that had the evidence been disclosed the
result at trial would have been different.[97]  The Supreme Court has
emphasized four aspects of the **Brady** materiality inquiry: first, a
showing of materiality does not require demonstration by a
preponderance that disclosure of the suppressed evidence would have
resulted in the defendant's acquittal[98]; second, the materiality

---

[96] **Banks v. Dretke**, ___ U.S. at ___, 124 S.Ct. at 1272;
**Strickler v. Greene**, 527 U.S. at 281-82, 119 S.Ct. at 1948.

[97] See **Banks v. Dretke**, ___ U.S. at ___, 124 S.Ct. at 1276;
**Strickler v. Greene**, 527 U.S. at 289-90, 119 S.Ct. at 1952; **Wood v.
Bartholomew**, 516 U.S. at 1, 5, 116 S.Ct. 7, 10, 133 L.Ed.2d 1
(1995); **Kyles v. Whitley**, 514 U.S. at 433, 115 S.Ct. at 1565,
**United States v. Bagley**, 473 U.S. at 682, 105 S.Ct. at 3383.

[98] See **Strickler v. Greene**, 527 U.S. at 289-90, 119 S.Ct. at
1952; **Kyles v. Whitley**, 514 U.S. at 434, 115 S.Ct. at 1566; **United
States v. Bagley**, 473 U.S. at 682, 105 S.Ct. at 3383 (expressly
adopting the "prejudice" prong of the **Strickland v. Washington**, 466
U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of
ineffective assistance claims as the appropriate standard for
determining "materiality" under *Brady*).
> As we made clear in *Kyles*, the materiality inquiry is not
> just a matter of determining whether, after discounting
> the inculpatory evidence in light of the undisclosed
> evidence, the remaining evidence is sufficient to support
> the jury's conclusions.  Rather, the question is whether
> "the favorable evidence could reasonably be taken to put
> the whole case in such a different light as to undermine
> confidence in the verdict."

**Strickler v. Greene**, 527 U.S. at 290, 119 S.Ct. at 1952, *quoting*
**Kyles v. Whitley**, 514 U.S. at 434-35, 115 S.Ct. at 1565. *which in
turn quoted* **United States v. Bagley**, 473 U.S. at 682, 105 S.Ct. at
3383.

standard is <u>not</u> a sufficiency of the evidence test[99]; third, once
materiality is established, harmless error analysis has no
application[100]; and fourth, materiality must be assessed
collectively, not item by item.[101]

    3.  <u>AEDPA Review</u>

      a.  <u>The State Court Proceedings</u>

While petitioner did present a series of **Brady** claims to the
state courts in the course of his first state habeas corpus
proceeding,[102] the **Brady** claims petitioner presented to this Court

---

[99] See **Kyles v. Whitley**, 514 U.S. at 434-35, 115 S.Ct. at 1566.
One does not show a *Brady* violation by demonstrating that
some of the inculpatory evidence should have been
excluded, but by showing that the favorable evidence
could reasonably be taken to put the whole case in such
a different light as to undermine confidence in the
verdict.
**Kyles v. Whitley**, 514 U.S. at 435, 115 S.Ct. at 1566.

[100] See **Kyles v. Whitley**, 514 U.S. at 435-36, 115 S.Ct. at
1566-67:
Assuming *arguendo* that a harmless-error enquiry were to
apply, a *Bagley* error could never be treated as harmless
since "a reasonable probability that, had the evidence
been disclosed to the defense, the result of the
proceeding would have been different," necessarily
entails the conclusion that the suppression must have had
"substantial and injurious effect or influence in
determining the jury's verdict."
**Kyles v. Whitley**, 514 U.S. at 435, 115 S.Ct. at 1566.

[101] **Kyles v. Whitley**, 514 U.S. at 436-37, 115 S.Ct. at 1567.

[102] Petitioner's original state habeas corpus application
included claims arguing that the prosecution had failed to disclose
(1) reports allegedly stating that eyewitnesses at the bank
furnished the FBI with many "different" physical descriptions of
the two bank robbers, (2) FBI reports showing that the only
deceptive area identified in the analysis of petitioner's February
21, 1984 polygraph examination results related to petitioner's
knowledge of the location of the stolen money, (3) evidence showing
that sixty or more fingerprint lifts from the bank could not be

in his first federal habeas corpus proceeding, as well as this proceeding, are significantly different from the **Brady** claims the Texas Court of Criminal Appeals rejected on the merits during petitioner's first state habeas corpus proceeding.[103] In the course of petitioner's first state habeas corpus proceeding, the state trial court found that (1) none of the eyewitnesses at the bank robbery could make facial identifications of petitioner or Leroy

---

linked to petitioner, (4) evidence showing that law enforcement officers investigating the bank robbery received information on a number of suspects other than petitioner and Leroy Sosa, including an Earl Hunter, and (5) the statements of trial witnesses Charles Esparza, Larry Cox, and Wanda Von Minden. See State Habeas Transcript, Volume I, at pp. 102-09 and 118-24. Petitioner's "Supplemental Petition" [sic] in his first state habeas corpus proceeding included another two *Brady* claims asserting the State had failed to disclose (1) information regarding Leroy Sosa's history of drug and alcohol abuse and (2) the "fact" that Leroy Sosa had been coerced during plea negotiations into giving perjured testimony during petitioner's trial. See State Habeas Transcript, Volume I, at pp. 310-16.

[103] This Court concluded in the course of petitioner's first federal habeas corpus proceeding that petitioner's *Brady* claims, among others, had been significantly supplemented (and significantly altered) through the submission of voluminous new evidentiary support and, therefore, available state court remedies had not been exhausted with regard to those altered claims. The *Brady* claims (including petitioner's supporting evidence) which petitioner presents to this Court in this federal habeas corpus proceeding, however, are the same *Brady* claims and supporting evidence that he presented to the state courts in his second state habeas corpus proceeding. Thus, petitioner has exhausted available state remedies on these claims for relief and the evidence supporting same.

Respondent argues that petitioner procedurally defaulted on the new aspects of his *Brady* claims by failing to present the new evidentiary support for same that petitioner relies upon in this Court to the state habeas court in the course of petitioner's first state habeas corpus proceeding. See Respondent's Motion for Summary Judgment, at p. 13: "they are procedurally barred to the extent that they are supported by that new evidence." For the reasons discussed in note 61, **supra**, however, respondent's assertions of procedural default are legally frivolous.

Sosa but, rather, limited their descriptions of the robbers to their physical stature; (2) petitioner's trial counsel was never given information regarding either (a) the results of petitioner's polygraph examination, (b) the names or descriptions of any other suspects, (c) the fact that numerous fingerprints were lifted from the bank which did not match petitioner or Leroy Sosa, or (d) the descriptions of the robbers furnished to the FBI by bank employees; (3) while Leroy Sosa did submit an affidavit in which he recanted several aspects of his trial testimony,[104] Leroy Sosa's recanting

---

[104] Leroy Sosa's one-page recanting affidavit was admitted into evidence during the hearing in petitioner's first state habeas corpus proceeding as Defendant's Exhibit 43. In pertinent part, it provided as follows:

1. From the age of 15 I drank alcohol everyday. At the time I was arrested in December of 1983, I was using methamphetamine four times a week, and I was using heroin twice a week.

2. When I was first incarcerated in the Floresville jail, I was ill from withdrawing from alcohol and I believe it was known to the jailers.

3. At the time of the trial I testified that Pedro Sosa initiated conversations about robbing the bank. However, I initiated the planning of the robbery. The reason I testified that Pedro Sosa planned the robbery was because the District Attorney, Alger Kendall, said that I must testify that Pedro planned it in order to keep my deal with Mr. Kendall. During the discussion between Mr. Kendall and I, I told him that it was not true that Pedro planned the robbery.

4. I carried Deputy Childress' .44 caliber gun when in the bank. Mr. Kendall told me that I was supposed to be carrying a .38.

5. In my statement dated 12/19/83, I said that we disarmed the Reserve deputy in the bank. However I am the person who took the Reserve Deputy's radio and .25 caliber revolver.

6. In my statement dated 12/19/83, I said that Pedro had the deputy take his shirt off. However, I am the person who told the deputy to take his shirt off.

7. At the time of the trial I testified that I did not own a gun at the time of the robbery. However,

affidavit did not recant the portions of his trial testimony in which he identified petitioner as the sole person who fatally shot Deputy Childress; (4) Leroy Sosa was not under the influence of drugs or alcohol at the time he was arrested or gave his statement and none of the evidence suggesting otherwise was in existence at the time of petitioner's trial[105]; and (5) the prosecuting attorney never solicited perjury from Leroy Sosa, never told Leroy he must testify in a particular manner regarding the identity of the person who planned the robbery, and never met with Leroy Sosa outside the presence of Leroy's attorney.[106]   The state trial court concluded

---

before and during the robbery I owned a .44 caliber handgun.
     8.   At the trial of Pedro Sosa, I testified that it was Pedro's idea to use a deputy's car during the robbery.   However, I came up with the idea to use a deputy's car after seeing one parked in the town of LaVernia, Texas before the robbery.

[105] Again, as explained above, in addition to Leroy Sosa's recanting affidavit, the state habeas court had before it the testimony of Texas Ranger Adolfo Cuellar, who was present during the arrest and interrogation of Leroy Sosa and who denied observing anything that led him to believe that Leroy was at that time under the influence of drugs or alcohol. See S.F. State Habeas Hearing, Volume VII of 8, testimony of Adolfo Cuellar, at pp. 765-76, 786, 790, and 798.

[106] See State Habeas Transcript, Volume II, at pp. 629-36 and 641-44.
     In addition to Leroy's recanting affidavit, the state trial judge who presided over petitioner's first state habeas corpus proceeding also had before him the testimony of both the prosecuting attorney, as well as Leroy Sosa's former defense counsel, both of whom denied any knowledge of either (1) any request, demand, or suggestion by the prosecution or its agents that Leroy Sosa testify falsely as to any subject during petitioner's trial or (2) any conversations between Leroy Sosa and the prosecutor outside the presence of Leroy's defense counsel. See S.F. State Habeas Hearing, Volume VII of 8, testimony of Allan Manka, at pp. 643-49 and 674-76; testimony of Alger H. Kendall,

that (6) the fingerprint evidence was not exculpatory, (7) there was no evidence linking any of the other suspects to petitioner's murder of Deputy Childress, and (8) none of the allegedly withheld evidence was "material" under **Brady**.[107] The Texas Court of Criminal Appeals found the foregoing findings and conclusions fully supported by the record and denied state habeas relief.

      b.   AEDPA Review

This Court has independently reviewed the record from petitioner's first state habeas corpus proceeding and concludes that the state habeas court's findings of fact, conclusions of law, and ultimate rejection on the merits of petitioner's **Brady** claims were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented to that court.

Petitioner failed to present the state habeas court with any evidence linking any person other than petitioner or Leroy Sosa to the murder of Deputy Childress. Petitioner presented the state habeas court with no evidence showing there was anything exculpatory or favorable about petitioner's polygraph examination results. Petitioner presented the state habeas court with no evidence showing that any of the fingerprint evidence obtained from the bank or Deputy Childress' car could be linked to any other

_____

Jr., at pp. 681-82, 692-94, 697, and 723.

    [107] See State Habeas Transcript, Volume II, at pp. 629-36 and 641-44.

suspect or was in any manner exculpatory.  The state habeas court's factual findings regarding the absence of any act by the prosecution designed to coerce Leroy Sosa to commit perjury during petitioner's trial are fully supported by the record before that court, as were that court's findings regarding Leroy's sobriety at the time of his arrest and subsequent interrogation.

The state habeas court reasonably concluded that petitioner's assertions of discrepancies between some of the bank employees' descriptions of the bank robbers and their trial testimony did not satisfy the materiality prong of **Brady**.  Even assuming that everyone of the bank employees who testified at petitioner's trial were mistaken as to exactly what the bank robbers did and said during the robbery, their erroneous testimony had no relevance to the outcome of either phase of petitioner's capital murder trial because of the overwhelming evidence in the form of petitioner's written confession and the trial testimony of Leroy Sosa (which remains un-recanted) establishing that petitioner twice shot Deputy Childress while Deputy Childress was acting in the course and scope of his official duties as a law enforcement officer.  The fact that Deputy Childress was shot twice, once at extremely close range, belies any assertion that his death was the result of anything other than an intentional, deliberate, act.  Moreover, there is no reasonable probability that, but for the failure of the prosecution to disclose any of the evidence presented to the state habeas court in petitioner's first state habeas corpus proceeding, the outcome

of either phase of petitioner's capital murder trial would have been different.

In sum, the state habeas court reasonably concluded that, when viewed collectively, the allegedly withheld evidence did not satisfy the "materiality" prong of **Brady** analysis.

4.   De Novo Review

a.   Overview

As will be explained hereinafter, because none of the new evidence supporting petitioner's **Brady** claims which petitioner first presented for the first time in his initial federal habeas corpus proceeding (and which is now before this Court) satisfies the standard of "actual prejudice" required under the "cause and actual prejudice" exception to the procedural default doctrine, petitioner procedurally defaulted on those aspects of his **Brady** claims herein.  Furthermore, this Court concludes that, even when all of the evidence supporting petitioner's purported **Brady** claims currently before this Court is viewed collectively, petitioner has utterly failed to present even an arguable factual or legal basis for a finding that any of that evidence satisfies the "materiality" prong of **Brady**.  While this Court has analyzed the petitioner's voluminous evidence purportedly supporting his **Brady** claims and has concluded that none of that evidence when viewed collectively is "material," for purposes of discussion, this Court will address that evidence in the same categories identified by petitioner in his pleadings.

b.   FBI Reports on Bank Robbery Witness Statements

Petitioner spends a considerable portion of his amended petition attempting to create what are essentially illusory differences between the trial testimony of various bank employees and other eyewitnesses to petitioner's bank robbery and the oral statements made by those same persons to FBI personnel in the hours immediately after the robbery. Having independently reviewed the voluminous record in this case, this Court concludes there is no reasonable probability that, but for the failure of the prosecution to tender the 302 reports to petitioner's trial counsel, the outcome of either phase of petitioner's capital murder trial would have been different.

For many different but equally compelling reasons, petitioner's arguments relating to the 302 reports fail to satisfy the materiality standard of **Brady**. Chief among these is the fact that petitioner was not convicted of capital murder simply because he robbed the bank in LaVernia, planned that robbery, or appeared to be "in charge" during the robbery. On the contrary, petitioner was convicted for the capital murder of a law enforcement officer in the performance of his official duties. Petitioner executed a sworn, written, confession in which he admitted that he pointed a handgun at Deputy Childress and that the weapon petitioner held in his hand went off. The medical examiner's trial testimony regarding the cause of Sammy Childress' death was, and remains, unchallenged. It was likewise undisputed at trial, and remains so, that Deputy Childress was acting in the course of his official

duties at the time he was kidnaped and murdered. Leroy Sosa
testified at petitioner's trial that petitioner twice shot Deputy
Childress because petitioner believed Deputy Childress had seen
petitioner's face.[108] None of the eyewitnesses to the events inside
the bank claimed to have any personal knowledge of the
circumstances surrounding the fatal shooting of Deputy Childress.
Likewise, petitioner admitted that he taunted and terrorized the
individuals inside the bank during the robbery and that he shot
Deputy Childress. Leroy Sosa has never recanted that portion of
his trial testimony in which he stated that petitioner deliberately
murdered Deputy Childress because petitioner believed the Deputy
had seen petitioner's face. Thus, even if petitioner's trial
counsel had possessed all of the FBI 302 reports petitioner has
furnished to this Court (and managed to impeach those witnesses
based on purported discrepancies between their testimony on direct
examination and the rather cursory synopses of their interviews

---

[108] See S.F. Trial, Volume 9, testimony of Leroy Sosa, at pp.
3308 & 3314-17. More specifically, Leroy Sosa testified (and has
never recanted) that (1) petitioner's ski mask came up and slightly
off petitioner's face while petitioner was putting on the deputy's
shirt, (2) on the drive back to their getaway vehicle from the
bank, petitioner stated that he had to kill the Deputy because the
Deputy had seen his face, (3) while Leroy was moving the money and
guns to the Thunderbird, petitioner walked to the back of the
Deputy's vehicle and Leroy heard a shot, (4) after they drove a
short distance in their Thunderbird, petitioner told Leroy to go
back because he had forgotten to wipe off the trunk of the Deputy's
vehicle, (5) when they did so, Leroy saw petitioner walk to the
trunk of the Deputy's vehicle and heard another shot, and (6)
petitioner explained that he had shot the Deputy a second time
because he was still moving. **Id.** Significantly, Leroy Sosa has
never recanted any of the foregoing portions of his trial
testimony.

contained therein),[109] there is no reasonable probability the outcome of either phase of petitioner's trial would have been any different.   Impeaching the bank eyewitnesses would have had no value in terms of refuting the clear evidence of both the identity

---

[109] The vast majority of the purported discrepancies between the trial testimony of the eyewitnesses inside the bank and the 302 reports identified by petitioner consist of details contained in those witnesses' trial testimony which were not set forth in their respective 302 reports.  However, petitioner has not established that the questions put to what were likely emotionally distraught and traumatized victims of petitioner's bank robbery in the hours immediately after the robbery and murder of Deputy Childress were anywhere as detailed as the meticulously thorough questioning those same witnesses faced during petitioner's trial many months later. Moreover, petitioner did not question the FBI agents who interviewed these witnesses regarding the specific questions those agents put to those witnesses during their post-robbery interviews. Therefore, there is no evidence before this Court establishing that any of the 302 reports were verbatim transcriptions of interviews with eyewitnesses.  On their faces, the 302 reports do not purport to be verbatim transcriptions.  On the contrary, they appear to be rather cursory summaries of information gleaned from witnesses. Likewise, there is no evidence before this Court establishing that any of the eyewitnesses inside the bank ever adopted the contents of their respective 302 reports.  In fact, there is nothing in the record now before this Court establishing that any of the eyewitnesses inside the bank, other than possibly Wanda Von Minden, ever saw the 302 report on the FBI's interview with them prior to petitioner's trial.

The argument implicit in this portion of petitioner's *Brady* claim is that any information omitted from the 302 reports but included in those same witnesses' trial testimony was necessarily never conveyed to the FBI by those witnesses during their post-robbery interview.  However, there is no evidentiary support for that contention anywhere in the record now before this Court.

Finally, because the FBI 302 reports in question do not purport to be verbatim transcriptions of what the eyewitnesses inside the bank observed during the robbery and there is no evidence suggesting that any of the eyewitnesses ever adopted those reports, the reports themselves could <u>not</u> have been used to impeach those witnesses. See **Duncan v. Cain**, 278 F.3d 537, 539 (5th Cir. 2002), **cert. denied**, 537 U.S. 829 (2002) (recognizing that an investigating officer's notes made during a witness interview are not covered by the Jencks Act and, absent proof the notes constitute a verbatim transcription, of the interview or were otherwise adopted by the witness, have no impeachment value).

of the person who shot Deputy Childress and the reason petitioner shot Deputy Childress furnished by petitioner's confession and Leroy Sosa's trial testimony.

Furthermore, in his written confession, petitioner admitted that he was the robber who wore the ski-mask and Deputy's shirt throughout the robbery.[110] Everyone of the eyewitnesses inside the bank who heard the ski-masked robber speak testified they heard the robber who was wearing the ski mask and Deputy's shirt make threats to kill the sheriff.[111] Despite the passage of more than two decades since petitioner's offense, and the lengthy, expensive, discovery this Court granted petitioner during his first federal habeas corpus proceeding, petitioner has presented this Court with no evidence suggesting that any of the bank employees' trial testimony or the facts set forth in petitioner's confession were in any manner erroneous.[112]

---

[110] See note 2, **supra**. Corroborating this aspect of petitioner's confession was the trial testimony of multiple eyewitnesses at the bank who stated that, after they heard the front door of the bank open and close, petitioner returned and announced that he was still inside the bank watching them. See S.F. Trial, Volume 8, testimony of Steve Keeland, at p. 2877; testimony of Lucille Burns, at p. 2909; testimony of Wanda Von Minden, at pp. 2933-34; testimony of Pat Wildenstein, at p. 2962; testimony of Glen McCoy, at p. 2999; and testimony of Dan Bosanko, at p. 3011.

[111] See notes 7 and 26, **supra**. See also S.F. Trial, Volume 8, testimony of Steve Keeland, at pp. 2875, 2877-78, & 2894-95; testimony of Lucille Burns, at pp. 2903-04, 2906, 2914-16, & 2918; testimony of Wanda Von Minden, at pp. 2929, 2933-34, 2947, & 2951; testimony of Pat Wildenstein, at pp. 2962-63; testimony of Glen McCoy, at pp. 2999 & 3006; testimony of Dan Bosanko, at p. 3011; and testimony of Charles R. Malloy, at pp. 3023-24.

[112] While petitioner points out that many of the FBI 302 reports lack the detail contained in the trial testimony of the

On the contrary, the only significant difference between any

bank employees, that is hardly surprising.  Each of the bank employees and other eyewitnesses inside the bank who testified at petitioner's trial was taken step-by-step through the events they observed the day of the robbery in painstaking detail by the prosecutor and sometimes by petitioner's trial counsel, as well. The fact that almost all these witnesses furnished details during their trial testimony that were not included in the 302 reports prepared by interviewing FBI agents based on interviews that occurred when the eyewitnesses were likely still suffering the trauma of having been just survived a life-threatening ordeal is hardly a basis for impeaching those witnesses.  In fact, even a minimally competent prosecutor could have responded to an attempt by petitioner's trial counsel to use the 302 reports to impeach these witnesses by emphasizing on redirect examination the extent of the trauma each witnesses suffered when petitioner and his accomplice barged into the bank waving handguns, demanded money, and repeatedly threatened to kill the sheriff whom they said they had outside in the trunk of their car.

As explained above, the vast majority of the purported discrepancies identified by petitioner between the trial testimony of the eyewitnesses inside the bank and their respective 302 reports consist of details omitted from the 302 reports that were included in those same witnesses' trial testimony.  However, despite having had the opportunity in petitioner's first federal habeas corpus proceeding to take the depositions of every FBI agent involved in the investigation of petitioner's crimes, petitioner has presented this Court with no specific factual allegations, much less any evidence, showing that the omissions in questions resulted from anything other than the failure of FBI agents to either ask the same detailed questions as did the prosecutor at petitioner's trial or the failure or FBI clerical personnel to record all such information.  As respondent has so succinctly pointed out, at the time of the interviews that furnished the information included in the 302 reports, the FBI agents were most likely focused on suspect identification rather than ascertaining relative culpability between the two bank robbers. See Respondent's Motion for Summary Judgment, at p. 60.

It must also be noted that petitioner has presented this Court with no specific factual allegations, much less any evidence, showing that any of the bank employees or other eyewitnesses inside the bank who testified at petitioner's trial have ever seen the 302 reports prepared by the FBI based on their interviews.  Nor has petitioner alleged any specific facts, or presented any evidence, showing that any of the eyewitnesses inside the bank who testified at his trial ever adopted the contents of those 302 reports as their own.  Absent a showing that these witnesses adopted those reports as "definitive" accounts of what they observed, it is extremely doubtful the 302 reports in question would have held much impeachment value for petitioner's trial counsel.

of the FBI 302 reports and the trial testimony of the eyewitnesses inside the bank consisted of a cryptic reference in the 302 report for LaVernia Mayor Charles Malloy to one of the bank robber's guns as "an unidentified gun."[113] For a number of reasons, this apparent discrepancy does not satisfy the materiality standard of **Brady**. First, petitioner does not present this Court with any specific factual allegations, much less any evidence, showing that the FBI agent who interviewed Charles Malloy immediately after the bank robbery ever actually asked Malloy whether he could identify the gun held by the ski-masked robber.  Second, petitioner presents no specific allegations or evidence establishing that Malloy ever reviewed the 302 report in question or adopted its contents as an accurate reflection of what he told the FBI agent who interviewed him immediately after the robbery.[114]  Third, there has never been

---

[113] Charles Malloy's 302 report appears behind tab 44 in Volume Six of Petitioner's exhibits.  The lone sentence in that report referring to the robber's gun reads as follows: "The unidentified individual then pointed an unidentified gun at his head and told him to 'lay face down on the floor' inside the office which is located adjacent to the bank's right front door upon entering the bank."  At petitioner's trial, Charles Malloy testified that he recognized the gun held by the ski-masked robber as "an old 44 that Deputy Childress carried." See S.F. Trial, Volume 8, testimony of Charles Malloy, at p. 3024.

[114] See **Duncan v. Cain**, 278 F.3d at 539.
This is a significant point because petitioner's trial counsel was furnished with the FBI's 302 reports on the interviews of three prosecution trial witnesses, i.e., Charles Esparza, Larry Cox, and Wanda Von Minden.  Despite having those 302 reports, petitioner's trial counsel was unable to utilize those reports to impeach any of these three witnesses, in large part, because none of those trial witnesses had ever adopted the contents of those rank hearsay reports as their own. See S.F. Trial Volume 8, testimony of Charles Esparza, at pp. 2831-32; testimony of Larry Cox, at pp. 2845-48; and testimony of Wanda Von Minden, at pp. 2948-50.

any evidence suggesting that Deputy Childress was shot at the bank or immediately after the bank robbery. On the contrary, all of the evidence now before this Court, including both the evidence introduced at petitioner's trial and the voluminous additional evidence presented by petitioner following extensive discovery in his first federal habeas corpus proceeding, points to the murder of Deputy Childress, i.e., the crime for which petitioner was convicted and sentenced to death, as having been committed several minutes after petitioner and Leroy Sosa fled the bank and reached the relatively isolated location where they left their getaway vehicle. In short, there is no evidence now before this Court suggesting that Deputy Childress was shot inside the bank or as the robbers were driving away from the bank. Thus, the issue of which robber held which gun <u>during</u> the bank robbery is irrelevant and immaterial to the issue of which robber actually shot Deputy Childress several minutes later when they reached the rural location where their yellow Thunderbird was parked. This latter fact was established beyond any doubt at petitioner's trial through petitioner's sworn, written, confession and the testimony of Leroy Sosa, neither of which has been recanted or otherwise brought into doubt by any evidence now before this Court.

> c.    <u>Other "Suspects"</u>

Petitioner has presented this Court with various law enforcement documents establishing that, in the days and weeks following those crimes, several names of persons other than petitioner's and Leroy Sosa's were brought to the attention of law

enforcement officers investigating the bank robbery and murder of Deputy Childress. More specifically, petitioner identifies Oscar Barrientos, Evodio Arriaga, Earl Hunter, Gilbert and Severo Garza, Gilbert Jaramillo, and Manuel Villanueva as "other suspects." However, petitioner has presented this Court with no fact-specific allegations, much less any evidence, establishing that there has ever existed any _evidence_ showing that any of these persons had any involvement in the murder of Deputy Childress. Therefore, there is no reasonable probability that but for the prosecution's failure to disclose the identities of all those persons whom law enforcement officials quickly ruled out as potential suspects, the outcome of either phase of petitioner's trial would have been different.

>        d.   Fingerprint Evidence

As the state trial court correctly noted in the course of petitioner's first state habeas corpus proceeding, the fact that there were many fingerprints lifted from the bank that did not match those of petitioner or Leroy Sosa is not exculpatory evidence.[115]   Moreover, in light of petitioner's confession and

---

[115] It can hardly be considered shocking that a place as open to the public as a bank lobby would produce many fingerprints unrelated to a robbery. Since at least as early as petitioner's first state habeas corpus proceeding, petitioner's counsel has had access to all of the fingerprint cards collected during the investigation of petitioner's crimes. To date, petitioner has presented no court, state or federal, with any evidence or fact-specific allegations showing that those cards contain any truly exculpatory, mitigating, or impeachment evidence. For instance, petitioner has never linked any of those fingerprints to any other potential suspect in the bank robbery. Likewise, petitioner has never alleged any specific facts, or presented any evidence, refuting the expert testimony at petitioner's trial establishing that the brown paper grocery bag left behind at the bank by the

Leroy Sosa's trial testimony, that fact is also <u>not</u> "material" for **Brady** purposes.

        e.   <u>Polygraph Evidence</u>

The same it true for the results of the polygraph examinations of petitioner, Bruno Juarez Escamilla, and Irene Lugo Villarreal. Petitioner has failed to allege any specific facts, much less furnish any evidence, establishing that those test results were favorable to petitioner.  As the state trial court noted during petitioner's first state habeas corpus proceeding, even assuming that Escamilla and Villarreal gave false answers to the polygraph examiner when questioned regarding Escamilla's alleged use of the yellow Thunderbird on the day of the robbery and murder, establishing their "guilty knowledge" on that point did <u>not</u> exculpate petitioner.[116]  The evidence introduced at petitioner's

---

robbers contained both petitioner's palm print and Leroy Sosa's thumb print.

[116] The reports on the polygraph examinations of Irene Lugo Villarreal and Bruno Juarez Escamilla appear behind tabs 81 and 82, respectively, in Volume Seven of Petitioner's Exhibits.  The report on Mrs. Villarreal states that she owned a yellow 1976 Oldsmobile Cutlass which she loaned to Bruno Escamilla on November 4, 1983. Mr. Escamilla's report indicates that he told his examiner that he attempted to start Mrs. Villarreal's yellow car once in November, 1983 but it would not start and, instead, he wound up borrowing her green car, instead.  While the polygraph reports in question do suggest that both these persons were less than completely forthright in their answers regarding Mr. Escamilla's use of Mrs. Villarreal's car on the date of the robbery and their knowledge of information regarding the bank robbery, petitioner has not presented this Court with any evidence showing that Mrs. Villarreal's yellow Oldsmobile was actually used in the bank robbery or murder of Deputy Childress, as opposed to the yellow and brown Thunderbird both petitioner and Leroy Sosa identified in their confessions as their getaway vehicle.

trial establishes that the bank robbery took place in LaVernia between 11:45 a.m. and noon on November 4, 1983.[117] Both petitioner and Leroy Sosa admitted they were back in San Antonio that same afternoon.[118] Thus, even assuming that petitioner's trial counsel could have used the polygraph examination reports in question to establish that Escamilla drove the actual getaway car on the date in question, that fact would not have been exculpatory for petitioner. There was ample opportunity for Escamilla to have used the yellow Thunderbird on that same date after petitioner and Leroy Sosa returned to San Antonio from LaVernia.

Likewise, petitioner's polygraph examination report provided nothing exculpatory.[119] On the contrary, that report indicates that

---

[117] See S.F. Trial, Volume 8, testimony of Lucille Burns, at p. 2906; and testimony of Glen McCoy, at p. 2996.

[118] See note 2, **supra**. Also as noted above, a tool salesman testified at petitioner's trial that petitioner gave him a substantial cash payment around 4:30 p.m. on the afternoon of November 4, 1983 at a location in San Antonio, after petitioner returned from across the street, where petitioner had gone to purchase beer. See S.F. Trial, Volume 9, testimony of James Thomas Cathcart, at pp. 3223-24.

[119] The report on petitioner's polygraph examination appears behind tab 24 in Volume Two of Petitioner's Exhibits. That report states that petitioner told his examiner that he threw away the money from the bank robbery the day after the crime but that petitioner's subsequent polygraph examination showed petitioner was deceptive when responding to questions about the money. The report reveals that petitioner then admitted to the examiner that he had lied about his disposition of the money from the robbery. Petitioner explained that he had given between $1,500 to $1,600 to Leroy Sosa and had used some of the money himself to buy groceries and beer, pay rent for his girlfriend, get a paint job for the car used in the robbery, and to pay other expenses. Petitioner informed the examiner that he dumped the remainder of the money in a dumpster by a grocery store about a week after the robbery and murder. When examined a second time after he offered this new

68

petitioner confessed to the bank robbery and the kidnaping and murder of Deputy Childress.   The only indications of deception contained in the report relate to the timing and manner of petitioner's disposition of the proceeds from the robbery.

Finally, it should be noted that petitioner has suggested no evidentiary basis through which his trial counsel could have obtained admission of any of the polygraph examination reports in question.   Because neither petitioner nor Mrs. Villarreal nor Mr. Escamilla testified at petitioner's trial, the polygraph examination reports could not have been used impeach any trial witness.   Under such circumstances, the polygraph test results do not even begin to satisfy the materiality" prong of **Brady**.[120]

f.   Hypnosis Evidence

This Court granted petitioner extensive discovery during petitioner's first federal habeas corpus proceeding in large part based on petitioner's counsel's representations, which it now appears were absolutely unfounded, that "hypnotically-enhanced" testimony was used to secure petitioner's conviction.  The evidence now before this Court establishes that only three persons were hypnotized during the investigation into petitioner's crimes and that two of those persons, i.e., Homer Burkett and Bernice Howes,

---

version of the events in question, petitioner's answers to questions regarding his disposition of the money showed no deception.

[120] See **Wood v. Bartholomew**, 516 U.S. at 6, 116 S.Ct. at 10.

did not testify at petitioner's trial.[121]   There is no evidence before this Court suggesting that any information within the personal knowledge of either of these witnesses or concerning the hypnosis sessions of either witness would have proved helpful in any manner to petitioner at trial.

The third person who was hypnotized, Charles Esparza, did testify at petitioner's trial but offered no testimony of significance at trial that was based upon any information he recalled while in a hypnotic state.[122]   To reiterate, at

---

[121] As explained above, both Mr. Burkett and Ms. Howes testified during the hearing in petitioner's first state habeas corpus proceeding.  For a detailed summary of their testimony during that hearing, see note 46, **supra**.  It will suffice to note that neither of these persons were able to divulge any new or additional information while under hypnosis that they had not furnished law enforcement officers prior to being placed under hypnosis.

[122] Charles Esparza's trial testimony is summarized in note 25, **supra**.  His testimony during petitioner's first state habeas corpus proceeding is summarized in note 47, **supra**.  Other than furnishing a license plate number that proved to be a complete and utter red herring, the only additional information Mr. Esparza furnished investigators while under hypnosis that he could not furnish beforehand was his observation that the rear license plate on the yellow vehicle he observed on the date in question appeared to have been tied on with string or twine because it was hanging down. Petitioner has offered no fact specific allegation, much less any evidence, showing how disclosure of Mr. Esparza's hypnosis session or the results of same would have proved favorable to petitioner at trial.
Furthermore, in the course of petitioner's first federal habeas corpus proceeding, this Court, per Judge Orlando L. Garcia and his staff, viewed the extremely poor quality videotape recording of Mr. Esparza's hypnosis session.  The audio portion of that recording was sufficiently clear to disclose that nothing the least bit suggestive was asked of Mr. Esparza while he was under hypnosis.  On the contrary, the examiner appeared to take great care to avoid suggesting any information that Mr. Esparza had failed to mention during his earlier interview.  In fact, Mr. Esparza actually was rather uncertain about the license plate

petitioner's trial, Mr. Esparza testified that, on the morning of
the robbery, he observed a yellow vehicle driving very slowly along
a road near LaVernia and that later that same date he saw what he
believed to be the same vehicle following closely behind a deputy
sheriff's vehicle.[123]   As such, Mr. Esparza was simply one of
several witnesses at petitioner's trial who testified they had
observed a yellow vehicle on November 4, 1983 in the vicinity of
LaVernia, traveling close behind a deputy sheriff's vehicle.[124]   The

---

number he claimed to have observed on the yellow vehicle,
suggesting several slightly different variations on the letters and
numbers.   A copy of the FBI's report on Mr. Esparza's hypnosis
session appears behind tab 88 in Volume Seven of Petitioner's
Exhibits.

It is true that, at petitioner's trial on cross-examination
Mr. Esparza mentioned that the rear license plate on the yellow
vehicle was hanging down.  See S.F. Trial, Volume 8, testimony of
Charles Esparza, at p. 2833.   However, that particular fact
apparently played no part in the subsequent identification of the
Thunderbird used by petitioner and Leroy Sosa as a getaway vehicle
after their bank robbery and murder of Deputy Childress (which
identification occurred only after Leroy Sosa's arrest and
confession).  In fact, petitioner has offered this Court absolutely
no evidence independent of Mr. Esparza's testimony at trial and
during petitioner's first state habeas corpus proceeding
establishing whether, in fact, the rear license plate on the
Thunderbird in question actually was "hanging down" on November 4,
1983.   Even if the rear license plate on the Thunderbird was not
"hanging down" on November 5, 1983, given petitioner's confession
and Leroy Sosa's trial testimony, impeachment of Mr. Esparza's
trial testimony to the contrary would have been immaterial under
Brady.

[123] See S.F. Trial, Volume 8, testimony of Charles Esparza, at
pp. 2822-28.

[124] Porfirio Cavazos testified at petitioner's trial that he
observed a yellow car with a light brown vinyl top following
closely behind a Wilson County Sheriff's vehicle and that the
driver of the patrol car had a big beard.  See S.F. Trial, Volume 8,
testimony of Porfirio Cavazos, at pp. 2835-37.
Larry Cox testified at petitioner's trial that he saw an
officer driving a deputy's car with another person, whom he

yellow vehicle Mr. Esparza identified before his hypnosis session
and which he described during his testimony at petitioner's trial
was fully consistent with the yellow Thunderbird petitioner and
Leroy Sosa both confessed they used as a getaway vehicle after
their bank robbery and murder of Deputy Childress.

While under hypnosis, Mr. Esparza did furnish investigators
with a series of license plate numbers that later proved to be
worthless because the only vehicle ever identified as having borne
any of those license plate numbers in question had been abandoned
many months before the bank robbery in Wharton, Texas.[125]  It is far

---

believed to be a child, wearing a ski mask riding in the passenger
seat of the deputy's vehicle while a yellow vehicle, that looked
like a late-seventies model Cougar, followed close behind. See S.F.
trial, Volume 8, testimony of Larry Cox, at pp. 2841-42.

Reagan L. Mills testified at petitioner's trial that he
observed a deputy's vehicle coming to a stop along a highway near
LaVernia while another vehicle, which he believed to be a two-tone
hard top, possibly a Dodge Charger, was coming to a stop close
behind the deputy's vehicle. See **Id.**, testimony of Reagan L. Mills,
at pp. 2854-56.

[125] A substantial portion of the voluminous documents produced
by the Government for in camera inspection by this Court during
petitioner's first federal habeas corpus proceeding related to the
many hours spent by investigators attempting to run down the
license plate number furnished by Mr. Esparza.  Furthermore, FBI
agent Karl McLeod testified during his deposition in petitioner's
first federal habeas corpus proceeding regarding his unsuccessful
efforts to track down a vehicle bearing any of the license plate
numbers suggested by Mr. Esparza while under hypnosis. See McLeod
Deposition, found at tab 31 in Volume Five of Petitioner's
Exhibits, at pp. 34-45.

It should be noted that petitioner has presented this Court
with absolutely no fact-specific allegations, much less any
evidence, showing that any of the license plate numbers furnished
by Mr. Esparza while under hypnosis belonged to any vehicle that
could have been involved in any of the crimes committed on November
4, 1983 to which petitioner and Leroy Sosa confessed.  In fact,
petitioner has presented this Court with no evidence showing that
any of the combinations of letters and numbers suggested by Mr.

from clear whether petitioner's trial counsel would have been able to impeach Mr. Esparza at trial with the fact that, while under hypnosis (but not otherwise) Mr. Esparza had "remembered" a license plate number on the yellow vehicle in question that was wholly inconsistent with the actual license plate number of the Thunderbird which both petitioner and Leroy Sosa had confessed they drove on the date in question.[126]   Assuming that some arguable impeachment value could have been obtained from disclosure of the report and videotape recording of the hypnosis session of Charles Esparza, there is no reasonable probability that the outcome of either phase of petitioner's capital murder trial would have been affected thereby.   Mr. Esparza was only one of four trial witnesses who placed a yellow vehicle in close proximity to a deputy Sheriff's car near LaVernia on November 4, 1983.[127]

---

Esparza while under hypnosis were actually on any license plate in the State of Texas on November 4, 1983.

[126]   At petitioner's trial, a San Antonio Police Officer testified that the license number on the Ford Thunderbird which petitioner and Leroy Sosa both confessed they had used to drive to LaVernia the day of the bank robbery and murder of Deputy Childress bore "PZA 564" on the date that vehicle was located by law enforcement agents.   See S.F. Trial, Volume 9, testimony of David Mills, at p. 3163.

In contrast, Charles Esparza, while under hypnosis, offered each of the following possible combinations of letters and numbers for the license plate he saw on the rear of the yellow vehicle on the date of the robbery: "938 JVL," "938 JVI," "938 LVJ," "983 LVJ," and "983 JVL." See Report on Esparza Hypnosis Session, at tab 88 in Volume Seven of Petitioner's Exhibits.

[127]   Petitioner has presented this Court with no evidence whatsoever suggesting that Mr. Esparza's identification of petitioner as one of the occupants of the yellow vehicle at petitioner's trial was in any way tainted by Mr. Esparza's hypnosis session.   In fact, during petitioner's first state habeas corpus

Charles Esparza never claimed to have any personal knowledge of who shot Deputy Childress or why.  The answers to both those questions were established beyond any doubt during petitioner's trial by petitioner's confession and the testimony of Leroy Sosa. Nothing petitioner has furnished this Court casts any doubt whatsoever on either the identity of the person who twice fatally shot Deputy Childress or the reasons why that crime occurred.

>    g.   Witness Statements

Petitioner argues that the prosecution should have furnished his trial counsel with statements allegedly made to law enforcement officers by trial witnesses Charles Esparza, Larry Cox, and Wanda Von Minden.  The insurmountable hurdles that face this aspect of petitioner's **Brady** claim are (1) the fact petitioner has offered this Court no evidence showing that either Charles Esparza, Larry Cox, or Wanda Von Minden ever executed a written statement for any investigating authority that was <u>withheld</u> from petitioner's trial counsel[128] and (2) assuming that the "statement" of Charles Esparza

---

proceeding, Mr. Esparza testified that his in-court identification of petitioner as the person who waved at him to pass the yellow vehicle was based solely upon his observations on November 4, 1983 and his first-hand observation of petitioner at trial. <u>See</u> S.F. State Habeas Hearing, Volume V of 8, testimony of Charles Esparza, at p. 241.  During his hypnosis session, Mr. Esparza offered no additional descriptions of either of the occupants of the yellow vehicle that he had not already given to his interviewer before the hypnosis session except for his comment at one point that one of the occupants of the yellow vehicle was 5'10" tall.  There was nothing exculpatory, mitigating, or impeaching in that observation.

[128] In fact, Larry Cox testified at petitioner's trial that he did <u>not</u> sign a written statement for any law enforcement agent. <u>See</u> S.F. Trial, Volume 8, testimony of Larry Cox, at p. 2848.  A copy of an FBI 302 report outlining the results of an interview with

to which petitioner is referring included the videotape recording
of Mr. Esparza's hypnosis interview and the resulting hearsay
written report on same, for the reasons set forth in detail in
Section III.C.4.f. above, disclosure of those items were not
required under **Brady** because the information contained therein was
not "material" within the meaning of **Brady**.

---

Larry Cox (which was never executed by Cox) was most definitely
disclosed to petitioner's trial counsel because it was marked as
Defendant's Exhibit 69 and presented to petitioner's trial counsel
during Cox's trial testimony. See **Id.**, at p. 2845. Thus, this 302
report on Larry Cox's FBI interview was never "withheld" from
petitioner's defense counsel within the meaning of *Brady*. See
**Lawrence v. Lensing**, 42 F.3d 255, 257 (5th Cir. 1995) (holding that
documents furnished to defense counsel during trial were not
"suppressed" within the meaning of *Brady).*
    Wanda Von Minden testified at petitioner's trial that she gave
an oral "statement" regarding the bank robbery to a female FBI
agent and that she filled out a pre-printed form describing the
bank robbers' physical appearance but the handwritten statement
recounting the robbery that she began writing shortly after the
robbery was never completed. See **Id.**, testimony of Wanda Von
Minden, at pp. 2941-44 & 2950-51. Furthermore, petitioner's trial
counsel attempted to employ a copy of a 302 FBI report summarizing
an interview with Ms. Von Minden, which had been marked for
identification purposes as Defendant's Exhibit 71, to impeach her.
See **Id.**, at pp. 2948-50. Thus, the FBI's 302 report on Mr. Von
Minden was not "withheld" from petitioner's trial counsel within
the meaning of *Brady*. See **Lawrence v. Lensing**, 42 F.3d at 257.
    Also during trial, the prosecution presented petitioner's
trial counsel with a copy of an FBI 302 report recounting the
results of an interview with Charles Esparza that was marked for
identification purposes as defendant's Exhibit 68. See S.F. Trial,
Volume 8, testimony of Charles Esparza, at pp. 2831-32. This 302
report was also not withheld or suppressed within the meaning of
*Brady*. See **Lawrence v. Lensing**, 42 F.3d at 257.
    In sum, petitioner's trial counsel was presented with FBI 302
reports summarizing interviews with each of these three witnesses.
Petitioner has presented this Court with no evidence showing that,
other than the documentation relating to the hypnosis session of
Charles Esparza discussed in Section III.C.4.f. above, any other
written reports existed at the time of petitioner's trial regarding
interviews with these three witnesses.

h.   Leroy Sosa's History of Drug and Alcohol Abuse

Petitioner argues that the prosecution "withheld" evidence of long-term drug and alcohol abuse by Leroy Sosa.[129]   Petitioner argues such evidence would have assisted his trial counsel in impeaching Leroy Sosa's trial testimony.   However, petitioner has

---

[129]   More specifically, petitioner points to statements contained in (1) Leroy Sosa's recanting affidavit, executed October 26, 1993, (2) a federal Presentence Report dated November 14, 1985, and (3) Leroy Sosa's Federal Bureau of Prison medical records, all dated subsequent to the commencement of Leroy Sosa's federal incarceration subsequent November, 1985.   These materials formed the basis for the opinion testimony of Dr. Paula Kathleen Lundberg-Love during petitioner's first state habeas corpus proceeding.   Dr. Lundberg-Love speculated that, based on the information contained in the foregoing documents, Leroy Sosa "might have been" suffering from the deleterious effects of alcohol, heroin, and methamphetamine withdrawal at the time of both his arrest and the post-arrest interview during which he gave his written confession. See S.F. State Habeas Hearing, Volume VI of 8, testimony of Paula Kathleen Lundberg-Love, at pp. 405-502.   Dr. Lundberg-Love admitted during her testimony that (1) she had never met or examined Leroy Sosa, (2) she had no personal knowledge regarding Leroy Sosa's actual demeanor at the time he gave his confession, (3) she had no evidence that Leroy Sosa committed perjury when he testified at petitioner's trial many months after his arrest, and (4) she had no personal knowledge regarding Leroy Sosa's condition when he testified at petitioner's trial.   **Id.**, at pp. 459, 471, 480, 487, and 500-01.
The state habeas court specifically found that there was no credible evidence then before it establishing that Leroy Sosa was, in fact, suffering from alcohol or narcotics withdrawal at the time of his arrest or confession.   See State Habeas Transcript, Volume II, at p. 641.   The state trial court based its factual findings, and its accompanying rejection of the underlying factual premise behind this aspect of petitioner's *Brady* claim, on the testimony of Texas Ranger Al Cuellar summarized in note 52, **supra**.   The state habeas court's factual finding was fully supported by the evidence then before that court.
Having independently reviewed the entire record now before this Court, including all the additional evidence included in petitioner's voluminous exhibits, this Court finds there is no evidence establishing that Leroy Sosa was, in fact, suffering from the type of withdrawal symptoms which Dr. Lundberg-Love speculated Leroy might have then been experiencing.

utterly failed to present this Court with any fact-specific allegations, much less any evidence, showing that any evidence existed at the time of petitioner's trial suggesting Leroy Sosa either (1) indulged in heroin or methamphetamine abuse at the time of his arrest and confession or (2) suffered from withdrawal symptoms at the time of his arrest and confession. There is no evidence now before this Court showing that the prosecution or any law enforcement agency was actually aware at the time of petitioner's trial of any assertions by Leroy Sosa that he was either intoxicated, under the influence of illicit narcotics, or suffering from withdrawal symptoms at the time of his arrest or the time he gave his written confession.[130]

In the face of a total lack of evidence showing that any law enforcement agent was actually aware at the time of petitioner's trial of Leroy Sosa's unsubstantiated assertions regarding his purportedly regular intake of massive amounts of illicit narcotics prior to his arrest, petitioner has wholly failed to demonstrate that any information on that subject existed at the time of petitioner's trial which could have been "withheld" or "suppressed" within the meaning of **Brady**. Neither the prosecution nor law

---

[130] As correctly pointed out by the state trial court in its factual findings in the course of petitioner's first state habeas corpus proceeding, the highly speculative and dubious opinion testimony of Dr. Kathleen Lundberg-Love suggesting that Leroy Sosa "might have been" suffering from withdrawal symptoms at the time of his arrest and confession, was based upon federal prison medical records, a recanting affidavit of Leroy Sosa, and information Leroy Sosa conveyed to a federal probation officer for purposes of creating a pre-sentence investigative report, all of which were created long after the date of petitioner's trial.

enforcement agents could "withhold" or "suppress" information that was not then in their possession.

Petitioner argues that, had law enforcement agents done a more thorough job searching the residence where Leroy Sosa was arrested, they might have discovered unspecified evidence in the attic suggesting that Leroy Sosa was an abuser of heroin and other illicit narcotics.[131]   The record now before this Court establishes that law enforcement agents did conduct a search of Leroy's Sosa's grandmother's home secondary to their otherwise lawful arrest of Leroy at that address, albeit one that did <u>not</u> extend to searching the attic of that residence.[132]   Even assuming that Leroy Sosa's arresting officers negligently circumscribed the parameters of the search in question, that fact does <u>not</u> establish that law enforcement agents were aware at the time of petitioner's trial of purported **Brady** material located in the attic of Leroy Sosa's grandmother's home.   Neither the Supreme Court nor any other court has ever extended the rule in **Brady** to evidence which law enforcement agents negligently failed to discover.

Insofar as petitioner argues that law enforcement agents might have discovered information regarding Leroy Sosa's alleged use of

---

[131] Petitioner has furnished this Court with no fact-specific allegations, much less any evidence, showing what a thorough search of the attic of Leroy Sosa's grandmother's home on the date of Leroy's arrest would actually have revealed in terms of evidence or information that could have been used to impeach Leroy's testimony at petitioner's trial.

[132] <u>See</u> S.F. State Habeas Hearing, Volume VII of 8, testimony of Adolfo Cuellar, at pp. 765-76, 786, 790, 792, and 798.

illicit narcotics had they undertaken a more thorough investigation

into Leroy's background or the residence where Leroy was arrested,

that contention fails for the additional reason that petitioner had

equal opportunity to discover this same evidence, assuming that it

actually existed at the time of petitioner's trial.  Evidence that

is equally available to defense counsel exercising diligence as it

is to the prosecution cannot be "withheld" or "suppressed" within

the meaning of **Brady**.   Put more simply, evidence is _not_

"suppressed" within the meaning of **Brady** if the defendant either

knew, should have known, or with the exercise of reasonable

diligence could have learned, of the essential facts permitting him

to take advantage of the evidence in question.[133]  Petitioner has

---

[133] See **Bigby v. Cockrell**, 340 F.3d 259, 279 (5th Cir. 2003)
(holding prosecutors had no duty under _Brady_ to furnish
petitioner's trial counsel with copies of jail medical records
showing the numerous psychotropic medications petitioner was taking
while incarcerated and awaiting trial because those records could
have been obtained by petitioner's counsel through the exercise of
reasonable diligence); **Kuntzer v. Cockrell**, 303 F.3d 333, 336 (5th
Cir. 2002), **cert. denied**, 536 U.S. 978 (2002) (holding that _Brady_
does not obligate the State to furnish a defendant with exculpatory
evidence that is fully available to a defendant through the
exercise of reasonable diligence); **In re Smith**, 142 F.3d 832, 836
(5th Cir. 1998), (holding that if defendant, using reasonable
diligence, could have obtained the information, no claim arises
under _Brady_); **Rector v. Johnson**, 120 F.3d 551, 558-59 (5th Cir.
1997), **cert. denied**, 522 U.S. 1120 (198) (holding the State has no
obligation to point the defense toward potentially exculpatory
evidence if that evidence is either in the possession of the
defendant or can be discovered by exercising due diligence);
**United States v. Mmahat**, 106 F.3d 89, 94 (5th Cir. 1997), **cert.
denied**, 522 U.S. 848 (1997) (holding that a defendant asserting a
_Brady_ claim must show that the information allegedly withheld was
unavailable to him through due diligence); **United States v. Aubin**,
87 F.3d 141, 148-49 (5th Cir. 1996), **cert. denied**, 519 U.S. 1119
(1997), (holding that due diligence on the part of the defendant is
a necessary element in a successful _Brady_ claim and that the
government is not obligated to conduct a defendant's investigation

failed to allege any facts showing that his trial counsel was unable, despite the exercise of reasonable diligence, to obtain any information regarding Leroy Sosa's alleged drug abuse that was available at the time of petitioner's trial.

Petitioner has offered this Court no fact-specific allegations, much less any evidence, showing that any local, state, or federal law enforcement agency actually knew about Leroy Sosa's purported long-term drug and alcohol abuse at the time of petitioner's trial. By definition, the prosecution could not "suppress" or "withhold" information from petitioner's trial counsel in violation of **Brady** when that information either did not then exist, had not then been discovered by any law enforcement agency, or was equally available to all parties through the exercise of reasonable diligence.

Moreover, because Leroy Sosa's written confession was never admitted into evidence at petitioner's trial, any evidence showing that Leroy was suffering from drug or alcohol withdrawal at the time he gave his confession was <u>not</u> "material" within the meaning of **Brady**. Petitioner has presented this Court with no fact-specific allegations, much less any evidence, showing that Leroy

---

or to make a defendant's defense for him); **Williams v. Scott**, 35 F.3d 159, 163 (5th Cir. 1994), **cert. denied**, 513 U.S. 1137 (1995) (holding that a **Brady** violation does not arise if the defendant, using reasonable diligence, could have obtained the information); and **Blackmon v. Scott**, 22 F.3d 560, 564-65 (5th Cir. 1994), **cert. denied**, 513 U.S. 1060 (1994) (holding that the state is not required to furnish the defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence).

Sosa was suffering from the alleged effects of drug or alcohol withdrawal at the time he testified at petitioner's trial.

      i.   <u>Conclusions Re the Materiality of the Allegedly Suppressed Evidence</u>

Consistent with the Supreme Court's directives, this Court must evaluate the materiality prong of petitioner's multi-faceted **Brady** claim by examining all evidence that was allegedly withheld from petitioner's trial counsel and assessing the collective or cumulative impact of the non-disclosure of same on the outcome of each phase of petitioner's capital murder trial.

      (1)  <u>Guilt-Innocence Phase of Trial</u>

Petitioner was charged with capital murder for the fatal shooting of Deputy Childress. The most compelling evidence supporting petitioner's conviction consisted of petitioner's own confession and the trial testimony of Leroy Sosa. None of the evidence petitioner argues the prosecution "suppressed" or "withheld" from his trial counsel would have reduced the inculpatory impact of either petitioner's confession or Leroy Sosa's trial testimony, both of which established petitioner's guilt beyond any doubt.

Even assuming that petitioner's trial counsel could have obtained some impeachment value from inadmissible FBI 302 reports, inadmissible polygraph examination reports, non-matching fingerprint cards, the videotape of Charles Esparza's hypnosis session, and the fact that law enforcement officers received tips on "other suspects," petitioner has presented this Court with no

fact-specific allegations, much less any evidence, showing a reasonable probability that the impeachment of Charles Esparza or any of the eyewitnesses inside the bank would have had any impact whatsoever on the outcome of the guilt-innocence phase of petitioner's trial.

There is simply no reasonable probability that but for the non-disclosure of any of the evidence now before this Court, the outcome of the guilt-innocence phase of petitioner's capital murder trial would have been different. None of the evidence currently before this Court casts any doubt on the veracity of either petitioner's confession or the portion of Leroy Sosa's trial testimony in which he identified petitioner as the person who fatally shot Deputy Childress.

(2)   <u>Punishment Phase of Trial</u>

Likewise, petitioner's decision to execute Deputy Childress was established by the trial testimony of Leroy Sosa.[134] Petitioner's confession established that he wore the Deputy's shirt and a ski-mask and that both he and Leroy Sosa were armed

---

[134] Leroy Sosa testified that (1) despite Deputy Childress' pleas for his life, petitioner shot Deputy Childress because petitioner believed Deputy Childress, who was handcuffed in the trunk of his patrol vehicle, had seen petitioner's face, (2) after Leroy drove away from the scene, petitioner directed Leroy to turn around so they could wipe off any fingerprints from the trunk of Deputy Childress' vehicle, (3) when they returned to the patrol vehicle, petitioner shot Deputy Childress a second time, and (4) petitioner explained that he had done so because Deputy Childress was "still moving." <u>See</u> S.F. Trial, Volume 9, testimony of Leroy Sosa, at pp. 3312-17 & 3347-48.

throughout the bank robbery.[135]   All but one of the eyewitnesses
inside the bank testified at petitioner's trial that they heard the
ski-masked robber repeatedly threaten to kill the sheriff who was
in the car outside.[136]   The ski-masked robber also threatened others

---

[135] See note 2, **supra**.   During petitioner's first federal
habeas corpus proceeding in this Court, petitioner's counsel
asserted there was a need for discovery to ascertain which of the
bank robbers wore the ski mask.   Despite having been granted
virtually unlimited discovery in that proceeding, petitioner has
presented this Court with absolutely no evidence suggesting that
anyone other than petitioner wore the ski mask during the bank
robbery.   In his confession, petitioner admitted that he wore the
ski mask inside the bank. See State Exhibit 52, contained in S.F.
Trial, "Trial Exhibits" Volume.   Leroy Sosa testified at
petitioner's trial that petitioner wore the ski mask during the
robbery. See S.F. Trial, Volume 9, testimony of Leroy Sosa, at p.
3311.   To date, neither has ever recanted their statements on that
point.

It must also be noted that all of the eyewitnesses inside the
bank who observed both robbers noted a distinct difference in build
between the two bank robbers and all testified that the ski-masked
robber was the less heavy of the two robbers while the other
robber, who wore a Halloween mask, was very heavy to the point of
being obese. See, e.g., S.F. Trial, Volume 8, testimony of Steve
Keeland, at p. 2871; testimony of Lucille Burns, at pp. 2898-2903;
testimony of Wanda Von Minden, at pp. 2926-28, 2937-39, & 2941;
testimony of Pat Wildenstein, at pp. 2955-56; testimony of Glen
McCoy, at pp. 2995-98; testimony of Dan Bosanko, at pp. 3013-15;
and testimony of Charles R. Malloy, at pp. 3023 & 3028.

At petitioner's trial, Charles Malloy described Deputy
Childress as "a very slender man." **Id.**, testimony of Charles R.
Malloy, at p. 3023.   Furthermore, the jury had the opportunity to
observe first-hand the physiques of petitioner and Leroy Sosa and
to decide for itself which of the two robbers could have fit into
Deputy Childress' shirt.

[136] See notes 7 and 26, **supra**.   Of the witnesses inside the
bank who testified at petitioner's trial, only teller Julie
Pollock, who dove to the floor when the robbery began and claimed
not to have heard anything the ski-masked robber said during the
robbery failed to testify about the threats against the sheriff
made by the ski-masked bank robber. See S.F. Trial, Volume 8,
testimony of Steve Keeland, at pp. 2875, 2877-78, & 2894-95;
testimony of Lucille Burns, at pp. 2903-04, 2906, 2914-16, & 2918;
testimony of Wanda Von Minden, at pp. 2929, 2933-34, 2947, & 2951;
testimony of Pat Wildenstein, at pp. 2962-63; testimony of Glen

inside the bank.[137]  Several witnesses inside the bank testified to

an aborted attempt by the ski-masked robber to take female teller

Pat Wildenstein as an additional hostage just before the robbers

fled the bank.[138]  The eyewitnesses inside the bank also agreed the

ski-masked robber had taunted them before finally leaving.[139]  Most

---

McCoy, at pp. 2999 & 3006; testimony of Dan Bosanko, at p. 3011; and testimony of Charles R. Malloy, at pp. 3023-24.  There is no reasonable probability that petitioner's trial counsel would have had any success impeaching all these witnesses on this specific aspect of their testimony given the ambiguities and lack of comprehensiveness contained in the FBI 302 reports for these trial witnesses.

[137] See S.F. Trial, Volume 8, testimony of Steve Keeland, at pp. 2893-95 (the ski-masked robber held a cocked gun to his back and repeatedly announced "I am the Sheriff, now"); testimony of Steve Keeland at p. 2874 (ski-masked robber also threatened Glen McCoy and Lucille Burns); testimony of Lucille Burns, at pp. 2905 & 2912 (ski-masked robber pointed his gun right at her and ordered her to put down her phone); testimony of Wanda Von Minden, at pp. 2927-28, 2930, 2932, & 2939 (ski-masked robber directed her to come out of her office and threatened "Over here, lady, or I will blow your brains out" and repeatedly threatened to "blow the brains out" of others inside the bank); testimony of Glen McCoy, at p. 3003 (ski-masked robber yelled "Freeze" at him); and testimony of Charles Malloy, at p. 3025 (ski-masked robber threatened to harm him).

[138] See S.F. Trial, Volume 8, testimony of Lucille Burns, at pp. 2908-09; testimony of Pat Wildenstein, at pp. 2961-62; testimony of Glen McCoy, at pp, 2998-99 & 3005; and testimony of Charles R. Malloy, at p. 3026.

[139] Steve Keeland testified at petitioner's trial that (1) the ski-masked robber told the bank employees who were laying face down on the floor in Wanda Von Minden's office to give him twenty minutes, (2) when they heard the bank front door open, some of them started to move around, and (3) at that point, the ski-masked robber returned to taunt them, saying "See, I haven't gone, I was just testing you; y'all make sure you stay down twenty minutes." See S.F. Trial, Volume 8, testimony of Steve Keeland, at p, 2870. Lucille Burns testified at petitioner's trial that (1) she heard the front doors shut as the heavy-set robber left, (2) the ski-masked robber told those persons laying face down on the floor not to leave and said he was going to stay there and watch them,

witnesses inside the bank described the ski-masked robber as the one who seemed to be "in charge" during the robbery.[140]  The autopsy on the body of Deputy Childress revealed evidence of two separate

---

(3) a few seconds later, someone moved, and (4) the ski-masked robber said "See, I am still here watching you. **Id.**, testimony of Lucille Burns, at p. 2909.

Wanda Von Minden testified at petitioner's trial that (1) the ski-masked robber told them to remain on the floor at least twenty minutes or he would shoot the sheriff, (2) shortly thereafter, they heard the door click as if someone had left, (3) someone moved and the ski-masked robber came back, (4) he stood in the doorway and said laughingly  "See, I am still here, I fooled you." **Id.**, testimony of Wanda Von Minden, at pp. 2933-34.

Pat Wildenstein testified at petitioner's trial that (1) the ski-masked robber told them to give him twenty minutes and then walked away but (2) the ski-masked robber came right back and said "See, I am watching you, now y'all know, don't try anything because I don't want to hurt that old man." **Id.**, testimony of Pat Wildenstein, at p. 2962.

Glen McCoy testified that (1) told them to give him twenty minutes or he would shoot the deputy sheriff through the back seat, (2) McCoy heard the door pop open then, moments later, (3) the ski-masked robber said "See, I haven't left yet." **Id.**, testimony of Glen McCoy, at p. 2999.

Dan Bosanko testified at petitioner's trial that (1) the ski-masked robber said he wanted twenty minutes or he would kill the deputy, (2) the ski-masked robber said he would check to make sure they didn't get up, and (3) the ski-masked robber came back a minute later. **Id.**, testimony of Dan Bosanko, at p. 3010.

[140] <u>See</u> S.F. Trial, Volume 8, testimony of Steve Keeland, at pp. 2874-77 & 2882 (ski-masked robbers ordered numerous people inside the bank to move around at gun point and kept everything under control); testimony of Lucille Burns, at pp. 2902 (ski-masked robber appeared to be self-assured and unhurried); testimony of Wanda Von Minden, at p. 2947 (ski-masked robber did not appear nervous, was very talkative, and "bragged" that he had on the sheriff's shirt); testimony of Pat Wildenstein, at p. 2968 (ski-masked robber was telling the other robber what needed to be done); and testimony of Dan Bosanko, at pp. 3010 & 3014 (ski-masked robber seemed to be "in charge" and appeared to have everything "under control").

gunshot wounds to the neck and head, either of which would have been fatal, and one of which was a close range wound. [141]

Petitioner has presented this Court with no evidence showing that any of the eyewitnesses testified falsely or erroneously at his trial when they described the many threats made by the ski-masked robber. Nor has petitioner offered this Court any evidence showing that anyone other than petitioner shot Deputy Childress. Likewise, petitioner had offered this Court no evidence suggesting any justification for his execution of a peculiarly vulnerable Deputy Childress other than petitioner's own desire to avoid apprehension for his crimes. Petitioner offered his state trial court jury nothing substantial in the way of mitigating evidence and has supplemented the record now before this Court with no evidence showing petitioner has ever accepted responsibility for his crime or expressed sincere remorse therefor.

Given the consistency of the multiple eyewitnesses inside the bank on so many critical points during their testimony at petitioner's trial, there is no reasonable probability that petitioner's trial counsel could have effectively impeached all of them on the more aggravating aspects of their testimony. As explained above in Section III.C.4.b. above, because the FBI 302 reports of interviews given by the eyewitnesses inside the bank were never adopted by any of those witnesses as their own, the utility of those reports for impeachment purposes is extremely

---

[141] See note 8, **supra**.

suspect.[142]   Those hearsay reports were _not_ prior inconsistent statements for impeachment purposes.

Given (1) the overwhelming evidence of petitioner's guilt, (2) the nature of the murder of Deputy Childress, (3) the behavior exhibited by petitioner throughout the bank robbery, (4) the total absence of any evidence showing petitioner has ever accepted responsibility for his offenses, (5) the meager potential for impeachment of the multiple eyewitnesses who testified to petitioner's threatening conduct inside the bank,[143] and (6) the absence of any significantly mitigating value to any of the allegedly "withheld" or "suppressed" evidence now before this

---

[142]   See **Duncan v. Cain**, 278 F.3d at 539.  Also as explained above, the attempts by petitioner's trial counsel to cross-examine Wanda Von Minden based upon the cryptic 302 report on her interview failed miserably because she would not adopt that rank hearsay document as an accurate and complete recitation of everything she observed on the date of the bank robbery. See S.F. Trial, Volume 8, testimony of Wanda Von Minde, at pp. 2942-51.  Despite having been granted almost limitless discovery in the course of his first federal habeas corpus proceeding, petitioner has offered this court no evidence suggesting that any of the other bank employees or eyewitnesses inside the bank who testified at petitioner's trial would have been willing to adopt their cursory 302 reports as full and complete statements of what they observed during the robbery. Therefore, there is no reasonable probability that petitioner's trial counsel would have been any more successful attempting to impeach any of the other bank employees and eyewitnesses had he been given all of the 302 reports instead of just Ms. Von Minden's.

[143]   Because none of the eyewitnesses inside the bank ever adopted the cursory 302 reports prepared by FBI agents following the post-bank robbery interviews, those reports were of very little potential utility for impeachment purposes. See **Duncan v. Cain**, 278 F.3d at 539.  In fact, this point was amply demonstrated at petitioner's trial during the attempts by petitioner's trial counsel to impeach Wanda Von Minden using the FBI's 302 report on her interview (which was marked for identification purposes as Defendant's Exhibit 71). See S.F. Trial, Volume 8, testimony of Wanda Von Minden, at pp. 2943-50.

Court, there is no reasonable probability that, but for the failure of the prosecution to disclose any or all of the evidence now before this Court, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

D.   Delay in Execution Violated Eighth Amendment & International Covenant on Civil and Political Rights

    1.   The Claims

In his fourth claim for federal habeas corpus relief herein, petitioner argues that (1) the extended period during which he was denied the assistance of counsel for the purpose of pursuing state collateral review of his capital murder conviction and death sentence, (2) the alleged withholding of exculpatory evidence by the State, and (3) the setting of multiple execution dates combined with (4) his prolonged stay on death row to violate both the Eighth Amendment and the International Covenant on Civil and Political Rights.[144]

    2.   No Constitutional Right to State Habeas Counsel

Before addressing respondent's assertion that this claim is foreclosed under the non-retroactivity doctrine the United States Supreme Court announced in **Teague v. Lane**,[145] this Court is compelled to make several observations.  First, both the Supreme Court and Fifth Circuit have repeatedly held there is no constitutional right to the assistance of counsel in a state habeas

---

[144] See Petitioner's Amended Petition, at pp. 170-202.

[145] 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

corpus challenge to an otherwise final criminal conviction.[146] Second, allegations of infirmities in state habeas corpus proceedings, such as petitioner's complaints that he was denied adequate discovery in his state habeas corpus proceedings, do not constitute grounds for federal habeas relief.[147]   Third, as explained at great length in Section III.C. above, this Court has

---

[146] See **Coleman v. Thompson**, 501 U.S. 722, 752, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); **Pennsylvania v. Finley**, 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987); **Roberts v. Dretke**, 356 F.3d 632, 640 (5th Cir. 2004); **Martinez v. Johnson**, 255 F.3d 229, 239 (5th Cir. 2001), **cert. denied**, 534 U.S. 1163 (2002); **In re Goff**, 250 F.3d 273, 275 (5th Cir. 2001); **Beazley v. Johnson**, 242 F.3d 248, 271 (5th Cir. 2001), **cert. denied**, 534 U.S. 945 (2001); **Fairman v. Anderson**, 188 F.3d 635, 642-44 (5th Cir. 1999); **Callins v. Johnson**, 89 F.3d 210, 212 (5th Cir. 1996), **cert. denied**, 519 U.S. 1017 (1996); **Woods v. Johnson**, 75 F.3d 1017, 1035 n.26 (5th Cir. 1996), **cert. denied**, 519 U.S. 854 (1996); **Irving v. Hargett**, 59 F.3d 23, 26 (5th Cir. 1995), **cert. denied**, 516 U.S. 1120 (1996); and **Johnson v. Hargett**, 978 F.2d 855, 859-60 (5th Cir. 1992), **cert. denied**, 507 U.S. 1007 (1993).

[147] See **Beazley v. Johnson**, 242 F.3d at 271; **Rudd v. Johnson**, 256 F.3d 317, 310 (5th Cir. 2001), **cert. denied**, 534 U.S. 1001 (2001) (recognizing that an attack on a state habeas corpus proceeding is an attack on a proceeding collateral to the petitioner's detention and not on the validity of the detention itself); **Wheat v. Johnson**, 238 F.3d 357, 361 (5th Cir. 2001), **cert. denied**, 532 U.S. 1070 (2001); **Morris v. Cain**, 186 F.3d 581, 585 n.6 (5th Cir. 1999), (holding that alleged errors committed by state habeas court did not furnish a basis for federal habeas relief); **Hallmark v. Johnson**, 118 F.3d 1073, 1080 (5th Cir. 1997), **cert. denied sub nom. Monroe v. Johnson**, 522 U.S. 1003 (1997), (holding that state habeas court's refusal to entertain challenge to prison disciplinary proceeding did not furnish basis for federal habeas relief); **Nichols v. Scott**, 69 F.3d 1255, 1275 (5th Cir. 1995), **cert. denied**, 518 U.S. 1022 (1996), (holding that an attack upon a state habeas proceeding is an attack on a proceeding collateral to the petitioner's detention and not the detention itself); **McCowin v. Scott**, 67 F.3d 100, 102 (5th Cir. 1995); **Duff-Smith v. Collins**, 973 F.2d 1175, 1182 (5th Cir. 1992), **cert. denied**, 507 U.S. 1056 (1993); **Millard v. Lynaugh**, 810 F.2d 1403, 1410 (5th Cir. 1987), **cert. denied**, 484 U.S. 838 (1987); **Vail v. Procunier**, 747 F.2d 277 (5th Cir. 1984); and **Tijerina v. Estelle**, 692 F.2d 3, 5-6 (5th Cir. 1982).

painstakingly examined all of the new evidence proffered by petitioner and finds absolutely nothing of an "exculpatory" nature in the record now before this Court.  Petitioner has never formally recanted his confession and Leroy Sosa has never recanted the portion of his trial testimony identifying petitioner as the person who twice fatally shot Deputy Childress.  The State never withheld any "exculpatory" evidence from petitioner at any time because no such evidence exists.

     3.   <u>De Novo Application of Federal Law - **Teague** Foreclosure</u>

     Respondent's contention that petitioner's fourth claim is foreclosed by the non-retroactivity doctrine of **Teague** is correct. Federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review.[148]  Absent compelling reasons to the contrary, a federal court should apply the holding in **Teague** even when it has

---

   [148] <u>See</u> **Caspari v. Bohlen**, 510 U.S. 383, 389-90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994); **Teague v. Lane**, 489 U.S. at 310, 109 S.Ct. at 1075; **Daniel v. Cockrell**, 283 F.3d 697, 705 (5th Cir. 2002), **cert. denied**, 537 U.S. 874 (2002) (recognizing that *Teague* held a federal court may not create or apply new constitutional rules on habeas review); **Jackson v. Johnson**, 217 F.3d 360, 263-64 (5th Cir. 2000); **Murphy v. Johnson**, 205 F.3d 809, 817 (5th Cir. 2000), **cert. denied**, 531 U.S. 957 (2000); **Matthew v. Johnson**, 201 F.3d 353, 359 (5th Cir. 2000), **cert. denied**, 531 U.S. 830 (2000); **Johnson v. Puckett**, 176 F.3d 809, 819 (5th Cir. 1999); **Vega v. Johnson**, 149 F.3d 354, 357 (5th Cir. 1998), **cert. denied**, 525 U.S. 1119 (1999); **Johnson v. Scott**, 68 F.3d 106, 111 n.10 (5th Cir. 1995), **cert. denied**, 517 U.S. 1122 (1996); **Lackey v. Scott**, 52 F.3d 98, 100 (5th Cir. 1995), **stay granted and cert. dism'd**, 514 U.S. 1093 (1995); **Davis v. Scott**, 51 F.3d 457, 466-67 (5th Cir. 1995), **cert. denied**, 516 U.S. 992 (1995); **Mann v. Scott**, 41 F.3d 968, 976 (5th Cir. 1994), **cert. denied**, 514 U.S. 1117 (1995); **Crank v. Collins**, 19 F.3d 172, 175 (5th Cir. 1994), **cert. denied**, 512 U.S. 1214 (1994); and **Motley v. Collins**, 18 F.3d 1223, 1230 (5th Cir. 1994), **cert. denied**, 513 U.S. 960 (1994).

been implicitly waived by the State.[149]  Under **Teague**, a "new rule"

is one which was not dictated by precedent existing at the time the

defendant's conviction became final.[150]  Under this doctrine, unless

reasonable jurists hearing the defendant's claim at the time his

conviction became final would have felt compelled by existing

precedent to rule in his favor, a federal habeas court is barred

---

[149]  **Jackson v. Johnson**, 217 F.3d at 361-63.

[150]  See **O'Dell v. Netherland**, 521 U.S. 151, 156, 117 S.Ct.
1969, 1973, 138 L.Ed.2d 351 (1997), (holding that a "new rule"
either "breaks new ground," "imposes a new obligation on the States
or the Federal Government," or was not "dictated by precedent
existing at the time the defendant's conviction became final");
**Caspari v. Johnson**, 510 U.S. at 390, 114 S.Ct. at 953; **Murphy v.
Johnson**, 205 F.3d at 817; **Truman v. Johnson**, 205 F.3d 844, 846 (5th
Cir. 2000), **cert. denied**, 530 U.S. 1219 (2000); **Matthew v. Johnson**,
201 F.3d at 359, (holding that the inquiry is whether a state court
considering the defendant's claim at the time his conviction became
final would have felt compelled by existing precedent to conclude
that the rule the defendant sought was required by the
Constitution); **Vega v. Johnson**, 149 F.3d at 357; **Lucas v. Johnson**,
132 F.3d 1069, 1080-81 n.7 (5th Cir. 1998), **cert. dism'd**, 524 U.S.
965 (1998); **White v. Johnson**, 79 F.3d 432, 437-38 (5th Cir. 1996),
**cert. denied**, 519 U.S. 911 (1996); **Davis v. Scott**, 51 F.3d at 459-
60; **Mann v. Scott**, 41 F.3d at 976; **Crank v. Collins**, 19 F.3d at
175; and **Motley v. Collins**, 18 F.3d at 1230.

from doing so on collateral review.[151]   This non-retroactivity doctrine applies equally to a novel application of an old rule.[152]

The only two exceptions to the **Teague** non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of

---

[151] **Id.**  The holding in **Teague** is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. See **Caspari v. Bohlen**, 510 U.S. at 390, 114 S.Ct. at 953; **Jackson v. Johnson**, 217 F.3d at 363; and **Fisher v. State of Texas**, 169 F.3d 295, 305 (5th Cir. 1999).

[152] See **Stringer v. Black**, 503 U.S. 222, 227-29, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992); **Butler v. McKellar**, 494 U.S. 407, 414-15, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990); **West v. Johnson**, 92 F.3d 1385, 1399 (5th Cir. 1996), **cert. denied**, 520 U.S. 1242 (1997); and **Lackey v. Scott**, 52 F.3d at 100.

ordered liberty.[153]  Neither of those two exceptions applies to any
of the petitioner's claims for relief herein.

A conviction becomes final for **Teague** purposes when either the
United States Supreme Court denies a certiorari petition on the
defendant's direct appeal or the time period for filing a
certiorari petition expires.[154]  Petitioner's conviction became
final for **Teague** purposes not later than May 16, 1989, i.e., the
date the deadline for filing a petition for writ of certiorari on
petitioner's behalf with the United States Supreme Court expired.[155]

_____

[153] See **O'Dell v. Netherland**, 521 U.S. at 157, 117 S.Ct. at
1973; **Graham v. Collins**, 506 U.S. 461, 478, 113 S.Ct. 892, 897-98,
122 L.Ed.2d 260 (1993); **Jackson v. Johnson**, 217 F.3d at 364; **Murphy
v. Johnson**, 205 F.3d at 817-18; **Truman v. Johnson**, 205 F.3d at 846;
**Matthew v. Johnson**, 201 F.3d at 369; **Muniz v. Johnson**, 132 F.3d
214, 225 (5th Cir. 1998), **cert. denied**, 523 U.S. 1113 (1998); and
**Brown v. Cain**, 104 F.3d 744, 752 (5th Cir. 1997), **cert. denied**, 520
U.S. 1195 (1997).

[154] See **Caspari v. Bohlen**, 510 U.S. at 390, 114 S.Ct. at 953:
"A state conviction and sentence become final for purposes of
retroactivity analysis when the availability of direct appeal to
the state courts has been exhausted and the time for filing a
petition for a writ of certiorari has elapsed or a timely filed
petition has been finally denied."; **Daniel v. Cockrell**, 283 F.3d at
705; **Ott v. Johnson**, 192 F.3d 510, 513 (5th Cir. 1999), **cert.
denied**, 529 U.S. 1099 (2000); **Felder v. Johnson**, 180 F.3d 206, 210
(5th Cir. 1999), **cert. denied**, 528 U.S. 1067 (1999); **Goodwin v.
Johnson**, 132 F.3d 162, 179 n.13 (5th Cir. 1998); and **Nichols v.
Scott**, 69 F.3d 1255, 1264 (5th Cir. 1995), **cert. denied**, 518 U.S.
1022 (1996).

[155] See **Daniel v. Cockrell**, 283 F.3d at 705 (holding a Texas
prisoner's conviction became final for **Teague** purposes ninety days
after the Texas Court of Criminal Appeals denied his petition for
discretionary review); **Flanagan v. Johnson**, 154 F.3d 196, 197 (5th
Cir. 1998) (holding that a Texas prisoner's criminal conviction
became "final" on the ninetieth day after the Texas Court of
Criminal Appeals issued its opinion, i.e., the deadline for filing
a certiorari petitioner with the United States Supreme Court
expired).
In petitioner's case, the Texas Court of Criminal Appeals

Petitioner cites no authority in existence as of the date petitioner's conviction became final which would have compelled reasonable jurists on that date to accept petitioner's fourth claim for relief herein.  Nor has this Court been able to locate a single holding of the United States Supreme Court, any federal Circuit Court, or any other federal District Court granting federal habeas corpus relief under the circumstances present in petitioner's case. As of the date petitioner's conviction became final, no American court had held that either the Eighth Amendment's prohibition against cruel and unusual punishments or the terms of the International Covenant on Civil and Political Rights applicable in this nation prohibit the execution of a convicted capital murderer who has successfully avoided multiple execution dates by filing actions in state and federal court collaterally attacking his conviction and sentence.

In fact, as of the current date, there is still no authority other than the obiter dicta cited by petitioner in several post-1989 opinions supporting the contention that a convicted death row inmate's successful manipulation of state and federal collateral review and deliberate delay in pursuing state and federal collateral review can give rise to an independent ground for setting aside that inmate's otherwise lawful conviction or

---

issued its opinion affirming his conviction and sentence on February 15, 1989.

94

sentence.[156]   Therefore, regardless of whether cloaked with the

---

[156] Even if this Court were to address the merits of petitioner's fourth claim for relief, petitioner would not be entitled to federal habeas corpus relief. Petitioner waited almost four years after his conviction became final before filing his first state habeas corpus application. Then, after his first state habeas application was denied, petitioner invoked this Court's jurisdiction. During his first federal habeas corpus proceeding, initiated prior to the advent of the AEDPA, petitioner represented, in his pleadings, motions, and oral arguments, that extensive discovery was necessary in that cause because, among other things, (1) hypnotically enhanced testimony had been used to secure his conviction, (2) there was a genuine dispute with regard to which of the two bank robbers wore the deputy's shirt and ski mask during the robbery, (3) there was evidence in the custody of federal law enforcement agencies showing that persons other than petitioner actually committed the bank robbery and murder of Deputy Childress, and (4) petitioner had been denied adequate discovery during his state habeas corpus proceeding.

After this Court allowed petitioner extensive and expensive discovery, petitioner filed a second amended federal habeas corpus petition in that cause in which he deliberately included both unexhausted claims for relief and new voluminous new evidence that cast a number of his otherwise exhausted claims for relief in a wholly new light, thus giving this Court no choice but to dismiss same without prejudice for want of exhaustion. See **Kunkle v. Dretke**, 352 F.3d 980, 988 (5th Cir. 2003) (holding a petitioner who presented the federal habeas court with "significant evidentiary support" not previously presented to the state courts supporting his otherwise exhausted claim had failed to exhaust state remedies on that claim); **Graham v. Johnson**, 94 F.3d 958, 968-69 (5th Cir. 1996) (holding a federal habeas petitioner fails to exhaust state remedies when he presents material additional evidentiary support to the federal court that was not presented to the state court); **Knox v. Butler**, 884 F.2d 849, 852 n.7 (5th Cir. 1989), **cert. denied**, 494 U.S. 1088 (1990): "on habeas review, federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as all factual allegations supporting those grounds. This rule extends to the evidence establishing the factual allegations themselves."; **Brown v. Estelle**, 701 F.2d 494, 496 (5th Cir. 1983) (holding a petitioner failed to exhaust state remedies on a claim rendered "significantly different and stronger" in federal court than when presented to the state court by the submission of additional documentary support).

Having finessed this Court into dismissing without prejudice his first federal habeas corpus proceeding for want of exhaustion, petitioner then filed an appeal from this Court's Judgment, thereby delaying even further the eventual resolution on the merits of his

imprimatur of the Eighth Amendment or the International Covenant on Civil and Political Rights, petitioner's fourth claim for relief is foreclosed by the non-retroactivity principle announced in **Teague**.[157]

E.   Retaliatory Setting of October 21, 1999 Execution Date

   1.   The Claim

   In his fifth claim for relief herein, petitioner argues that his Eighth Amendment rights, as well as those rights he possesses pursuant to the International Covenant on Civil and Political Rights ("ICCPR"),[158] were violated when the State set an execution date for petitioner following the dismissal without prejudice by this Court of petitioner's first federal habeas corpus action.[159]

   2.   De Novo Review - **Teague** Foreclosure

   Respondent correctly argues that the non-retroactivity principle announced in **Teague** forecloses this claim. Neither the Supreme Court nor any other federal court had held, as of the date petitioner's conviction became final, that a state court's allegedly "retaliatory" action in setting an execution date

---

claims herein.  There is no evidence now before this Court showing that the State of Texas had ever been unwilling to carry out petitioner's sentence.  The only impediments to same that have arisen since February 15, 1989 have been of petitioner's creation.

   [157] See **Lackey v. Johnson**, 83 F.3d 116, 117 (5th Cir. 1996), **cert. denied**, 519 U.S. 911 (1996); **White v. Johnson**, 79 F.3d 432, 438 (5th Cir. 1996), **cert. denied**, 519 U.S. 911 (1996).

   [158] 99 U.N.T.S. 171 (entered into in force in the United States September 8, 1992).

   [159] See Petitioner's Amended Petition, at pp. 203-15.

invalidates an otherwise valid sentence of death.  In fact, such a claim has never prevailed in any American court even at this late date.

F.    Denials of Requests for Co-Counsel and a Mental Health Expert

    1.    The Claim

In his sixth claim for relief herein, petitioner argues that the state trial court violated his constitutional right to the effective assistance of counsel when it denied petitioner's requests for appointment of a second attorney to assist his lead trial counsel and appointed two independent mental health experts to evaluate petitioner, rather than an expert who would assist petitioner's trial counsel alone.[160]

    2.    Independent Review of the Record

        a.    Co-Counsel was Present

During petitioner's first state habeas corpus proceeding, the state trial court, i.e., the same judge who presided over petitioner's trial, specifically found petitioner's lead trial counsel was assisted by court-appointed co-counsel Roger Trevino and a court-appointed investigator and that a third attorney, Ed Camara, also assisted petitioner's lead trial counsel at times.[161] This Court's independent review of the entire record from petitioner's trial court proceedings confirms the fact that

---

[160]  See Petitioner's Amended Petition, at pp. 246-70.

[161]  See State Habeas Transcript, Volume II, at p. 618.  That factual finding was fully supported by the record before the state habeas court in petitioner's first state habeas corpus proceeding.

attorneys Trevino and Camara did make appearances on behalf of
petitioner at various times throughout petitioner's state pretrial
and trial court proceedings.

> b.   Petitioner Made No Request for a "Defense" Expert

As explained in Section II.A.3.f. above,[162] petitioner's trial
counsel filed a formal motion requesting appointment of a mental
health expert to examine petitioner prior to the hearing on
petitioner's competence to stand trial and to report his or her
findings to the state trial court.[163]  In fact, petitioner's trial
counsel never requested that a mental health expert be appointed to
assist petitioner's trial counsel, either at the competency hearing
or trial on the merits.  As such, insofar as petitioner's sixth
claim for relief herein is premised upon the purported denial of a
defense request for appointment of a mental health expert who would
solely assist the defense,[164] as opposed to the appointment of an

---

[162] See notes 19-23, **supra**, and accompanying text.

[163] See Trial Transcript, at pp. 100-02 and note 19, supra.

[164] See Petitioner's Amended Petition, at p. 266 (insisting
petitioner's trial counsel requested appointment of a "defense"
expert).
   In point of fact, this Court's independent review of the
entire record from petitioner's pretrial proceedings in state court
reveals that petitioner's trial counsel never requested appointment
of a mental health expert whose duties would be exclusively to
assist petitioner's trial counsel.  On the contrary, petitioner's
trial counsel's written motion and statements to the trial judge
evidence a clear desire on the part of said counsel to have an
independent mental health evaluation performed on petitioner with
the results to be reported directly to the state trial judge, as
well as the parties. See Trial Transcript, at pp. 100-02; and S.F.
Trial, Volume 2, at pp. 660-72, 693-95, & 716-20.

independent expert who would his or her findings to the trial court, that claim has no basis in fact.

3.   De Novo Review

a.   **Teague** Forecloses Extension of **Ake** to Require Appointment of Co-Counsel or a Confidential Mental Health Expert to Assist the Defense

(1)   Second Counsel

Respondent is correct that, insofar as petitioner argues he was entitled to the appointment of a second attorney to assist his defense at trial based upon the Supreme court's holding in **Ake v. Oklahoma**,[165] that argument is foreclosed by the non-retroactivity doctrine of **Teague**. As of the date petitioner's conviction became final, no American court had ever held that the due process principles discussed by the Supreme Court in its opinion in **Ake** mandated appointment of <u>two</u> attorneys to serve as defense counsel in all capital murder trials. Nor had any American court held that multiple defense counsel were required as a matter of constitutional entitlement, under either the Sixth or Eighth Amendments, in every capital murder prosecution. Thus, extending the relatively narrow holding in **Ake** to mandate court-appointment of multiple defense counsel in capital murder prosecutions (no matter how wise such a practice might be from a variety of viewpoints) would amount to adoption of a "new" rule of constitutional criminal procedure. Furthermore, as noted above,

---

[165] 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

petitioner did receive the assistance of more than one attorney
during pretrial and trial proceedings.

>                  (2)   **Ake** Mental Health Expert

Respondent also correctly relies upon **Teague** to foreclose
petitioner's complaint that he was denied a confidential mental
health expert along the lines of the one mandated by due process
principles discussed in **Ake**.  In truth, petitioner's trial counsel
never requested appointment of such an expert.[166]

Writing for this Court in the case of **Rodolfo Baiza Hernandez
v. Johnson**,  SA-96-CA-58-FB,  Judge  Fred  Biery  addressed  the
assertion  of  a  right  to  the  appointment  of  a  "defense"  mental
health expert pursuant to **Ake** made under circumstances strikingly
similar to those in petitioner's state trial court proceedings:

> [T]he Supreme Court [has] ruled that an indigent criminal
> defendant is entitled to psychiatric assistance when
> either (1) the defendant's sanity is likely to be a
> significant factor at trial <u>or</u> (2) the prosecution
> presents psychiatric evidence of an indigent defendant's
> future  dangerousness  in  a  capital  sentencing
> proceeding.[167]  In **Ake**, the Supreme Court specifically
> held that an indigent criminal defendant did not possess
> a constitutional right to choose a psychiatrist of his
> personal liking or to receive funds to hire his own.[168]
> Unlike the situation in **Ake**, neither the petitioner nor
> his trial counsel demonstrated to the state trial court
> that petitioner's sanity at the time of his offense would

---

[166] <u>See</u> notes 19-23, **supra**, and accompanying text.

[167] <u>See</u> **Tuggle v. Netherland**, 516 U.S. 10, 12, 116 S.Ct. 283,
284, 133 L.Ed.2d 251 (1995); and **Ake v. Oklahoma**, 470 U.S. 68, 83,
105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985).

[168] **Id.**

be a significant factor at trial.[169] However, the Supreme Court was clear in **Ake** that an indigent criminal defendant is entitled to the assistance of a court-appointed, independent psychiatrist when the prosecution places before the jury psychiatric testimony on the question of future dangerousness.[170] At the punishment phase of petitioner's trial the prosecution did introduce expert testimony from Dr. Sparks, albeit in response to a convoluted hypothetical, regarding petitioner's future dangerousness. Therefore, under **Ake**, the petitioner would have been entitled to the assistance of a court-appointed psychiatrist to rebut or respond to that expert testimony. However, as explained at length above, the state habeas court properly found that the petitioner's trial counsel made no intelligible request for such psychiatric assistance but, instead, requested only a "disinterested" mental health evaluation of the petitioner's sanity at the time of his offense and competency to stand trial.

* * * * *

Petitioner argues, without any citation to any relevant authority, that his trial counsel's request for a sanity and mental competency evaluation by a disinterested expert implicitly amounted to a request for a confidential defense expert like that envisioned in **Ake**. However, nothing in any reasonable construction of the petitioner's formal written motion would have furnished the state trial court with even a clue that the petitioner was making such an "implicit" request. The Supreme Court has never extended the rule in **Ake** to apply to situations such as the petitioner's, in which an indigent criminal defendant's trial counsel made a specific request for a neutral evaluation of the defendant's sanity and competency to stand trial but no request for the appointment of a defense expert to assist in the presentation of evidence regarding future

---

[169] In **Ake**, insanity was the defendant's sole defense at trial; the defendant's behavior at arraignment had been so bizarre as to cause the trial court to sua sponte have him examined for competency to stand trial; a state psychiatrist found the defendant incompetent to stand trial and recommended that he be committed; the defendant was found to be competent to stand trial six weeks later only after he was heavily sedated with large doses of Thorazine three times a day; and the psychiatrists who examined the defendant in **Ake** did so only six weeks after his offense and suggested that his mental illness might have begun many years earlier. See **Ake v. Oklahoma**, 470 U.S. at 86, 105 S.Ct. at 1098.

[170] See **Ake v. Oklahoma**, 470 U.S. at 84, 105 S.Ct. at 1096-97.

dangerousness at the punishment phase of trial, like that
envisioned in **Ake**.
        Respondent argues correctly that this Court is
precluded in this federal habeas corpus proceeding by the
non-retroactivity doctrine of **Teague** from recognizing or
applying a new rule of constitutional law and from
expanding existing procedural requirements into new
areas.

Like the petitioner in **Hernandez v. Johnson**, petitioner's

trial counsel herein made a formal request to the state trial court

only for appointment of a disinterested mental health expert to

evaluate petitioner's sanity and competence to stand trial and

report his or her findings back to the state trial court.  Nothing

in the petitioner's formal pretrial written motion or oral

arguments made in support thereof put the state trial court on

notice that petitioner was requesting appointment of a confidential

mental health expert along the lines of the expert required by **Ake**

to assist petitioner's counsel at either the pretrial competency

hearing or at trial on the merits.  Just like **Hernandez**, petitioner

herein failed to present his state trial court with any evidence

showing that petitioner's sanity at the time of his offense would

likely be a significant issue at trial.  In fact, petitioner has

never alleged any facts in any judicial forum suggesting that

petitioner was insane at the time of his offense.  Moreover, unlike

Rodolfo Hernandez, the prosecution offered no expert opinion

testimony regarding future dangerousness at the punishment phase of

petitioner's capital murder trial.  Therefore, like the petitioner

in **Hernandez**, petitioner herein was not entitled under **Ake** to the

appointment of a confidential mental health expert to assist his

trial counsel.  Extension of the rule in **Ake** to a situation such as petitioner's, in which there was no request for appointment of a confidential mental health expert to assist defense counsel, is foreclosed by the non-retroactivity doctrine announced in **Teague**.

b.   No Relief on Petitioner's Due Process **Ake** Claim

Finally, even if this Court were to ignore the preclusive effect of **Teague**, petitioner has failed to allege any facts sufficient to entitle him to appointment of an **Ake** mental health expert.  In **Ake**, the Supreme Court held that an indigent criminal defendant is entitled to the assistance of a court-appointed mental health expert in two situations: first, when the defendant demonstrates to the trial judge that his sanity <u>at the time of the offense</u> is to be a significant factor at trial; and second, to rebut the State's expert opinion evidence regarding the issue of the defendant's future dangerousness.[171]  Because the prosecution offered no expert opinion evidence regarding future dangerousness at either phase of petitioner's trial, the latter scenario does not apply to petitioner's case.[172]  Likewise, petitioner utterly failed

---

[171] <u>See</u> **Ake v. Oklahoma**, 470 U.S. at 83, 105 S.Ct. at 1096; **White v. Johnson**, 153 F.3d 197, 201 (5th Cir. 1998), **cert. denied**, 153 F.3d 197 (1998).

[172] <u>See</u> **Tuggle v. Netherland**, 516 U.S. 10, 12, 116 S.Ct. 283, 284, 133 L.Ed.2d 251 (1995) (emphasizing that the holding in *Ake* applies where the prosecution has relied on psychiatric testimony regarding future dangerousness); **Goodwin v. Johnson**, 132 F.3d 162, 188-89 (5th Cir. 1998), **cert. denied**, 531 U.S. 1120 (2001) (holding that a criminal defendant is entitled to appointment of a mental health expert to rebut prosecution evidence of future dangerousness only when the prosecution has relied on mental health expert opinion testimony on that issue).

to present his state trial judge with any fact-specific allegations, much less any evidence, showing that there was any factual issue worthy of exploration regarding petitioner's sanity <u>at the time of his offense</u>, much less that such a contention would be a "significant factor at trial."[173]

Moreover, petitioner requested and received psychological evaluations from two, court-appointed, independent mental health experts, neither of whom identified any evidence showing that petitioner was legally insane at the time of his offense.[174] The Fifth Circuit has held that the procedural requirements of **Ake** in

---

[173] See **Dunn v. Johnson**, 162 F.3d 302, 308 (5th Cir. 1998), **cert. denied**, 526 U.S. 1092 (1999) (holding a state trial court's denial of a request for a court-appointed psychiatrist to assist the defense did not violate the rule in *Ake* because the defense failed to make a preliminary showing that the defendant's sanity would be a significant factor at trial); **Williams v. Collins**, 989 F.2d 841, 845 (5th Cir. 1993), (holding that "a defendant satisfies the threshold requirement of *Ake* only when he has made a factual showing sufficient to give the trial court reasonable ground to doubt his sanity at the time of the offense"); **Volanty v. Lynaugh**, 874 F.2d 243, 246 (5th Cir. 1989), **cert. denied**, 493 U.S. 955 (1989) (holding that mere allegations the defendant was severely addicted to heroin and temporarily insane <u>at the time of the offense</u> due to drug-induced intoxication did not satisfy the threshold requirement of *Ake*); and **Volson v. Blackburn**, 794 F.2d 173, 176 (5th Cir. 1986) (holding that a defendant's trial counsel's mere allegations that the defendant was unable to distinguish between right and wrong <u>at the time of the offense</u> failed to satisfy the threshold requirement of *Ake*).

[174] During the pretrial hearing (actually a jury trial) held to determine petitioner's competence to stand trial, each of the two psychologists who examined petitioner testified they saw nothing during their interviews or in the petitioner's answers to standardized psychological tests suggesting that petitioner was either insane, incompetent to stand trial, or mentally retarded. <u>See</u> S.F. Trial, Volume 3, testimony of Dr. Alfred V. Williams, at pp. 853-56, 877-87, & 892-93; and testimony of Dr. Betty Lou Schroder, at pp. 951-54, 962-71, 1005-06, & 1009.

situations where the defendant's insanity at the time of his offense will be a significant issue at trial are satisfied by examinations of the defendant by independent mental health experts such as those who examined petitioner and reported their findings to the state trial court.[175]

### c.   Harmless Error Analysis

Furthermore, insofar as petitioner complains about the failure of the state trial court to appoint a "confidential" mental health expert to assist the defense at trial (something petitioner's trial counsel failed to request), under the record now before this Court, any such failure was "harmless."  A constitutional error is "harmless" when it appears that the error complained of did not have "substantial and injurious effect or influence in determining the jury's verdict."[176]  Given petitioner's failure to demonstrate through evidence, or even to allege any specific facts showing, that there was anything a "confidential" mental health expert could have done to actually aid petitioner's trial counsel at either phase of petitioner's capital murder trial, the failure of the state trial court to appoint a "confidential" mental health expert to assist petitioner's trial counsel did not have a substantial and injurious effect or influence in determining the verdict at either

---

[175] See **Granviel v. Lynaugh**, 881 F.2d 185, 191 (5th Cir. 1989), **cert. denied**, 495 U.S. 963 (1990).

[176] **Brecht v. Abrahamson**, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); **White v. Johnson**, 153 F.3d at 201 (holding that alleged *Ake* error is properly subject to harmless error analysis under *Brecht*).

phase of petitioner's capital murder trial.[177]   This same holding
applies with regard to the outcome of the petitioner's competency
hearing.[178]

        d.   No Denial of Effective Assistance

     Petitioner argues that his complaints about the alleged
failure of the state trial court to grant his requests for co-
counsel and a confidential mental health expert to assist the
defense violated his Sixth Amendment right to the effective
assistance of counsel.   Insofar as petitioner argues in his sixth
claim for relief that he was constructively denied effective
assistance of counsel by virtue of the failure of the state trial
court to appoint co-counsel and a confidential "defense" mental
health expert and, therefore, he is not required to satisfy the
"prejudice" prong of **Strickland v. Washington**,[179] those contentions

---

[177]   Neither petitioner's trial counsel nor the prosecution
offered any evidence regarding petitioner's mental health at either
phase of petitioner's capital murder trial.   As is explained in
Section II.A.3.f. above, petitioner's trial counsel made no
specific request for appointment of a "confidential" mental health
expert.   Petitioner offered neither the state habeas court nor this
Court any evidence showing what exculpatory or mitigating evidence
a "confidential" mental health expert could have furnished to
petitioner's trial counsel, had such an expert been appointed to
assist the defense at petitioner's capital murder trial.

[178] While petitioner spends considerable effort attacking the
backgrounds and credentials of the two independent mental health
experts who testified at petitioner's competency hearing,
petitioner has utterly failed to present this Court with any
evidence showing that there was any mental health expert available
at the time of petitioner's competency hearing who would have been
willing to offer opinion testimony to the effect that petitioner
was not competent to stand trial.

[179]   466 U.S.  778, 104 S.Ct.  2052, 80 L.Ed.2d 674 (1984).

are foreclosed by the Supreme Court's holding in **Bell v. Cone**.[180]
In **Bell**, the Supreme Court specifically held that the presumption
of prejudice urged by petitioner herein applies only in three
situations, none of which occurred during petitioner's trial.[181]

In order to prevail on a claim that he was denied the
effective assistance of trial counsel guaranteed him by the Sixth
Amendment, petitioner must establish both that (1) his trial
counsel rendered professionally deficient performance, i.e., that
the performance of said counsel fell below an objective level of
reasonableness, and (2) petitioner was "prejudiced" thereby, i.e.,
there is a reasonable probability that, but for the deficient

---

[180] 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

[181] The Supreme Court emphasized in *Bell* the extremely narrow
range of three situations in which the presumption of prejudice
might arise that it has identified in **United States v. Cronic**, 466
U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).  More
specifically, the Supreme Court held that the *Cronic* presumption of
prejudice applies only when either (1) there was a complete denial
of counsel, such as when the accused was denied the presence of
counsel at a critical stage; (2) counsel entirely fails to subject
the prosecution's case to meaningful adversarial testing; or (3)
counsel was called upon to render assistance under circumstances
where competent counsel very likely could not. See **Bell v. Cone**,
535 U.S. at 695-96, 122 S.Ct. at 1851; **United States v. Cronic**, 466
U.S. at 659-60, 104 S.Ct. at 2047.  The Court's opinion in *Bell*
held that routine complaints about the performance of defense
counsel at various stages of a trial do not fall into the second of
the foregoing categories of exceptional circumstances warranting a
presumption of prejudice under *Cronic*. See **Bell v. Cone**, 535 U.S.
at 696-98, 122 S.Ct. at 1851-52.
Like Bell's complaints about the performance of his trial
counsel, petitioner's complaints about the impact of the state
trial court's denials of his requests for independent expert mental
health assistance (which, in fact, the state trial court did grant)
and co-counsel do not fall into any of the three categories of
cases identified by the Supreme Court in *Bell* and *Cronic*.  Thus,
petitioner was required to satisfy the dual prongs of *Strickland* in
order to prevail on his Sixth Amendment claim herein.

performance of his trial counsel, the outcome of either phase of petitioner's capital murder trial would have been different.[182]

Petitioner has alleged no specific facts before this Court, much less furnished any evidence, sufficient to satisfy the foregoing "prejudice" standard. The evidence of petitioner's guilt was, and remains, overwhelming. Despite having been granted extensive discovery in his first federal habeas corpus proceeding, petitioner offers this Court no fact-specific allegations, much less any evidence, suggesting what potentially helpful evidence, of either an exculpatory or mitigating nature, a "confidential" mental health expert could have furnished petitioner's trial counsel. Likewise, while petitioner complains generically about the potential benefits of having a second court-appointed counsel assist his lead trial counsel, petitioner offered the state courts, and offers this Court, no fact-specific allegations or evidence identifying any additional defensive theories, exculpatory evidence, or mitigating evidence that would have become available to petitioner at trial had his lead trial counsel been aided by a full-time, second, court-appointed defense counsel. As noted above, petitioner's lead trial counsel did receive part-time assistance of other counsel. Under such circumstances, petitioner has failed to satisfy the "prejudice" prong of **Strickland** and is

---

[182] See **Bell v. Cone**, 535 U.S. at 695, 122 S.Ct. at 1850; **Strickland v. Washington**, 466 U.S. at 688, 104 S.Ct. at 2064-65 (deficient performance prong explained); **Strickland v. Washington**, 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." **Id.**

not entitled to federal habeas corpus relief under the Sixth Amendment.[183]

G.   Challenge to the Wilson County Grand Jury

    1.   The Claims

In his eighth claim for federal habeas corpus relief, petitioner argues that the process used for selecting grand jurors in Wilson County results in an under-representation of women, and Hispanic women in particular, on grand juries in that County.[184] Petitioner argues that this under-representation violated his federal constitutional rights under both the Fourteenth Amendment's Equal Protection Clause and the Sixth Amendment's "fair cross-section" requirement.

    2.   Clearly Established Federal Law

        a.   Equal Protection and State Grand Jury Selection

Few principles of federal constitutional law have been more consistently and uniformly applied over time than the Supreme Court's pronouncement in **Strauder v. West Virginia**[185] that excluding otherwise qualified persons from service on grand juries solely on the basis of their race violates the equal protection guarantee of

---

[183] See **Crane v. Johnson**, 178 F.3d 309, 315 (5th Cir. 1999), **cert. denied**, 528 U.S. 947 (1999), (holding that a petitioner who failed to show what additional evidence a confidential mental health expert could have furnished his trial counsel had failed to satisfy the prejudice prong of *Strickland* with regard to a complaint that his trial counsel failed to request such an expert's appointment).

[184] See Petitioner's Amended Petition, at pp. 281-301.

[185] 100 U.S. 303, 307-10, 10 Otto 303, 25 L.Ed. 664 (1879).

the Fourteenth Amendment.[186]  In fact, invidious discrimination in

---

[186] See **Vasquez v. Hillery**, 474 U.S. 254, 261-62, 106 S.Ct. 617, 622-23, 88 L.Ed.2d 598 (1986) (recognizing that indictment of a criminal defendant by a grand jury from which members of a racial group purposefully have been excluded violates the defendant's right to equal protection of the laws); **Rose v. Mitchell**, 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979) (because discrimination on the basis of race in selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a while," indictment by a grand jury from which members of a racial group purposefully have been excluded violates equal protection principles); **Castaneda v. Partita**, 430 U.S. 482, 492, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977) (it is a denial of equal protection to try a defendant under an indictment issued by a grand jury from which all persons of his race or color have, solely because of that race or color, been excluded by the State); **Alexander v. Louisiana**, 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972) ("For over 90 years, it has been established that a criminal conviction of a Negro cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which Negroes were excluded by reason of their race."); **Arnold v. North Carolina**, 376 U.S. 773, 774, 84 S.Ct. 1032, 1032, 12 L.Ed.2d 77 (1964); **Eubanks v. Louisiana**, 356 U.S. 584, 585, 78 S.Ct. 970, 972, 2 L.Ed.2d 991 (1958)("a criminal defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race."); **Reece v. Georgia**, 350 U.S. 85, 87, 76 S.Ct. 167, 169, 100 L.Ed. 77 (1955) ("The indictment of a defendant by a grand-jury from which members of his race have been systematically excluded is a denial of his right to equal protection of the laws."); **Hernandez v. Texas**, 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954) ("it is a denial of equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury, or before a petit jury, from which all persons of his race or color have, solely because of that race or color, been excluded by the State, whether acting through its legislature, its courts, or its executive or administrative officers."); **Cassell v. Texas**, 339 U.S. 282, 287, 70 S.Ct. 629, 632, 94 L.Ed.2d 839 (1950) (plurality held that a long practice of grand jury selection in which the number of Negroes who served was limited to a number (one) that was considered proportional to the overall percentage of Negroes in the county population was forbidden by equal protection principles); **Patton v, Mississippi**, 332 U.S. 463, 465, 68 S.Ct. 184, 186, 92 L.Ed. 76 (1947) (exclusion of Negroes from grand and petit juries because of their race denies Negro defendants their equal protection rights under the Fourteenth Amendment); **Hill v. Texas**, 316 U.S. 400, 404, 62 S.Ct. 1159, 1160, 86 L.Ed. 1559 (1942)

the selection of grand jurors so undermines the structural integrity of the criminal tribunal that such claims are not amenable to harmless error analysis.[187]

To be entitled to federal habeas relief based on a claim of discriminatory selection of grand jurors, i.e., an equal protection violation, the petitioner must show that the procedure employed "resulted in substantial under-representation" of the members of a race or another identifiable group.[188] The test for determining

---

(evidence showing the total exclusion of Negroes from grand and petit juries in a county for sixteen years constituted a prima face case of equal protection violation); **Smith v. Texas**, 311 U.S. 128, 129, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940) (the intentional and systematic exclusion of Negroes from grand jury service solely on account of face and color violated equal protection rights); **Pierre v. Louisiana**, 306 U.S. 354, 357, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1939) (exclusion from grand or petit jury service on account of race is forbidden by the Fourteenth Amendment); **Norris v. Alabama**, 294 U.S. 587, 589, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935) (holding that, regardless of whether the mechanism employed to achieve the result, i.e., be it statutory, judicial, or administrative, the total exclusion of all persons of the African race from service on grand juries violates equal protection); **Rogers v. Alabama**, 192 U.S. 226, 231, 24 S.Ct. 257, 259, 48 L.Ed. 417 (1904); **Carter v. Texas**, 177 U.S. 442, 447, 20 S.Ct. 687, 689, 44 L.Ed. 839 (1900); **Neal v. Delaware**, 103 U.S. 370, 396, 13 Otto 370, 26 L.Ed. 567 (1881).

[187] See **Vasquez v. Hillery**, 474 U.S. at 263-64, 106 S.Ct. at 623 (plurality holding of four Justices). A majority of the Supreme Court has held that the rule in **Strauder** and its progeny is so fundamental that the rule and reasoning of **Stone v. Powell** does not foreclose federal habeas review of such claims. See **Rose v. Mitchell**, 443 U.S. at 560-61, 99 S.Ct. at 3002.

[188] See **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005; **Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280.
   While the vast majority of the Supreme Court's opinions applying the equal protection principle first recognized in **Strauder** have addressed claims that members of a criminal defendant's racial or ethnic group were systematically and purposefully excluded from grand jury service, even a cursory examination of the Supreme Court's recent equal protection

whether this standard has been satisfied has four components:
first, the petitioner must establish the excluded group is a
recognizable, distinct class, singled out for different treatment
under state law, as written, or as applied[189]; second, the

---

jurisprudence convinces this Court that standing to assert such an
equal protection claim is not limited to members of the allegedly
excluded group. See **Campbell v. Louisiana**, 523 U.S. 392, 400-01,
118 S.Ct. 1419, 1424-25, 140 L.Ed.2d 551 (1998) (holding that a
white defendant had standing to complain about the alleged
exclusion of blacks from his grand jury); **Powers v. Ohio**, 409 U.S.
400, 410-16, 111 S.Ct. 1364, 1370-74, 113 L.Ed.2d 411 (1991)
(holding a criminal defendant could complain about the race-based
exclusion of jurors effected through peremptory challenges whether
or not the defendant and the excluded jurors shared the same race).
    Respondent argues that a criminal defendant's right to assert
an equal protection claim premised on the alleged exclusion from
state grand juries of members of a group other than one of which
the defendant was a member did not exist until the Supreme Court's
1991 opinion in **Powers v. Ohio**. See Respondent's Motion for Summary
Judgment, at p. 125. Therefore, respondent argues, petitioner's
challenges to the alleged exclusion of women from his 1983 grand
jury is foreclosed by *Teague*. **Id.**  However, as early as its
fragmented opinion in **Peters v. Kiff**, 407 U.S. 493, 92 S.Ct. 2163,
33 L.Ed.2d 83 (1972), the Supreme Court recognized that a criminal
defendant has standing to bring an equal protection challenge to
the exclusion of members of a racial or ethnic group from grand
jury service, regardless of whether the defendant was a member of
that group.

[189] **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005;
**Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280.
    The Supreme Court's unanimous opinion in **Hernandez v. Texas**
included an insightful discussion of the nature of this inquiry:
        Throughout our history differences in race and color
    have defined easily identifiable groups which have at
    times required the aid of the courts in securing equal
    treatment under the laws. But community prejudices are
    not static, and from time to time differences from the
    community norm may define other groups which need the
    same protection. Whether such a group exists within a
    community is a question of fact. When the existence of
    a distinct class is demonstrated, and it is further shown
    that the laws, as written or as applied, single out that
    class for different treatment not based on some
    reasonable classification, the guarantees of the
    Constitution have been violated.

petitioner must establish that the degree of under-representation

was <u>substantial</u>, usually by comparing the proportion of the group

in the total population to the proportion called to serve as grand

jurors over a significant period of time[190]; third, a selection

---

**Hernandez v. Texas**, 347 U.S. at 478, 74 S.Ct. at 670 (emphasis added).

[190] See **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005; **Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280 ("This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class.").
     The Supreme Court's opinion in *Castaneda* cited **Hernandez v. Texas** as authority for the use of the exclusion method or proving discrimination. See **Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280.   In *Hernandez,* the Supreme Court faced a record establishing that (1) 14% of the county population were of Hispanic surnames, (2) 11% of the males over age 21 had such names, (3) 6 or 7 percent of the freeholders on the tax rolls were of Mexican descent, yet (4) for 25 years, there was no record of any Mexican-American citizen serving as members of a jury commission, grand jury, or petit jury. **Hernandez v. Texas**, 347 U.S. at 481, 74 S.Ct. at 672.   Needless to say, the Supreme Court had no difficulty determining that such a showing fulfilled the petitioner's duty to establish a *prima facie* case of discrimination. **Id.** 347 U.S. at 481-82, 74 S.Ct. at 672.   In so doing, the Supreme Court relied upon its holding in **Norris v. Alabama**, in which the Supreme Court faced another record showing the total exclusion of all Negroes from jury service despite ample evidence that such persons "constituted a substantial segment of the population of the jurisdiction" over an extended period of time, which also constituted prima facie proof of the systematic exclusion of Negroes from jury service. See **Id.**, 347 U.S. at 480, 74 S.Ct. at 671.   The record in *Norris* revealed that the total county population was 36,881 including 2,688 Negroes and that the 666 Negro males were included among 8,801 males over age 21 yet no witness called to testify before the trial court, including several county officials responsible for supervising jury trials, could recall even a single Negro ever having served on a grand or petit jury in the county's history. See **Norris v. Alabama**, 294 U.S. at 590-92, 55 S.Ct. at 580-81.
     The Supreme Court has held "substantial" the following discrepancies: 79% of county population was Mexican-American but only 39% of such persons served as grand jurors over an 11-year period (see **Castaneda v. Partida**, 430 U.S. at 495, 97 S.Ct. at 1280); 60% of population were Negroes but only 37% of grand jurors

procedure that is susceptible of abuse or is not racially neutral

support the presumption of discrimination raised by the statistical

showing[191]; and finally, once the foregoing prima facie case is

established, the burden shifts to the State to rebut the prima

facie case.[192]

In the course of its equal protection opinions the Supreme

Court has taken care to point out that the Fifth Amendment's

---

(see **Turner v. Fouche**, 396 U.S. 346, 339, 90 S.Ct. 532, 539, 24
L.Ed.2d 567 (1970)); 27.1% of those on tax rolls were Negroes but
only 9.1% of those on grand jury venires (see **Whitus v. Georgia**,
385 U.S. 545, 550-51, 87 S.Ct. 643, 646-47, 17 L.Ed.2d 599 (1967));
24.4% of tax lists but only 4.7% of grand jury lists (see **Sims v.
Georgia**, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 25
(1967)); 19.7% of tax lists but only 5% of jury list (see **Jones v.
Georgia**, 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 26 (1967)).

[191] See **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005;
**Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280.
   The Supreme Court has emphasized that selection procedures
which offer ample opportunity for consideration of the race of
potential grand jurors by those making the selection decision can
combine with a showing of statistical divergence from the breakdown
of the population to support a finding of discrimination. See
**Alexander v. Louisiana**, 405 U.S. at 630-31, 92 S.Ct. at 1225
(pointing out that, the racial designation of potential jurors
appeared on all questionnaires returned by them because different
color cards were attached to the returned questionnaires for
Negroes and Whites, and at two critical junctures in the selection
process where disproportionate elimination of Negroes occurred, the
racially identifying markers were visible to jury commissioners);
**Avery v. Georgia**, 345 U.S. 559, 560-61, 73 S.Ct. 891, 892, 97
L.Ed.2d 1244 (1953) (juror cards of different color were prepared
for Negroes and Whites from segregated tax lists and no Negroes had
appeared on the final jury); **Whitus v. Georgia**, 385 U.S. at 548-49,
87 S.Ct. at 645-46 (all-white jury resulted from selection of
jurors from a one-volume tax digest divided into separate sections
for Negroes and Whites and black taxpayers had a "c" after their
names and 42% of county population and 27% of taxpayers were Negro
but only 9% of petitioner's jury venire).

[192] See **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005;
**Castaneda v. Partida**, 430 U.S. at 495, 97 S.Ct. at 1280.

provision for presentment or indictment by a grand jury has never been held obligatory for the States.[193]

   b.   Fair Cross-Section Requirement

   The Sixth Amendment guarantees a criminal defendant the right to have his or her jury chosen from a venire or panel representing a fair-cross-section of the community.[194]   This right exists separate and apart from either of the Equal Protection rights recognized in **Batson v. Kentucky**[195] or in the long line of Supreme Court opinions discussed in Section III.G.2.a. above.[196]   The

_____

   [193] See **Alexander v. Louisiana**, 405 U.S. at 633, 92 S.Ct. at 1226-27.

   [194] **Taylor v. Louisiana**, 419 U.S. 522, 527-30, 95 S.Ct. 692, 696-97, 42 L.Ed.2d 690 (1975).
   The Supreme court reached its holding in *Taylor* by recognizing that (1) "the Sixth Amendment's provision for jury trial is made binding on the States by virtue of the Fourteenth Amendment" (**Taylor v. Louisiana**, 419 U.S. at 526, 95 S.Ct. at 696); (2) "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community" (**Id.**, 419 U.S. at 527, 95 S.Ct. at 696); (3) the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial (**Id.**, 419 U.S. at 528, 95 S.Ct. at 697).   Interestingly, the Supreme Court cited its long line of equal protection cases outlawing the purposeful exclusion of racial and ethnic groups from service on grand and petit juries in support of its interpretation of the Sixth Amendment's fair cross section requirements.
   The Supreme Court acknowledged that its holding in *Taylor* announced a new rule of constitutional criminal procedure. See **Taylor v. Louisiana**, 419 U.S. at 535-36, 95 S.Ct. at 700 ("until today no case had squarely held that the exclusion of women from jury venires deprives a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community.").

   [195] 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

   [196] See **Holland v. Illinois**, 493 U.S. 474, 478-83, 110 S.Ct. 803, 806-08, 107 L.Ed.2d 905 (1990) (distinguishing the principles governing the Supreme Court's equal protection case law forbidding

Supreme Court has repeatedly refused to extend the Sixth Amendment's fair cross-section requirement to the selection of a petit jury once a jury panel or venire has been constituted that satisfies this requirement.[197] A criminal defendant has standing to challenge an exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class.[198] The Supreme Court has emphasized that its construction of the Sixth Amendment does not deprive the States of the opportunity to grant exemptions from jury service in cases of special hardship or incapacity or to persons engaged in particular occupations whose

---

the systematic discriminatory exclusion of identifiable groups from grand juries and petit jury venires from the Sixth Amendment's fair cross-section of the community requirement and holding that the latter did not prohibit the use of peremptory challenges in an allegedly racially discriminatory manner akin to the Equal Protection Clause's prohibition recognized in *Batson*).

[197] See **Holland v. Illinois**, 493 U.S. at 486-87, 110 S.Ct. at 810-11 (holding that the Sixth Amendment's fair cross-section requirement does not mirror the Equal Protection Clause's proscription against racial discrimination in the exercise of peremptory challenges); **Teague v. Lane**, 489 U.S. at 314-15, 109 S.Ct. at 1077-78 (recognizing that denial of the right to a fair cross-section of the community in a jury venire does not undermine the fundamental fairness that must underlie a criminal conviction); **Lockhart v. McCree**, 476 U.S. 162, 173, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986) ("We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").

[198] **Duren v. Missouri**, 439 U.S. 357, 359 n.1, 99 S.Ct. 664, 666 n.1, 58 L.Ed.2d 579 (1979); **Taylor v. Louisiana**, 419 U.S. at 526, 95 S.Ct. at 695-96.

uninterrupted performance of their duties is critical to the community's welfare.[199]

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process."[200]

3.   AEDPA Review

a.   The State Court Proceedings

Petitioner filed several pretrial motions to quash the indictment against him one of which argued that (1) "women, blacks and Mexican Americans" had been systematically excluded from grand juries in Wilson County and (2) "blacks and Mexican Americans" had been systematically excluded from the position of grand jury foreperson in Wilson County.[201]

---

[199] See **Taylor v. Louisiana**, 419 U.S. at 534, 95 S.Ct. at 700 ("States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare."); **Id.**, 419 U.S. at 538, 95 S.Ct. at 701 ("States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community.").

[200] **Duren v. Missouri**, 439 U.S. at 364, 99 S.Ct. at 668.

[201] See Petitioner's [first] motion to quash the indictment against him, Trial Transcript, at p. 64.

117

At an pretrial evidentiary hearing held May 18, 1984,[202] the
state trial court admitted into evidence documents from the 1980
census, as well as documents and testimony from the Wilson County
District Clerk regarding the ethnicity of persons called to serve
on grand juries in that county from 1972 through 1983.[203]   The

---

Petitioner's second motion to quash argued that the indictment
against him failed to properly allege the offense of capital murder
under applicable Texas law. See Trial Transcript, at pp. 68-69.

Petitioner's third motion to quash the indictment against him
included a multi-faceted attack upon the validity of the grand jury
under applicable Texas law, the qualifications and alleged
conflicts of interest of grand jurors, the failure of the
indictment to state an offense under applicable state law, the
constitutionality of the provisions of the Texas Penal Code
defining the offense of capital murder, the constitutionality of
the provisions of the Texas Code of Criminal Procedure addressing
the manner in which capital murder juries are to be charged, the
sufficiency of the evidence supporting the grand jury's return of
the indictment against petitioner, and alleged procedural
irregularities and errors during the grand jury's deliberations.
See Trial Transcript, at pp. 108-14.

Petitioner's fourth motion to quash argued that the Texas
Penal Code and Texas Code of Criminal Procedure provisions defining
capital murder and setting forth the procedures to be employed
during a capital murder trial were unconstitutional and that the
method of execution prescribed by Texas law was likewise
unconstitutional. See Trial Transcript, at pp. 117-18.

[202] The only evidentiary hearing held in connection with
petitioner's complaints about the manner in which his Wilson County
grand jury was selected occurred on May 18, 1984.   While an
evidentiary hearing was held June 28, 1984 on another of
petitioner's motions to quash the indictment against him, the focus
of that hearing was petitioner's allegations of grand juror
ineligibility and improprieties during the grand jury
deliberations. See S.F. Trial, Volume 2, at pp. 593-660.  The only
witnesses at the June 28, 1984 hearing were the members of the
grand jury that indicted petitioner and there was no evidence
offered or admitted during that hearing concerning the method by
which the Wilson County grand jury that indicted petitioner was
selected. Id.

[203] Wilson County District Clerk Jody Gregory testified that
potential grand jurors were selected twice a year by grand jury
commissions in Wilson County every year from 1972 through 1983

parties stipulated at the hearing to the fact that approximately 36.5 percent of Wilson County's total population of 16,756 at the 1980 Census had Hispanic surnames.[204]  In rebuttal, the prosecution called the four grand jury commissioners who picked the panel of twenty potential grand jurors from which the grand jury that indicted petitioner was selected.[205]  Finally, the state district

_____

except for the Spring of calendar year 1980, when a jury wheel was used. See S.F. Trial, Volume 1, testimony of Jody Gregory, at pp. 113-37.  Mrs. Gregory testified further from numerous exhibits that were admitted into evidence at the May 18, 1984 hearing that (1) of the 458 potential grand jurors selected by the grand jury commissions whom she could identify from the records in question, 143 had Hispanic surnames, (2) she personally knew of one Hispanic individual with an Anglo surname who was among those selected as a potential grand juror in the Fall of 1979 and one Anglo individual with an Hispanic surname who was selected in the Spring of 1981, and (3) twenty of the fifty potential grand jurors selected at random in the Spring of 1983 had Hispanic surnames. **Id.**  Of the twenty persons called for grand jury service in the Fall of 1983, four had Hispanic surnames and three of those were selected for service on the 12-person grand jury that indicted petitioner. **Id.**, at p. 117.

[204] See S.F. Trial, Volume 1, testimony of Jody Gregory, at pp. 118-19.  More specifically, the 1980 census figures indicated that 6,112 of the County's total population were "of Spanish origin." **Id.**  Curiously, the parties did not stipulate to, or offer any evidence on, the Census figures for Wilson County's population in 1970.

[205] Grand jury commissioner Esmeralda Sanchez testified that (1) she and the other commissioners used tax records and voter registration records to select grand jurors, although they were not limited to the names in those books, (2) the Judge directed them to select people who were not over the age of 65, did not have children under age ten, and who were not in school, (3) the Judge directed them to get a mix of men and women and different minorities, (4) she chose people from Poth and chose persons with both Anglo and Spanish surnames, and (5) she deliberately did not choose people with small children or those over age 65. See S.F. trial, Volume, testimony of Esmeralda Sanchez, at pp. 168-83.
    Grand Jury commissioner Balde Trevino testified that (1) the commissioners used tax and voters records, and possibly phone books to choose gand jurors, (2) he personally chose two names from the

judge who supervised the grand jury commissioners testified that
(1) he read the grand jury commissioners the list of qualifications
for grand jurors from the state statute, (2) he urged them to
achieve geographic diversity across the County, an occupational
mix, age diversity, approximately a fifty/fifty split on gender,
and racial percentages that were a close match to the 1980 census
figures for the County, (3) he furnished the commissioners with tax
rolls, voter registration records, and phone books, and (4) he made
the commissioners aware of the legal excuses that persons could
make to grand jury service.[206]   The prosecution also offered

---

voter registration list but understood that they were not limited
to the names on voter lists, (3) he did not exclude persons with
children under age ten from his picks, and (4) he did not consider
the ethnicity or gender of the persons he selected. **Id.**, testimony
of Balde Trevino, at pp. 183-96.

Commissioner Rosemary Canada, who identified herself as black,
testified that (1) she employed the tax list to select her choices,
(2) she chose only persons she knew, (3) the grand jury commissions
began with an initial list of forty persons and whittled that list
down to twenty names, (4) she did not consider age in making her
selections and did not believe the commissioners rejected anyone
because they had children, (5) they did reject some names among the
potential grand jurors because those persons were over age 65, and
(6) they did their best to follow the court's instructions. **Id.**,
testimony of Rosemary Canada, at pp. 196-216.

Commissioner Jim Adams, who identified himself as Native
American, testified that (1) the commissioners used the ethnicity
percentages within the County as a general guideline but realized
they were not mandatory, (2) they began with forty names and
whittled it down to twenty, (3) their primary concern was achieving
proportional geographic diversity across the County, (4) he chose
three persons from LaVernia, (5) in selecting his potential grand
jurors, he did consider age, (6) the commissioners did exclude
persons with children under age ten, and (7) the judge advised them
against choosing people from the same occupation. **Id.**, testimony of
Jim Adams, at pp. 216-24.

[206] See S.F. Trial, Volume 1, testimony of Robert Lee
Eschenburg, at pp. 236-41.

rebuttal testimony from the Wilson County District Clerk establishing that, in the 1980 census, Hispanics made up approximately 45 percent of Wilson County's population under the age of eighteen.[207]  The prosecution argued that the percentage of persons called to serve on Wilson County grand juries from 1972 through the Fall of 1983 who were of Hispanic ethnicity actually was greater than the percentage of Hispanics in the County's adult population.[208]  The state trial court denied petitioner's motion to quash the indictment.[209]

In the course of petitioner's first state habeas corpus proceeding, petitioner presented the state courts with extensive statistical analyses culled from the 1980 census and Wilson County grand jury records covering the time period from the early-to-mid-1970's through 1992.[210]  However, petitioner did not offer the state

---

[207] More specifically, Jody Gregory testified that the 1980 census data already admitted into evidence established that, of the County's 5,429 persons under the age of 18, 2442 were either of "Mexican" national origin or "other Spanish." **Id.**, testimony of Jody Gregory, at p. 232.  Put more simply, in the 1980 census, almost forty cent of Wilson's County's Hispanic population was under age eighteen (2,442 out of 6,112).

[208] See **Id.**, at pp. 244-49.  The prosecution also pointed out that almost 36 percent of the grand jury forepersons during the time period in question were of Hispanic origin, again greatly exceeding the percentage of Hispanic adults in the County. **Id.**

[209] **Id.**, at p. 249.

[210] See State Habeas Transcript, Volume I, at pp. 27-48.  More specifically, Tables 1 and 2 that appear on pages 36 and 38 in petitioner's first state habeas corpus application appear to be identical to the corresponding tables that appear on pages 289 and 291 of Petitioner's Amended Petition herein.  The only underline evidence establishing the ethnicity of Wilson County grand jurors that was presented to the state trial court consisted of the documents

habeas court any new or additional evidence supporting these statistical summaries. The state trial court found that petitioner had failed to present any evidence supporting his complaints about the alleged under-representation of women and Hispanics on Wilson County grand juries.[211]

>    b.   AEDPA Analysis

>    (1)   The Numbers

In pertinent part, the data relied upon by petitioner in support of his eighth claim for federal habeas relief herein establishes that (1) as of the 1980 census, approximately 34 percent of the adult population of Wilson County were Hispanic, (2) 44.7 percent of the persons who served as grand jury commissioners during the time period 1975-92 were Hispanic, (3) 32.7 percent of persons who were called to serve on Wilson County grand juries from 1973-92 were Hispanic, and (4) 30.8 percent of the persons who actually served as Wilson County grand jurors from 1973-92 were Hispanic.[212]

---

admitted into evidence during the May 18, 1984 evidentiary hearing. The underlying sources of the data relating to Wilson County grand jury service from 1984-92 used to created these statistical tables apparently were never presented to the state habeas court in the course of petitioner's state habeas corpus proceeding. However, respondent has not objected to petitioner's reliance on the data in question. In fact, respondent relies on the same statistical tables in support of his contention that petitioner failed to establish a prima facie case of discrimination. See Respondent's Motion for Summary Judgment, at pp. 120-21.

[211] See State Habeas Transcript, Volume II, at p. 621.

[212] See Petitioner's Amended Petition, at pp. 289-91.

The same data establishes that (1) as of the 1980 census, approximately 51 percent of the adult population of Wilson County were female, (2) 41 percent of the persons who served as grand jury commissioners in Wilson County during the time period 1975-92 were women, (3) 36 percent of persons who were called to serve on Wilson County grand juries from 1973-92 were women, and (4) 38.3 percent of the persons who actually served as Wilson County grand jurors from 1973-92 were women.[213]

Petitioner's data establishes that (1) as of the 1980 census, approximately 17.3 percent of the adult population of Wilson County were Hispanic females, (2) 21.8 percent of the persons who served as grand jury commissioners during the time period 1975-92 were Hispanic females, (3) 10.7 percent of persons who were called to serve on Wilson County grand juries from 1973-92 were Hispanic women, and (4) 10.8 percent of the persons who actually served as Wilson County grand jurors from 1973-92 were Hispanic women.[214]

Finally, this Court's independent review of the record now before it reveals that three of the twelve grand jurors who served on the grand jury that indicted petitioner were Hispanic, at least five were women, and at least one of the women had an Hispanic surname.[215]

---

[213] **Id.**

[214] **Id.**

[215] Wilson County District Clerk Jody Gregory testified at the pretrial hearing held May 18, 1984 that four of the twenty members of the grand jury panels selected in the Fall of 1983 were Hispanic and that three of these persons were actually selected to serve on

(2)   Equal Protection Claim

(a)   The Legal Standard

As explained above, in order to establish a prima facie case of discrimination in the selection of grand jurors, the petitioner must (1) establish the excluded group is a recognizable, distinct class, singled out for different treatment under state law, as written, or as applied; (2) establish that the degree of under-representation was substantial; and (3) show the selection procedure was susceptible of abuse or was not racially neutral.[216]

(b)   No Proof of Anti-Hispanic Discrimination

Petitioner has failed to satisfy any of these three criteria with regard to the treatment of Hispanics in the selection of

---

the grand jury that indicted petitioner. See S.F. Trial, Volume 1, testimony of Jody Gregory, at p. 117. During the June 28, 1984 pretrial hearing addressing petitioner's motion to quash based on his allegations of misconduct during the grand jury deliberations, eleven of the twelve grand jurors who served on the grand jury that indicted petitioner testified. See S.F. Trial, Volume 2, at pp. 593-656. Of those persons, five were female and two had Hispanic surnames, including one woman. **Id.**

While District Clerk Gregory's testimony suggests that the final grand juror was Hispanic, it is unclear from the records now before this Court whether the twelfth grand juror was male or female. The record now before this Court does not include any of the documentary exhibits admitted into evidence during the May 18, 1984 evidentiary hearing on petitioner's motion to quash, i.e., the excerpts from the 1980 census tables admitted into evidence during that hearing or any of the Wilson County grand jury records admitted into evidence during that hearing as exhibits 4A through 4Y. The Clerk of this Court retained copies of most of the documents relating to petitioner's trial, direct appeal, and first state habeas corpus proceeding that were submitted to this Court in connection with petitioner's first federal habeas corpus proceeding. However, the exhibits from the pretrial hearing referenced above were not included among those records.

[216] See **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005; **Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280.

Wilson County grand jurors.  Petitioner offered the state courts no evidence whatsoever indicating any historical discrimination against Hispanics has ever taken place in Wilson County with regard to the selection of grand jurors.  Petitioner's own data establishes that Hispanics were <u>over</u>-represented among the grand jury commissioners who selected the groups of twenty potential grand jurors called semi-annually in Wilson County during the period 1973-92.  Moreover, petitioner's own data establishes that the percentage of Hispanics in Wilson County as of the 1980 census matched almost perfectly the proportion of Hispanic potential grand jurors called to serve in Wilson County during the same time period.  Other than reliance on Hispanic surnames, petitioner had identified no aspect of the selection process in Wilson County susceptible to abuse or discriminatory animus.  In short, petitioner presented the state courts with no evidence that Wilson County's grand jury commissioners operated in the manner of those in all-white grand jury commissions in other Texas counties that the Supreme Court repeatedly chastised for either excluding all blacks from their grand jury panels or failing to include more than token black representation on their grand jury panels.

Given (1) the demonstrated over-representation of Hispanics among Wilson County grand jury commissioners during the time period in question, (2) the fact that half the grand jury commissioners who selected the grand jury panel from which petitioner's grand jury was drawn were Hispanic, and (3) the fact that the percentage of Hispanic grand jurors in Wilson County almost exactly matched

125

the percentage of Hispanics among the county's adult population, the state habeas court's rejection on the merits of this aspect of petitioner's equal protection claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

(c)   Under-Representation of Women

Petitioner did identify a statistically significant under-representation of women in Wilson County of roughly 15 percent for grand jury panels and 13 percent for actual grand juries. However, petitioner did not offer any other evidence of historical discrimination against women in grand or petit jury service in Wilson County similar to the Louisiana scheme automatically exempting women that the Supreme Court struck down in **Taylor v. Louisiana**. In addition, according to petitioner's own data, women made up more than 40 percent of Wilson County grand jury commissioners during the time period in question and more than 38 percent of the actual grand jurors who served in that county. The only other evidence regarding the selection of grand jurors presented to the petitioner's state habeas court consisted of the testimony of (1) the supervising state district judge that he routinely directed grand jury commissioners to attempt to achieve roughly a fifty/fifty split between men and women on grand jury panels and (2) the grand jury commissioners who selected the grand

126

jury panel from which petitioner's grand jury was selected, half of whom were female, all of whom denied any intention to discriminate against women when selecting potential grand jurors.  In short, petitioner failed to show that, in terms of the selection of grand jurors, women had been singled out for different treatment in Wilson County.

Moreover, petitioner undercuts his claim of gender-based discrimination by emphasizing that the grand jury selection process tends to exclude persons over the age of sixty-five and persons who are responsible for the care of children under the age of ten because such persons are eligible for  exemptions from jury service available under state law.   Petitioner argues there are disproportionate shares of both these groups in Wilson County. While that may be the case, petitioner failed to present the state courts with any evidence showing that Wilson County or the State of Texas adopted or maintained the exemptions in question, both of which are gender-neutral on their faces, for the purpose of reducing the number or percentage of women serving on grand or petit juries.

Unlike the scheme in Louisiana for excluding women from jury service struck down by the Supreme Court in **Taylor v. Louisiana**, none of the gender-neutral exemptions from jury service identified by petitioner as impacting disproportionately upon women in Wilson County are self-executing.  On the contrary, for any person, male or female, to be exempted from grand jury service because of their advanced age or responsibility for the care of young children, that

127

person must choose to exercise that exemption. While some of the grand jury commissioners who selected the grand jury panel from which petitioner's grand jury was drawn indicated they considered age as a factor in their selections, not all did so. None of them indicated any intention to artificially keep the number of women on the grand jury panel below the "fifty/fifty" split urged by their supervising judge. Likewise, while all the grand jury commissioners who were questioned about the subject admitted they deliberately excluded persons who had young children, none of them admitted that gender played any role in their selection of potential grand jurors or that they treated men and women who had responsibility for the care of young children differently when it came to selecting potential grand jurors.

While there is a difference of 13 percent between the percentage of women in Wilson County's adult population and the percentage of women who served as grand jurors in that county during the 20-year period identified by petitioner, the fact remains that five of the twelve persons who actually served on the grand jury that indicted petitioner were female.[217] Given the gender-neutral factors that most likely explain the difference in female participation on Wilson County grand juries over the time period in question and the absence of any evidence of historical patterns of discrimination against women in Wilson County, the state habeas court's rejection on the merits of petitioner's equal

---

[217] See S.F. Trial, Volume 2, at pp. 605-17, 633-41, & 650-56.

protection claim with regard to women was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

(d)   <u>Hispanic Women</u>

Petitioner did not present his state trial or habeas courts with any evidence showing that a pattern of historical discrimination against Hispanic women has ever existed in Wilson County.   It appears true that while Hispanic women made up 17.3 percent of the adult population in Wilson County in 1980, they made up only 10.8 percent of grand jurors who served in that county during an approximately twenty-year-period with petitioner's indictment as its mid-point.   However, petitioner offered the state courts no evidence of any intentional discrimination against Hispanic women in grand jury selection in Wilson County.   On the contrary, petitioner's own data indicates that Hispanic women were <u>over</u>-represented among Wilson County grand jury commissioners (21.8 %) during the time period in question.   Thus, any difference between the percentage of Hispanic women included in Wilson County grand jury panels and the percentage of that county's Hispanic women in the adult population generally does not appear to have resulted from the exclusion of Hispanic women from the role of grand jury commissioner.   Moreover, petitioner's data shows that Hispanics comprised a disproportionately large share of the

children in Wilson County as of 1980.[218]   The gender-neutral exclusion of persons responsible for the care of young children might have disproportionately impacted Hispanic families in 1980, but petitioner offered no evidence showing that disproportionate impact continued beyond that date.

Given the foregoing, the state habeas court's rejection on the merits of petitioner's complaints about alleged discrimination against Hispanic women in Wilson County grand jury selection was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

(3)   Fair Cross-Section Claim

The fundamental problem with applying the Sixth Amendment's requirement that petit juries be drawn from jury venires or panels that represent a fair cross-section of the community is that the

---

[218] The exemption from jury service applicable to persons responsible for the care of young children might have had a disproportionate impact upon Hispanic families as of the date of the 1980 census but petitioner failed to offer any evidence to his state habeas court showing that this statistical fact remained a constant before or after the date of that census.
None of the children of Wilson County who were under the age of ten at the time of the 1980 census were still under the age of ten by the time of the 1990 census.  In short, petitioner failed to show that the allegedly disproportionate impact on Hispanic families in Wilson County in 1980 of the exemption for persons responsible for the care of young children still had the same impact on Hispanic families in that county a decade later.  Transitory statistical quirks can hardly form the basis for a finding of intentional discrimination.

Supreme Court has never applied this constitutional requirement to the selection process for state <u>grand</u> juries.  On the contrary, as explained above, the Supreme Court has taken great care in recent years to limit the application of the fair-cross-section requirement.[219]  Thus, insofar as petitioner argued before his state habeas court that the under-representation of women and Hispanic women on Wilson County <u>grand</u> juries violated the fair cross-section requirement, that argument is foreclosed by the non-retroactivity doctrine of **Teague v. Lane**.  Neither of the two exceptions to that doctrine recognized by the Supreme Court to date have any application to petitioner's complaints about relatively minor discrepancies between the number of women and Hispanic women in Wilson County's adult population and the numbers of women and Hispanic women who served as grand jurors in that county before and after petitioner's indictment.

Moreover, for the reasons discussed above in Section III.G.3.b.(2) above (1) petitioner presented his state habeas court with no evidence showing any discrimination against Hispanics with regard to the selection of grand jury commissioners or grand jurors, (2) Hispanics were actually <u>over</u>-represented among Wilson County grand jury commissioners and almost proportionately represented among those chosen for Wilson County grand jury panels during the years identified by petitioner, (3) Hispanic women were actually <u>over</u>-represented among Wilson County grand jury

---

[219] <u>See</u> note 197, **supra**.

commissioners during the time period covered by petitioner's data, and (4) there was no evidence of any discriminatory intention with regard to the relatively minor differences between the percentages of women and Hispanic women in the county population and the percentages of grand jury panels and actual grand jurors who were either women or Hispanic women.

Accordingly, the rejection on the merits of petitioner's Sixth Amendment "fair cross-section" claim with regard to the Wilson County grand jury selection process was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

    4.   <u>De Novo Review</u>

        a.   <u>Equal Protection Claim</u>

Petitioner has failed to allege sufficient specific facts to establish a prima facie case under the well-settled standard for equal protection claims regarding grand jury selection. To reiterate, petitioner's burden is to establish that (1) the excluded group is a recognizable, distinct class, singled out for different treatment under state law, as written, or as applied; (2) the degree of under-representation was <u>substantial</u>; and (3) the

selection procedure was susceptible of abuse or was not racially neutral.[220]

As explained above, both Hispanics generally and Hispanic women in particular were over-represented (in terms of their percentage of the county's adult population) among Wilson County grand jury commissioners during the twenty-year-period leading up to and following petitioner's indictment. The percentage of Hispanics who actually served as grand jurors during that period (30.8%) was less than two percentage points below the percentage of Hispanics among the county's adult population in 1980 (33.7%). There was even less difference between the percentage of Hispanics among the county's adult population in 1980 and the percentage of Hispanics included on grand jury panels during the time period identified by petitioner (32.7%).

Petitioner offers no fact-specific allegations other than relatively small statistical disparities (51.1% & 38.3% for women generally and 17.3% & 10.8% for Hispanic women) in support of his complaints that women and Hispanic women were under-represented on Wilson County grand juries. However, no less than five of the twelve grand jurors who voted to indict petitioner were female and

---

[220] See **Rose v. Mitchell**, 443 U.S. at 565, 99 S.Ct. at 3005; **Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280; **Rideau v. Whitley**, 237 F.3d 472, 485 (5th Cir. 2000), **cert. denied sub nom. Cain v. Rideau**, 533 U.S. 924 (2001); **James v. Whitley**, 39 F.3d 607, 609 (5th Cir. 1994), **cert. denied**, 514 U.S. 1069 (1995); **Johnson v. Puckett**, 929 F.2d 1067, 1071-72 (5th Cir. 1991), **cert. denied**, 502 U.S. 898 (1991); **Guice v. Fortenberyy**, 661 F.2d 496, 499 (5th Cir. 1981).

one of them had an Hispanic surname.[221]  Petitioner has alleged no
facts showing that any pattern of historical discrimination against
either women in general or Hispanic women in particular has ever
occurred in Wilson County.  Unlike Louisiana, Tennessee, and other
jurisdictions that once excluded women from grand jury service
through statutes or <u>automatic</u> exemptions, Texas law provides only
gender-neutral exemptions for persons of advanced age or for those
responsible for the care of small children.  While women in general
were under-represented among Wilson County grand jury commissioners
over the approximately twenty year period identified by petitioner,
half of the four grand jury commissioners who selected the grand
jury panel from which petitioner's grand jury was selected were
female, as were five of the final twelve grand jurors who indicted
petitioner.

The Supreme Court has never mandated precise ethnic or gender
proportionality of representation in grand juries or grand jury
panels.[222]  Substantial percentages of women served as petitioner's
grand jury commissioners (2/4 or 50%) and as petitioner's actual
grand jurors (5/12 or 41%).  A substantial percentage of the grand

---

[221] More specifically, five women served on the twelve-person
grand jury that indicted petitioner, i.e., Ann Cooper, Mary Jane
Donaho, Betsy Herry, Dorothy Eschenburg, and Norma Ramirez.  <u>See</u>
S.F. trial, Volume 2, at pp. 605-17, 633-41, & 650-56.

[222] <u>See</u> **Rideau v. Whitley**, 237 F.3d at 487 ("The Supreme Court
has stressed that it has never announced mathematical standards for
the demonstration of 'systematic exclusion of blacks but has,
rather, emphasized that a factual inquiry is necessary in each case
that takes into account all possible explanatory factors.'")
<u>quoting</u> **Alexander v. Louisiana**, 405 U.S. at 630, 92 S.Ct. at 1225.

jury commissioners in Wilson County during the time period focused upon by petitioner were female (41%) and Hispanic women were actually over-represented on Wilson County grand jury commissions during that same period. Under such circumstances, petitioner's complaints that women in general only made up 38.3% of Wilson County grand jurors who served during the ten years before and the ten years after his indictment, unaccompanied by any fact-specific allegations of official discrimination against women in Wilson County, are insufficient to establish a prima facie case of discrimination against women in connection with the selection of the grand jury that returned his indictment. Therefore, insofar as petitioner complains about the alleged exclusion of women from his grand jury, petitioner's equal protection claim is without merit.[223]

> b.   Fair Cross-Section Claim

The Fifth Circuit has recognized that the individual criminal defendant's right to select a petit jury from a venire or panel representative of a fair cross-section of the community serves a different interest than the broader equal protection guarantee violated by the exclusion of an identifiable group from grand jury

---

[223] The reality is that, had petitioner's grand jury included one additional Hispanic female, the gender and ethnic composition of petitioner's grand jury would have been a nearly perfect reflection of the gender and ethnic composition of Wilson County. More specifically, the addition of one more Hispanic female to petitioner's grand jury would have resulted in that grand jury including four Hispanics (4/12 or 33.3% of the grand jury), two Hispanic women (2/12 or 16.7%) and six women (6/12 or 50%). In short, petitioner's actual grand jury was one Hispanic female short of being a nearly perfect reflection of the overall ethnic and gender breakdown of the adult population of Wilson County.

service.[224]   Nonetheless, despite the fact that the Supreme Court

has never applied the Sixth Amendment's fair cross-section

requirement to the selection of a state <u>grand</u> jury, the Fifth

Circuit has consistently done so for several decades.[225]   Therefore,

---

[224] <u>See</u> **Johnson v. Puckett**, 929 F.2d at 1071 ("The injury to
equal protection caused by racial discrimination in the selection
of members of a grand jury 'is not limited to the defendant - there
is injury to the jury system, to the law as an institution, to the
community at large, and to the processes of our courts.'") <u>quoting</u>
**Rose v. Mitchell**, 443 U.S. at 556, 99 S.Ct. at 3000, and **Ballard v.
United States**, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181
(1946).

[225] <u>See</u>, <u>e.g.</u>, **Murphy v. Johnson**, 205 F.3d 809, 818 (5th Cir.
2000), **cert. denied**, 531 U.S. 957 (2000) ("at the time Murphy's
conviction became final [October 11, 1994], our precedent dictated
that the fair cross-section requirement of the Sixth Amendment
applied to the selection process for grand juries."); **Atwell v.
Blackburn**, 800 F.2d 502, 504-05 (5th Cir. 1986), **cert. denied**, 480
U.S. 920 (1987); **Ciudadanos Unidos de San Juan v. Hidalgo County
Grand Jury Commissioners**, 622 F.2d 807, 825-26 (5th Cir. 1980),
**cert. denied**, 450 U.S. 964 (1981) ("the Constitution permits
neither tokenism nor strict proportionality but requires rather
that the grand jurors be chosen from a 'fair cross section' of
those eligible for grand jury service...."); **Curry v. Estelle**, 524
F.2d 981, 983 (5th Cir. 1975); and **Brooks v. Beto**, 366 F.2d 1, 11-
14 (5th Cir. 1966), **cert. denied**, 386 U.S. 975 (1967). <u>See</u> <u>also</u>
**Brooks v. Beto**, 366 F.2d at 11 ("[I]t is a constitutional
imperative that the jury, grand or petit, fairly represent the
community.").
   The Fifth Circuit's application of the Sixth Amendment's fair
cross-section requirement to the selection of grand jurors may have
resulted from the fact that many of the Supreme Court's equal
protection opinions striking down racially discriminatory selection
processes dealt with systems used to select both grand and petit
jurors.   Additionally, the Fifth Circuit's opinion in **Brooks v.
Beto**, which is the genesis of fair cross-section analysis via-a-vis
grand juries in this Circuit, cited a number equal protection
opinions issued by the Supreme Court, as well as several <u>dissenting</u>
opinions written by Supreme Court Justices in those cases.
   For instance, neither of the two Supreme Court opinions cited
by the Fifth Circuit in **Murphy v. Johnson** to support its
application of Sixth Amendment fair cross-section principles to
grand jury selection involved Sixth Amendment claims.   More
specifically, **Peters v. Kiff** stands only for the proposition that
the Fourteenth Amendment's due process clause gives a criminal

in the course of conducting a <u>de</u> <u>novo</u> review of petitioner's complaints regarding the method for selecting grand jurors in Wilson County, this Court is compelled to employ the same fair cross-section analysis applied by the Fifth Circuit to evaluate such claims.   More simply put, this Court must determine whether the petitioner has established the following prima facie case: first, that the group allegedly excluded from grand jury service in Wilson County was a "distinctive" group in that community; second, that representation of this group in grand jury panels was not fair and reasonable in relation to the number of such persons in that community; and third, that this under-representation was due to systematic exclusions of the group in the grand jury selection process.[226]

For the reasons discussed at length in Section III.G.4.a. above, petitioner has failed to establish a prima facie case of purposeful discrimination against Hispanics in general, against Hispanic women in particular, or against women in general. Petitioner's own data establishes that Hispanics, as a group, participated on Wilson County grand jury venires (32.7%) and actual

---

defendant standing to challenge the exclusion of an identifiable group of persons from grand jury service regardless of whether the defendant is a member of that same group.   **Smith v. Texas** was one of the many opinions issued by the Supreme Court striking down racially discriminatory grand jury selection on <u>equal</u> <u>protection</u> grounds.   Neither of those two Supreme Court opinions, or any of the opinions cited by the Fifth Circuit in **Brooks v. Beto** involved Supreme Court application of the Sixth Amendment's fair cross-section requirement to state grand jury selection.

[226] <u>See</u> **Atwell v. Blackburn**, 800 F.2d at 505, <u>citing</u> **Duren v. Missouri**, 439 U.S. at 364, 99 S.Ct. at 668.

grand juries (30.8%) during the period from 1973-92 in almost
precisely the same percentage as Hispanics appeared among that
county's adult population in 1980 (33.7%).  Furthermore, Hispanics
were significantly <u>over</u>-represented on grand jury commissions
during that same time period (47.4%).

Petitioner offered neither the state courts nor this Court any
fact-specific allegations, much less any evidence, showing that
Hispanic women, as opposed to Hispanics generally, have ever been
subject to treatment in Wilson County that would render them an
"identifiable group" for purposes of the Sixth Amendment's fair
cross-section requirement.  On the contrary, the testimony of the
Wilson County District Clerk at petitioner's May 18, 1984 pretrial
hearing furnishes evidence of the difficulty involved in relying
exclusively upon Hispanic surnames as an indicator of female
ethnicity.[227]  Petitioner has identified nothing about the selection
process for Wilson County grand jury venires that would facilitate

---

[227] Wilson County District Clerk Jody Gregory testified at that
pretrial hearing that she was personally aware of at least two
instances in which persons who appeared on Wilson County grand jury
lists with Anglo surnames were, in fact, Hispanic. <u>See</u> S.F. trial,
Volume 1, testimony of Jody Gregory, at pp. 133 & 136.  Petitioner
offered his state habeas court, and offers this Court, no fact-
specific allegations showing that any of the information available
to Wilson County grand jury commissioners at the time they select
potential grand jurors specifically identifies the ethnicity of the
persons available for selection as potential grand jurors.   In
short, unlike some of the systems struck down by the Supreme Court,
which readily identified persons as either black or white,
petitioner has not alleged that Wilson County grand jury
commissioners had any means of identifying Hispanics or Hispanic
females on county voter registration lists, tax rolls, or in phone
books other than by relying on surnames, an extremely inexact
factor in a state as ethnically diverse as Texas.

a systemic exclusion of female Hispanics other than reliance on Hispanic surnames as an indicator of ethnicity. It is significant that both Hispanics generally and Hispanic women in particular were over-represented on Wilson County grand jury commissions during the time period framing petitioner's indictment.[228]

Moreover, petitioner argues persuasively that the reason why women in general and Hispanic women in particular did not appear on Wilson County grand jury venires as often as their percentages of that county's adult population had more to do with the exemptions from jury duty for persons over the age of 65 and persons responsible for the care of young children provided by state law (and the fact that women are over-represented among those two groups in Wilson County) than to any systemic attempt to exclude women or Hispanic women from grand jury service.[229] The Supreme

_____

[228] This fact distinguishes the situation in Wilson County from the all-white Dallas County grand jury commissions that claimed their failure to identify and select blacks for service on grand juries was due to the fact they did not personally know many blacks. See **Cassell v. Texas**, 339 U.S. at 290, 70 S.Ct. at 633 (recognizing as illegitimate claims by Dallas County grand jury commissioners that they chose only persons whom they knew and that they knew no "eligible Negroes in an area where Negroes made up so large a proportion of the population").

[229] See Petitioner's Amended Petition, at pp. 299-301. While petitioner argues that Wilson County grand jury commissioners presumptively exclude women over age sixty-five or women responsible for the care of small children, the testimony of the four Wilson County grand jury commissioners who selected the grand jury panel from which petitioner's grand jury was selected belie any contention that there was any consideration of gender made by those four persons when they were selecting potential grand jurors. On the contrary, all four grand jury commissioners acknowledged that they did exclude persons on the basis of age or because of the presence of small children in the household but none indicated that they applied either of those criteria in a different manner when

Court took great pains in **Taylor v. Louisiana** to emphasize that the States remain free to adopt non-discriminatory exemptions from jury service for persons with special hardships or engaged in particular, critical, occupations.[230]   Petitioner alleges no specific facts showing that either of the two exemptions which petitioner argues disproportionately impacted women in Wilson County were adopted or maintained because of their potentially disproportionate impact on women.   The non-automatic exemptions from jury service for persons over age 65 or responsible for the care of small children identified by petitioner are both gender-neutral and ethnicity-neutral on their faces and appear to be precisely the sort of general rules the Supreme Court had in mind when it acknowledged the long-standing validity of "reasonable exemptions" from jury service.[231]

---

considering men or women as potential grand jurors. See S.F. Trial, Volume 1, testimony of Esmeralda Sanchez, at pp. 168-83; testimony of Balde Trevino, at pp. 183-96; testimony of Rosemary Canada, at pp. 196-216; and testimony of Jim Adams, at pp. 216-24.   A fair reading of those four persons' testimony reveals that their primary concerns in selecting potential grand jurors in the Fall of 1983 were in maintaining the proper geographic balance and proportion of potential grand jurors between the various communities across Wilson County and in ensuring that no one occupation predominated. **Id.**

[230] See **Taylor v. Louisiana**, 419 U.S. at 524 & 538, 95 S.Ct. at 700-01.

[231] See **Duren v. Missouri**, 439 U.S. at 370, 99 S.Ct. at 671 ("a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so.  An exemption appropriately tailored to this interest would, we think, survive a fair-cross-section challenge.").

The only evidence now before this Court regarding the actual thought processes of the grand jury commissioners who selected petitioner's grand jury venire belies any contention that there was any attempt to exclude women in general or Hispanic women in particular from grand jury service.[232] Furthermore, given that at least five of the twelve grand jurors who indicted petitioner were female, any attempt to systematically exclude women failed in the

---

[232] In addition to the testimony of the four grand jury commissioners, all of whom denied rejecting any person on the basis of gender, was the testimony of the supervising state district judge that he had instructed the commissioners in the following manner:

> Then I go over with them the mix that I think they should have.  One of the mix is your geographic, the 20 people that they pick should be from across the county. not from one particular area.  I talk about an occupation mix, normally.  I tell then that it's not wise to pick 20 farmers, or 20 auto mechanics, to spread the occupation around.  I tell them that we need an average spread from 18 to 65, don't pick all 65 or all 18.  I talk about this sex spread, not that I - - I assume that most counties have about half female and about half male.  They should take this into account.
>
> And then I go into the racial mix, and I give them the actual percentages of Hispanic, Black and others from the 1980 census, and try to stress that the people that they pick for that 20 should match as close as we can the mix of this county, and then I, at the end, I normally give them probably the tax rolls, the voter registration, phone books, anything with names in them, and I tell them that this is just to give them the correct names and addresses because it's important that we have the addresses, and that is to save time to look them up, and somewhere down the line I also emphasize, normally when I am giving the qualifications of the people that they are to choose, I tell them they don't have to be taxpayers, they don't have to be registered voters, they don't have to be anything, only the qualifications as listed in this Code of Criminal Procedure, and that is in general.

S.F. Trial, Volume 1, testimony of Robert Lee Eschenburg, at pp. 239-40.

case of petitioner's grand jury.[233]  Reasonable exemptions, such as those based on special hardship, incapacity, or community needs, are unlikely to pose a substantial threat that the remaining pool of jurors will not be representative of the community.[234]  Neither of the exemptions identified by petitioner (both of which are gender-neutral and racially-neutral on their faces) resulted in the percentages of women or Hispanic women serving on Wilson County grand juries being reduced substantially below those groups' percentages of that county's adult population.  Furthermore, petitioner failed to allege any specific facts showing that the reductions in percentages below county-wide adult population percentages of women (51.1% to 36%) or Hispanic women (17.3% to 10.7%) among Wilson County grand jury panels reflected any systematic exclusion of either group from grand jury service.

Therefore, even under de novo review, petitioner is not entitled to federal habeas corpus relief on his fair-cross-section challenge to his Wilson County grand jury panel.

---

[233] The difference between the percentage of women in the adult population of Wilson County in 1980 (51.1%) and the percentage of women among Wilson County grand jury venire members from 1973-92 (36%) and among actual Wilson County grand jurors from 1973-92 (38.3%) pale in comparison to the differences in gender representation found to violate the fair cross-section requirement by the Supreme Court in Taylor (53% of the voting age population in that Parish were female yet only 12 of 1,800 persons called to serve on petit juries were female) and Duren (54% of voters were female yet only 15% of those on weekly venires were female).

[234] **Duren v. Missouri**, 439 U.S. at 370, 99 S.Ct. at 671; **Taylor v. Louisiana**, 419 U.S. at 534, 95 S.Ct. at 700.

H.   Atascosa County Petit Jury Venire Selection Process

   1.   The Claim

   In his ninth claim for federal habeas relief, petitioner argues that Hispanics are under-represented on Atascosa County petit jury venires in sufficiently substantial margins to violate both the Fourteenth Amendment's equal protection guarantee, as well as the Sixth Amendment's guarantee of a petit jury selected from a fair cross-section of the community.[235]

   2.   Clearly Established Federal Law

   The applicable federal constitutional standards for deciding both equal protection and fair cross-section claims are set forth in Section III.G.2. above.[236]

---

[235] See Petitioner's Amended Petition, at pp. 302-21.  It is telling that petitioner's discussion of this claim includes no citation to the location in the record where the state trial court addressed this claim.  That is because, as is explained below, petitioner never presented this claim to the state trial court.  As is also explained below, while petitioner did challenge his petit jury venire at a brief evidentiary hearing held November 5, 1984, that challenge did not include any allegation or evidence showing that Atascosa County had ever discriminated against Hispanics in the selection of petit jury venires.

   Petitioner did not present the state courts with his complaint about the alleged under-representation of Hispanics on Atascosa County petit jury venires until petitioner's filed his first state habeas corpus application.  For unknown reasons, however, petitioner offered the state habeas court no evidence supporting that complaint.  Thus, unlike petitioner's challenge to the Wilson County procedures for selecting grand jurors, which petitioner supported during a pretrial motion with census data and properly authenticated records from the Wilson County District Clerk's office, petitioner offered the state courts no similar evidence regarding the ethnic breakdown of Atascosa County's adult population or the ethnic composition of Atascosa County petit jury venires.

[236] See notes 185-200, **supra**, and accompanying text.

3.   <u>AEDPA Review</u>

    a.   <u>The State Court Proceedings</u>

While petitioner did file a pretrial motion challenging the array of potential jurors summoned for jury selection for trial on the merits,[237] nothing in that motion indicated that petitioner was asserting therein that any racial animus or racially discriminatory intention was at work in the process for selecting Atascosa County petit jury venires.[238]  On the contrary, the only evidence offered by petitioner's trial counsel in support of that motion when it was heard on November 5, 1984 was the testimony of an Atascosa County Deputy District Clerk regarding the manner in which requests for excuses from jury duty had been handled by the District Clerk's office.[239]  At the conclusion of that testimony, petitioner's trial

---

[237] <u>See</u> Trial Transcript, at pp. 252-54.

[238] Petitioner's motion challenging the jury venire argued that the array violated various provisions of the Texas Constitution, the Texas Code of Criminal Procedure, and the federal Constitution because students, women with children under ten years of age, persons who were unable to read or write, and persons who had not registered to vote were selectively excluded from jury service. More specifically, petitioner complained that the system of exemptions allowed under Texas law had been used or would be used to exclude persons in the foregoing categories from jury service in such a manner as to create a jury venire predisposed toward convicting petitioner.  Nothing in that motion suggested that any consideration of race or ethnicity was involved in the Atascosa County process for selecting potential petit jury venires.

[239] More specifically, an Atascosa County Deputy District Clerk testified that (1) the District Clerk's office generally required persons submitting requests for excuses from jury duty to return their jury summons with the excuse request form on the back properly notarized, (2) a number of persons who had been called for petitioner's jury venire had not appeared that morning at the start of voir dire and had not furnished the District Clerk's office with properly executed excuse request forms, (3) in some cases, persons

counsel requested that a writ of attachment be issued for most of
the persons who had been summoned for jury duty that morning but
who had been absent when their names were called by the District
Clerk.[240] The state trial court denied petitioner's motion for writ
of attachment as to the absent jurors and proceeded with voir dire
but did grant petitioner's motion requesting that the jurors be
redrawn.[241]

Despite having been afforded a week-long evidentiary hearing
in the course of petitioner's first state habeas corpus proceeding,
petitioner presented the state habeas court with no evidence
whatsoever supporting his challenge to the racial or ethnic
composition of his petit jury venire or otherwise addressing the

---

summoned for jury duty had called the District Clerk's office or
sent non-notarized letters to the District Clerk requesting to be
excused, (4) the District Clerk's office personnel did not excuse
any of these persons from jury duty, (5) several of the absent
jurors had been excused by the trial judge following the District
Clerk's office's receipt of a written or telephonic request to be
excused, and (6) no one in the District Clerk's office had done
anything with the purpose of influencing the outcome of the
petitioner's trial. See S.F. Trial, Volume IV, testimony of Linda
Trevino, at pp. 1147-64.

Ms. Trevino was asked no questions concerning any attempt by
any court personnel to distinguish between potential jurors on the
basis of ethnicity. In fact, other than a recitation of the names
of the persons who had been "no shows" for jury duty that morning
(which disclosed that many of the no shows had Hispanic surnames)
there was absolutely no evidence introduced during the hearing on
petitioner's motion to challenge the array relating to the
ethnicity of any members of the jury venire. In short, there was
no discussion regarding the racial or ethnic composition of the
petitioner's petit jury venire because those matters were
irrelevant to the petitioner's motion to challenge the array.

[240] See S.F. Trial, Volume 4, at pp. 1164-66.

[241] Id., at pp. 1166-68.

ethnic composition of jury venires in Atascosa County. Petitioner's pleadings in his first state habeas corpus proceeding did include a number of statistical tables purportedly setting forth the racial or ethnic characteristics of Atascosa County petit jury venires during the time period 1978-88, as well as 1990 census and voter registration data for Atascosa County.[242]  However, petitioner made no effort during his state habeas corpus proceeding to introduce into evidence any of the actual data underlying these tables.  In fact, petitioner never even requested that the state habeas court take judicial notice of the 1990 census figures for Atascosa County.  In short, there was no <u>evidence</u> before the state habeas court upon which that court could have evaluated petitioner's contention that Hispanics were under-represented among Atascosa County jury venires.

In the course of petitioner's first state habeas corpus proceeding, the state trial court found that petitioner had presented no evidence supporting his allegations of alleged racial or ethnic bias in Atascosa County's petit jury venire selection process.[243]

      b.   <u>AEDPA Analysis</u>

Petitioner presented no evidence to either his state trial court or state habeas court regarding either the ethnic composition

---

[242] <u>See</u> State Habeas Transcript, Volume 1, at pp. 52-53, 59, 61-62, & 64-66.  These tables are identical to the tables set forth in petitioner's pleadings herein. <u>See</u> Petitioner's Amended Petition, at pp. 305-06, 312, & 314-18.

[243] <u>See</u> State Habeas Transcript, Volume 2, at p. 622.

146

of Atascosa County's adult population or ethnic composition of petit jury venires in that county.   Accordingly, there was no evidentiary support for petitioner's complaint that Hispanics had been excluded from petit jury service in that county.   In short, petitioner failed to present the state courts with any <u>evidence</u> showing that Hispanics were under-represented on Atascosa County petit jury venires in relation to their percentage of the county's adult population.[244]

Under such circumstances, the state habeas court's rejection on the merits of petitioner's equal protection and fair cross-section challenges to the process for selecting jury venires in Atascosa County was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.[245]

---

[244] Petitioner has not identified any stipulation in the state court records by the parties as to the accuracy or admissibility of the statistical tables contained in petitioner's first state habeas corpus application which have been reproduced in petitioner's amended federal habeas corpus petition.   This Court's independent review of the voluminous state court records from petitioner's first and second state habeas corpus proceedings disclosed no such stipulation.

[245] <u>See</u> **Rose v. Mitchell**, 443 U.S. at 566-74, 99 S.Ct. at 3005-09 (holding that a petitioner bringing an equal protection challenge based on alleged discrimination in the selection of grand jury forepersons failed to establish a prima facie case where he presented neither documentary proof nor testimony from witnesses possessing personal knowledge regarding the racial characteristics of grand jury forepersons during the relevant time period).

4.   De Novo Review

    a.   The Constitutional Standards

To prevail on his equal protection and fair cross-section claims, ordinarily, a petitioner must allege and prove either (1) "substantial under-representation" of a group on the jury venire[246] or (2) that representation of the group in question on jury venires is "not fair and reasonable in relation to the number of such persons in the community."[247]

    b.   No Summary Judgment Evidence in the Record

In the face of respondent's motion for summary judgment, petitioner has presented this Court with no proper summary judgment evidence supporting his contention that Hispanics were under-represented on Atascosa County petit jury venires.   While

---

[246] See **Castaneda v. Partida**, 430 U.S. at 494, 97 S.Ct. at 1280 (holding that an equal protection claim requires a showing that the procedure employed resulted in substantial under-representation); **Rideau v. Whitley**, 237 F.3d at 485-87 (holding that a prima facie showing of an equal protection violation in the selection of a jury venire requires proof of (1) substantial under-representation on the venire from which the defendant's jury was drawn combined with a practice providing an opportunity for discrimination or (2) disparate representation of an identified group in comparison to the proportion of that group in the community over a period of time).

[247] See **Duren v. Missouri**, 439 U.S. at 364, 99 S.Ct. at 668 (holding that a fair cross-section claim requires a showing that representation of the identified group in venires is not fair and reasonable in relation to the number of such persons in the community); **United States v. Williams**, 264 F.3d 561, 568-69 (5th Cir. 2001) (holding that, absent evidence of the percentage of African-Americans in the community and in the composition of jury venires throughout the jurisdiction, there was no baseline for the comparison necessary to support a fair cross-section claim); **McGinnis v. Johnson**, 181 F.3d 686, 689 (5th Cir. 1999), **cert. denied**, 528 U.S. 1125 (2000).

petitioner's amended petition does contain a verification provision, the language of that paragraph does <u>not</u> satisfy the stricture of Section 1746 of Title 28 United States Code.[248] Likewise, nothing in petitioner's amended petition indicates that petitioner's federal habeas counsel possesses personal knowledge regarding any of these matters.  Likewise, petitioner's unsworn state habeas corpus pleadings do not constitute proper summary judgment evidence.[249]

The Fifth Circuit Court of Appeals has never allowed litigants to oppose summary judgments by the use of unsworn materials.[250]   Unsworn pleadings do <u>not</u> satisfy Rule 56(e)'s

---

[248] Petitioner's "verification" paragraph appears on page 325 of his amended petition and reads as follows: "I have read the foregoing Petition for Writ of Habeas Corpus, seeking federal habeas corpus relief pursuant to 28 U.S.C. §2254, I am familiar with its contents, and to the best of my knowledge and belief, the matters set forth therein are true and correct." Petitioner's Amended Petition, at p. 325.
In contrast to the foregoing language, Section 1746 of Title 28, United States Code, requires that a verified pleading be executed expressly under penalty of perjury.

[249] <u>See</u> **Diamond Offshore Company v. A&B Builders, Inc.**, 302 F.3d 531, 544 n.13 (5th Cir. 2002) (recognizing that state court pleadings are not proper summary judgment evidence).

[250] <u>See</u> **Watts v. Kroger Company**, 170 F.3d 505, 508 (5th Cir. 1999), (holding that a district court properly struck several handwritten, unsworn, not notarized statements that were not in form of affidavits); **King v. Dogan**, 31 F.3d 344, 346 (5th Cir. 1994) (refusing to permit a <u>pro se</u> litigant to rely upon an unverified pleading and unauthenticated documents to defeat the defendant's motion for summary judgment); **Barker v. Norman**, 651 F.2d 1107, 1123 (5th Cir. 1981); and **Gordon v. Watson**, 622 F.2d 120, 123 (5th Cir. 1980).

requirements for summary judgment proof.[251]  In order for <u>verified</u>

pleadings to constitute proper summary judgment proof, they must

conform to the requirements of affidavits, i.e, they must establish

the affiant's competency to testify to the matters in question, be

based upon personal knowledge, and contain a clear explication of

factual information that would be admissible at trial, not mere

unsupported conclusions.[252]   A  summary  assertion  made  in  an

---

[251] <u>See</u> **<u>Wallace v. Texas Tech University</u>**, 80 F.3d 1042, 1047
(5th Cir. 1996); **<u>Little v. Liquid Air Corp.</u>**, 37 F.3d 1069, 1075
(5th Cir. 1994); **<u>King v. Dogan</u>**, 31 F.3d at 346; **<u>Dorsett v. Board
of Trustees for State Colleges & Universities</u>**, 940 F.2d 121, 123
(5th Cir. 1991); and **<u>Gordon v. Watson</u>**, 622 F.2d at 123.  The filing
of an unverified amended complaint renders a verified original
complaint a nullity unless the amended complaint specifically
refers to and adopts or incorporates by reference the earlier
pleadings. **<u>King v. Dogan</u>**, 31 F.3d at 346; and **<u>Boelens v. Redman
Homes, Inc.</u>**, 759 F.2d 504, 508 (5th Cir. 1985).

[252] <u>See</u> **<u>Marshall v. East Carroll Parish Hospital</u>**, 134 F.3d 319,
324-25 (5th Cir. 1998) (holding that conclusory, unsupported
statements in an affidavit are insufficient to create a genuine
issue of material fact); **<u>Barhan v. Ry-Ron Inc.</u>**, 121 F.3d 198, 202
(5th Cir. 1997) (holding that hearsay in an affidavit does not
constitute proper summary judgment evidence); **<u>Clark v. America's
Favorite Chicken Co.</u>**, 110 F.3d 295, 297 (5th Cir. 1997) (holding
that unsupported allegations or affidavit or deposition testimony
setting forth ultimate or conclusory facts and conclusions of law
are insufficient to defeat a motion for summary judgment); **<u>King v.
Dogan</u>**, 31 F.3d at 346 (holding that a verified complaint can be
considered as summary judgment evidence only to the extent that it
comports with the requirements of Rule 56(e)); **<u>Salas v. Carpenter</u>**,
980 F.2d 299, 304-05 (5th Cir. 1992), and **<u>Cormier v. Pennzoil</u>**, 969
F.2d 1559, 1561 (5th Cir. 1992) (both holding that a court may not
consider hearsay contained in an affidavit when ruling on a summary
judgment motion); **<u>Orthopedic & Sports Injury Clinic v. Wang</u>**, 922
F.2d 220, 225 (5th Cir. 1991), (holding that unsupported affidavits
setting forth ultimate or conclusory facts and conclusions of law
are insufficient to either support or defeat a motion for summary
judgment).  If these requirements are met, verified pleadings can
be considered as summary judgment evidence. <u>See</u> **<u>RTC v. Starkey</u>**, 41
F.3d 1018, 1024 (5th Cir. 1995).  To constitute proper summary
judgment evidence, assertions in affidavits must be based upon the
affiant's own personal knowledge. <u>See</u> **<u>Askanase v. Fatjo</u>**, 130 F.3d

affidavit is simply not enough to raise a genuine issue of material fact.[253]   The Fifth Circuit has repeatedly rejected efforts to oppose summary judgment with improper documents.[254] Unauthenticated documents simply do not constitute proper summary judgment evidence.[255]

---

657, 672 (5th Cir. 1997).

[253] See **Marshall v. East Carroll Parish Hospital**, 134 F.3d at 324-25; **Melton v. Teachers Insurance & Annuity Association**, 114 F.3d 557, 559 (5th Cir. 1997); **Clark v. America's Favorite Chicken Co.**, 110 F.3d at 297; **Duffy v. Leading Edge Products, Inc.**, 44 F.3d 308, 312 (5th Cir. 1995).   The non-moving party must set forth specific facts to establish that there is a genuine issue for trial, but where the evidential submissions lack probative value as to a genuine issue, summary judgment is appropriate. See **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[254] See **King v. Dogan**, 31 F.3d at 346, (holding that unverified pleadings and unauthenticated documents did not constitute proper summary judgment evidence); **Johnston v. City of Houston**, 14 F.3d 1056, 1060 (5th Cir. 1994), (holding that unsworn pleadings do not constitute proper summary judgment evidence); **Salas v. Carpenter**, 980 F.2d at 305, (holding that only those portions of an expert witness's affidavit that provided admissible opinion evidence could be considered for summary judgment purposes); **Duplantis v. Shell Offshore, Inc.**, 948 F.2d 187, 192 (5th Cir. 1991), (holding that a nonmovant could not oppose a summary judgment motion with an unauthenticated letter); **Martin v. John W. Stone Oil Distributor, Inc.**, 819 F.2d 547, 549 (5th Cir. 1987), (holding that a district court may not consider either hearsay evidence in affidavits or unsworn documents in a summary judgment proceeding); **Messerole v. M/V Fina Belgique**, 736 F.2d 147, 149 (5th Cir. 1984), (holding that an unsworn letter is not proper summary judgment proof); and **Jones v. Menard**, 559 F.2d 1282, 1285 n.5 (5th Cir. 1977), (holding that a written report drafted by a person who is not properly qualified as an expert may not be considered as summary judgment evidence).

[255] See **King v. Dogan**, 31 F.3d at 346, (holding that unverified pleadings and unauthenticated documents did not constitute proper summary judgment evidence); and **Duplantis v. Shell Offshore, Inc.**, 948 F.2d at 192, (holding that a nonmovant could not oppose a summary judgment motion with an unauthenticated letter).

Nothing in petitioner's amended petition herein demonstrates that petitioner's federal habeas counsel possessed personal knowledge regarding the racial or ethnic composition of either Atascosa County's adult population or Atascosa County's petit jury venires during the relevant time frame. Petitioner had multiple opportunities during his two state habeas corpus proceedings to present the state courts with affidavits from knowledgeable Atascosa County officials, certified copies of public records, or other admissible evidence establishing the ethnic breakdown of Atascosa County's adult population and the ethnic characteristics of Atascosa County's petit jury venires during the time period that included petitioner's capital murder trial. Petitioner failed to do so. Despite having been granted liberal discovery during petitioner's first federal habeas corpus proceeding, petitioner's current counsel has furnished this Court with no <u>evidence</u> sufficient to oppose respondent's motion for summary judgment in this regard. As a result, there is no proper summary judgment evidence now before this Court establishing that Hispanics were, in fact, under-represented on Atascosa County petit jury venires during the time frame that included petitioner's trial. In fact, petitioner has offered this Court no proper summary judgment evidence showing that Hispanics were under-represented on his own November, 1984 petit jury venire.

    c.   <u>No Merits</u>

Furthermore, even if this Court were to assume the accuracy of the statistics contained in petitioner's pleadings herein,

petitioner has failed to establish a prima facie case for either an equal protection or fair cross-section claim because petitioner alleges no facts showing the racial or ethnic composition of the persons in Atascosa County who were eligible to serve as jurors at the time of petitioner's 1984 capital murder trial.[256]

Moreover, the record of jury selection at petitioner's trial on the merits belies any claim that any race-consciousness was involved therein. The petitioner's jury venire was selected using voter registration lists, a race-neutral and gender-neutral practice long sanctioned in this Circuit.[257] Furthermore, as

---

[256] This is significant because petitioner admits that Atascosa County underwent a dramatic 24% increase in total population during the time period that included petitioner's capital murder trial. See Petitioner's Amended Petition, at p. 305 n.157. Respondent argues, likewise without any citation to any evidence in the record now before this Court, that the 1980 census figures for Atascosa County showed that Hispanics comprised only 42.5% of the County's adult population at that time, as contrasted to petitioner's reliance on a 49% figure for the 1990 census. See Respondent's Motion for Summary Judgment, at pp. 127-28. Petitioner has not contested these figures. Under such circumstances, reliance upon 1990 census data as a benchmark of ethnicity within Atascosa County in 1984 appears dubious, at best.

The Fifth Circuit has made clear that, for purposes of equal protection analysis, the relevant "community" consists of those individuals who were eligible to serve as jurors in the jurisdiction in question. See **United States v. Williams**, 264 F.3d at 568 (holding the relevant community consisted of those individuals who were eligible to serve as jurors in the District); **United States v. Fike**, 82 F.3d 1315, 1321 (5th Cir. 1996) ("the pertinent inquiry is the pool of African-Americans in the district who are eligible to serve as jurors").

[257] See **Soria v. Johnson**, 207 F.3d 232, 249 (5th Cir. 2000), **cert. denied**, 530 U.S. 1286 (2000) (holding the fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore under-represented on jury panels presents no constitutional issue.); **United States v. Wesevich**, 666 F.2d 984, 991 (5th Cir. 1982) (approving the use of voter registration lists to select juries despite a 19.6%

respondent points out, even after the state trial court engaged in the process of granting numerous requests for excuses submitted by members of the jury venire,[258] 36.2% of the remaining members of the petitioner's jury venire had Hispanic surnames.[259]  That figure is extremely close to the 39.4% figure cited by petitioner as the Hispanic percentage of Atascosa County's registered voters in 1984.[260]

Finally, even assuming that the exercise of optional exemptions by persons who were responsible for the care of young children disproportionately impacted upon Hispanic members of the jury venires in Atascosa County, that exemption is both gender-neutral and race-neutral on its face and clearly within the scope of "reasonable" exemptions the Supreme Court has recognized.[261]

--------

difference between the Hispanic population in general and the percentage of registered voters in the District who were Hispanic).

[258] The non-discriminatory manner in which the state trial court addressed the requests by individual members of the jury venire to be excused is evidence from a review of those proceedings. See S.F. Trial, Volume 4, at pp. 1094-1119. Petitioner does not allege any facts showing that there was any discriminatory animus or disproportionate impact on any identifiable group resulting from the state trial court's granting of those requests for excuse in petitioner's case.

[259] See Respondent's Motion for Summary Judgment, at p. 131.

[260] See Petitioner's Amended Petition, at p. 314, Table 7.

[261] See **Duren v. Missouri**, 439 U.S. at 370, 99 S.Ct. at 671 ("a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so.  An exemption appropriately tailored to this interest would, we think, survive a fair-cross-section challenge.").

Under such circumstances, petitioner's complaints about the composition of his petit jury venire and the process for selecting petit jury venires in Atascosa County generally are insufficient to establish a prima facie case for either an equal protection or fair cross-section claim.

I.   Cumulative Error Claim

In his final ground for federal habeas corpus relief, petitioner argues that the cumulative impact of the alleged violations of his federal constitutional rights outlined in his amended petition independently warrants federal habeas corpus relief.[262]

For the reasons set forth at length above, the record now before this Court establishes that none of petitioner's complaints are sufficient to rise to the level of a violation of his federal constitutional rights.   Even when considered collectively or cumulatively, petitioner's complaints herein do not establish a violation of any of his federal constitutional rights.   The evidence of petitioner's guilt was, and remains, overwhelming. Despite having been afforded extremely liberal discovery in the course of his first federal habeas corpus proceeding, petitioner has presented this Court with no exculpatory or mitigating evidence that was either withheld by the prosecution or undiscovered because of the ineffective performance of his trial counsel.

---

[262] See Petitioner's Amended Petition, at pp. 322-23.

The cumulative error doctrine provides that only when the constitutional errors committed in the state court trial so infected the trial that they violated the trial's fundamental fairness is federal habeas relief warranted.[263]  Because none of the alleged errors about which petitioner complains herein rise to the level of a constitutional violation, there is nothing for this Court to cumulate.[264]  Furthermore, having reviewed the record from petitioner's trial, direct appeal and both state habeas corpus proceedings in detail, this Court finds nothing fundamentally unfair in any of those proceedings.  Petitioner's state court capital murder trial was not rendered fundamentally unfair by virtue of any of the matters about which petitioner complains in this Court.  Therefore, petitioner is not entitled to federal habeas corpus relief based on a cumulative error theory.

## IV. **Certificate of Appealability**

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of

---

[263] See **Jackson v. Johnson**, 194 F.3d 641, 655 n.59 (5th Cir. 1999), **cert. denied**, 529 U.S. 1027 (2000).

[264] See **Livingston v. Johnson**, 107 F.3d 297, 308 (5th Cir. 1997), **cert. denied**, 522 U.S. 991 (1997) (cumulative errors must be of a constitutional dimension); **Westley v. Johnson**, 83 F.3d 714, 726 (5th Cir. 1996), **cert. denied**, 519 U.S. 1094 (1997) (holding that an independent claim based on cumulative error exists only when (1) the individual errors involved matters of constitutional dimension; (2) the errors were not procedurally defaulted; and (3) the errors so infected the entire trial that the resulting conviction violates due process).

Appealability ("CoA").[265]   The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA.[266]   Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA.[267]   Under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted.[268]   In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone.[269]

---

[265] See **Hill v. Johnson**, 114 F.3d 78, 80 (5th Cir. 1997), (recognizing that the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); and **Muniz v. Johnson**, 114 F.3d 43, 45 (5th Cir. 1997), (holding that the standard for obtaining a CoA is the same as for a CPC).

[266] See **Robison v. Johnson**, 151 F.3d 256, 259 n.2 (5th Cir. 1998), **cert. denied**, 526 U.S. 1100 (1999); and **Hallmark v. Johnson**, 118 F.3d 1073, 1076 (5th Cir. 1997), **cert. denied sub nom. Monroe v. Johnson**, 523 U.S. 1041 (1998).

[267] See **Miller-El v. Johnson**, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); and 28 U.S.C §2253(c)(2).

[268] See **Crutcher v. Cockrell**, 301 F.3d 656, 658 n.10 (5th Cir. 2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); **Jones v. Cain**, 227 F.3d 228, 230 n.2 (5th Cir. 2000), (holding the same); and **Lackey v. Johnson**, 116 F.3d 149, 151 (5th Cir. 1997), (holding that the scope of appellate review of denial of habeas petition limited to issue on which CoA granted).

[269] See **Crutcher v. Cockrell**, 301 F.3d at 658 n.10; **Lackey v. Johnson**, 116 F.3d at 151; **Hill v. Johnson**, 114 F.3d at 80; **Muniz v. Johnson**, 114 F.3d at 45; **Murphy v. Johnson**, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right.[270]  To make such a showing, the petitioner need _not_ show that he will prevail on the merits but, rather, demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further.[271]  This Court is authorized to address the propriety of granting a CoA _sua sponte_.[272]

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim.  If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong.[273]  In a case in

---

[270] See **Miller-El v. Johnson**, 537 U.S. at 336, 123 S.Ct. at 1039; **Slack v. McDaniel**, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); and **Barefoot v. Estelle**, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

[271] See **Miller-El v. Johnson**, 537 U.S. at 336, 123 S.Ct. at 1039; **Slack v. McDaniel**, 529 U.S. at 484, 120 S.Ct. at 1604; and **Barefoot v. Estelle**, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4.

[272] **Alexander v. Johnson**, 211 F.3d 895, 898 (5th Cir. 2000).

[273] "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." **Miller-El v. Johnson**, 537 U.S. at 338, 123 S.Ct. at 1040, quoting **Slack v. McDaniel**, 529 U.S. at 484, 120 S.Ct. at 1604.

which the petitioner wishes to challenge on appeal this Court's
dismissal of a claim for a reason not of constitutional dimension,
such as procedural default, limitations, or lack of exhaustion, the
petitioner must show that jurists of reason would find it debatable
whether the petition states a valid claim of the denial of a
constitutional right and whether this Court was correct in its
procedural ruling.[274]

Viewed in proper context, there is no basis for disagreement
among jurists of reason with regard to this Court's disposition of
any of petitioner's claims herein, many of which are barred by the
non-retroactivity doctrine of **Teague v. Lane**.   Petitioner has
offered no testimony to any court suggesting that his confession
was anything other than the product of his voluntary, post-arrest,
decision to tell his version of the events leading up to his fatal
shooting of Deputy Childress.   Upon even cursory scrutiny,
disclosure of petitioner's purported **Brady** material would have had
no possible impact on the outcome of either phase of petitioner's
capital murder trial.   Petitioner's constructive denial of counsel
claim is squarely foreclosed by the Supreme Court's holding in **Bell
v. Cone**.   Petitioner did not request appointment of a confidential
mental health expert.   Petitioner's lead trial counsel was assisted

---

[274] **Slack v. McDaniel**, 529 U.S. at 484, 120 S.Ct. at 1604,
(holding that when a district court denies a habeas claim on
procedural grounds, without reaching the underlying constitutional
claim, a CoA may issue only when the petitioner shows that
reasonable jurists would find it debatable whether (1) the claim
is a valid assertion of the denial of a constitutional right and (2)
the district court's procedural ruling was correct).

occasionally by other attorneys.  Petitioner's complaints about the procedures for selecting his grand and petit juries ignore the reality that both his grand jury venire and his petit jury venire included substantial numbers of the very types of persons petitioner claims were "systematically excluded" from service on those bodies.  Petitioner alleged no specific facts, much less furnished any evidence, showing a pattern of racial or gender discrimination in grand or petit jury selection in either Wilson or Atascosa Counties.

This Court carefully reviewed all of petitioner's claims for relief herein under both the AEDPA's highly deferential standard of review, as well as a de novo standard of review.  Under such circumstances, petitioner is not entitled to a Certificate of Appealability.

Accordingly, it is hereby **ORDERED** that:

1.   All relief requested in petitioner's amended petition, filed May 12, 2000,[275] is **DENIED**.

2.   Petitioner is **DENIED** a Certificate of Appealability.

3.   All other pending motions are **DISMISSED** AS MOOT.

4.   The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

5.   The Clerk shall collect all state court records received in connection with petitioner's first federal habeas corpus proceeding herein, i.e., cause no. SA-95-CA-586, and assemble same

---

[275] See docket entry no. 9.

with the state court records received from respondent in this cause
and, in the event of an appeal, at the appropriate time, the Clerk
shall forward <u>all</u> such records to the Fifth Circuit.

**SIGNED and ENTERED this** _20th_ **day of May, 2004, at San
Antonio, Texas.**

_____
**XAVIER RODRIGUEZ**
**United States District Judge**

161